## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) | CYNTHIA LAKEY AND DOUGLAS LAKEY, as co-Special Administrators for the Estate of Jared Lakey, | |
| | Plaintiffs, | |
| v. | | Case No.: _____20-cv-152-RAW_____ |
| (2) | CITY OF WILSON, | |
| (3) | JOSHUA TAYLOR, in his official and individual capacities, | ATTORNEY LIEN CLAIMED |
| (4) | BRANDON DINGMAN, in his individual capacity, | JURY TRIAL DEMANDED |
| (5) | CHRIS BRYANT, in his official and individual capacity as Sheriff of Carter County, | |
| (6) | DAVID DUGGAN, in his individual capacity, | |
| (7) | FRANK SHAAF, in his individual and official capacities, | |
| | Defendants. | |

## COMPLAINT

Cynthia and Douglas Lakey (Estate), for their cause of action against the above-named Defendants, state as follows:

### I.

### PARTIES, JURISDICTION, VENUE

1.      Cynthia and Douglas Lakey are the court appointed co-Special Administrators for the Estate of Jared Lakey in Stephens County District Court Case No. PB-2019-134. They are the parents of Jared Lakey.

2.      The City of Wilson (City) is a municipal corporation subject to 11 O.S. § 9-101 *et seq*.

3.      City is located in Carter County, Oklahoma.

4.      City follows the aldermanic form of government.

5.      Josh Taylor (Taylor) is the current police chief for City.

6.      On July 4-5, 2019, Taylor was the acting police chief for City, or alternatively, was the police chief's authorized decisionmaker.

7.      The position of police chief, or the chief's authorized decisionmaker, is a final policymaker under City's form of government.

8.      Brandon Dingman (Dingman) was an employee of City on July 4-5, 2019.

9.      On July 4-5, 2019, City employed Dingman as a reserve peace officer subject to 70 O.S. § 3311.

10.     On July 4-5, 2019, Frank Schaff (Schaff) was City's elected mayor.

11.     On July 4-5, 2019, Schaff was Taylor's landlord.

12.     On July 4-5, the Carter County Sheriff's Office (CCSO) employed David Duggan (Duggan) as a deputy.

13.     Chris Bryant (Bryant) is the elected Sheriff of Carter County. He is sued in his official and individual capacities. As Sheriff for Carter County, Bryant is responsible for the adoption, promulgation, maintenance, and enforcement of CCSO policies and practices related to use of force and training CCSO deputies.

14.     On July 19, 2019, a preservation letter was served on City.

2

15.     On July 19, 2019, a preservation letter was served on CCSO.

16.     On August 30, 2019, a notice of tort claim was served on City.

17.     No response to the notice of tort claim was received and the claim was denied by operation of law.

18.     Estate has timely satisfied all prerequisites to filing suit.

19.     The events complained of occurred in Carter County, Oklahoma and some of the claims herein arise under federal law making jurisdiction and venue proper.

## II.

### STATEMENT OF FACTS

20.     Estate adopts and incorporates the preceding paragraphs as if fully set forth herein.

21.     Radio logs show that at 11:49 p.m. on July 4, 2019, "Johnna" called to report a male running down the street. (Ex. 1).

22.     "Johnna" did not report that the man was naked.

23.     Radio logs show that at 11:52 p.m., there was a call out to Taylor in response to the report from "Johnna."

24.     A report prepared by Taylor states that he was dispatched in response to a male screaming and yelling.

25.     Taylor's report does not include any facts suggesting he was dispatched in response to a naked man.

26.     Radio logs show that at 11:55 p.m. Taylor was "out with the subject."

3

27.     Upon information and belief, the "subject" was Jared Lakey.

28.     Taylor was wearing a City-issued body camera at the time.

29.     City policy required Taylor to activate his body camera before any police-citizen encounter. (Ex. 2)

30.     Upon information and belief, Taylor activated his body camera consistent with City policy.

31.     Upon information and belief, the police vehicle used by Taylor was also equipped with a dash camera.

32.     Upon information and belief, the dash camera would capture events occurring in front of the vehicle when activated.

33.     Upon information and belief, City policy required Taylor to activate the dash camera when he responded to the call from "Johnna."

34.     Upon information and belief, Taylor activated the dash camera consistent with City policy.

35.     A report prepared by Taylor detailed his narrative of events once Taylor engaged Jared. (Ex. 3).

36.     Taylor's narrative describing how the encounter began is not corroborated by any video known to exist, including from Taylor's body or dash camera.

37.     Taylor's narrative claimed Jared was naked with socks on before the encounter began.

38.     Taylor's narrative claimed Jared appeared agitated.

4

39.    Taylor's narrative claimed Jared went to the front of the patrol vehicle and pushed down on the pumper guard.

40.    Taylor's narrative claimed Jared was "aggressive" and said "Okay we are going to do this."

41.    Taylor's narrative claimed he unholstered his TASER and ordered Jared to the ground and put his hands behind his back.

42.    Taylor's narrative claimed Jared got on the ground and laid on his back and rolled over several times.

43.    Taylor's narrative claimed he called for Dingman and held Jared at "TASER point"

44.    Contrary to Taylor's narrative, radio logs show that Taylor reported a TASER deployment at 11:57 p.m.

45.    Taylor's narrative, that he merely held Jared at "TASER point," is contradicted by the radio logs and Duggan's report. (Ex. 4)

46.    Estate specifically disputes that Jared was naked when the encounter began, and that he behaved as described in Paragraphs 38-40 above. *Cf.*, *Pauly v. White*, 814 F.3d 1060, 1079 (10th Cir. 2016) (*vacated on other grounds*) ("[S]ince the victim of deadly force is unable to testify, courts should be cautious on summary judgment to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story-the person shot dead-is unable to testify.") (citations omitted).

47.     Taylor's narrative report does not include any statement or suggestion that Taylor, or anyone else, ever communicated to Jared that he was under arrest.

48.     When Taylor reported the first TASER deployment, Jared was not attempting to flee.

49.     When Taylor reported the first TASER deployment, Jared was not resisting arrest or physically interfering with an arrest.

50.     When Taylor reported the first TASER deployment, Jared was not suspected of committing any violent crime.

51.     When Taylor reported the first TASER deployment, Jared was not suspected of committing any felony crime.

52.     When Taylor reported the first TASER deployment, Jared was not engaged in any activity that warranted use of a TASER.

53.     It is excessive to use a TASER in dart mode under the facts described in Taylor's narrative prior to the first reported deployment.

54.     Use of a TASER under the circumstances described in Taylor's narrative prior to Dingman's arrival would not be proportional to the circumstances confronting Taylor.

55.     Upon information and belief, City expected Taylor to use the TASER as part of his job duties.

56.     At 11:59 p.m., radio logs show that Dingman arrived on the scene and deployed his TASER.

6

57.     Upon information and belief, City expected Dingman to use the TASER as part of his job duties.

58.     A report prepared by Dingman detailed his narrative of events after he arrived on scene. (Ex. 5).

59.     Dingman's narrative claimed that Taylor was holding Jared at TASER point when he arrived.

60.     Dingman's narrative that Taylor was merely holding Jared at TASER point is contradicted by the radio logs and Duggan's report.

61.     Dingman's narrative claimed that he approached Lakey "to place him into cuffs"

62.     Dingman's narrative claimed as soon as he pulled cuffs and "contacted Lakey he pushed up off the ground to avoid being placed into cuffs."

63.     Dingman's narrative claimed the two officers continued using their TASERs "to attempt to keep [Jared] from getting up and giving him the opportunity to come at Cpt. Taylor of myself."

64.     Dingman's justification for continuing to use the TASER is not tethered to any effort by Jared to actually get up or "come at Cpt. Taylor or myself."

65.     Use of a TASER under the circumstances described in the Paragraph 63 would be excessive.

66.     Use of a TASER under the circumstances described in Paragraph 63 would not be proportional to the circumstances confronting Taylor or Dingman.

67.   Dingman's narrative claimed both officers continued to give Lakey commands to place his hands behind his back.

68.   Dingman's narrative, like Taylor's, never suggested that Jared was placed under arrest or told that he was under arrest.

69.   Lakey's physical size would make it difficult if not impossible for him to comply with commands to put his hands behind his back without assistance.

70.   Upon information and belief, Lakey did not disobey any commands.

71.   Upon information and belief, Lakey was effectively subdued at all times.

72.   Upon information and belief, Taylor and Dingman repeatedly deployed their TASERs on Lakey because he was unable to put his hands behind his back.

73.   Upon information and belief, the repeated use of the TASERs was not proportional to the circumstances confronting Taylor or Dingman.

74.   Repeatedly using a TASER in probe mode results in involuntary movement that is inconsistent with Dingman's narrative that Jared was acting with purpose.

75.   A reasonable officer trained on the use of a TASER in dart mode would understand and recognize the difference between involuntary or reactionary movement and purposeful action.

76.   Jared's activity, as reported in the narratives by Taylor and Dingman, is involuntary or reactionary movement and not purposeful action.

8

77.  Dingman's narrative claimed Taylor replaced his TASER cartridge so that he could continue his TASER deployments.

78.  Dingman's narrative claimed Lakey was "still being combative."

79.  Dingman's narrative used boilerplate language that does not describe any action by Lakey that would justify using any force at all, and Estate specifically disputes Dingman's contentions detailed in Paragraphs 61, 62, 78, and 91.

80.  Boilerplate language in a use of force narrative is a well-known and understood report-writing technique that officers use to mask an unlawful or unjustified use of force.

81.  Repeatedly using a TASER on Lakey based on boilerplate language that does not describe any conduct whatsoever is excessive.

82.  Repeatedly using a TASER on Lakey based on boilerplate language that does not describe any conduct whatsoever is not proportional to the circumstances confronting Taylor or Dingman.

83.  At 12:02 a.m. on July 5, 2019, radio logs show a call out to Officer Dunn, who worked for a different agency.

84.  Dingman's narrative claimed Taylor continued giving commands, presumably for Jared to put his hands behind his back, an act Jared was incapable of performing without assistance.

85.  Dingman's narrative claimed that along with Taylor, the two decided to keep Lakey on the ground till more units could arrive "for officer safety."

9

86.    Dingman's narrative claimed, "In the state of mind Lakey was in he was not going to comply with our commands and wanted to fight Captain Taylor and I."

87.    Dingman's narrative that Jared "wanted to fight" is not supported by or consistent with Jared's actions.

88.    At 12:04 a.m., radio logs document a TASER deployment by Taylor and a call out to CCSO deputy Duggan.

89.    Dingman's narrative claimed both Taylor and Dingman gave "several" commands for Lakey to place his hands behind his back.

90.    Dingman's narrative claimed Lakey continued "not to comply with any commands."

91.    Dingman's narrative claimed Lakey then attempted to get up again.

92.    Dingman's narrative claimed that he deployed a TASER at Jared in response.

93.    Video from Taylor's body camera is available only after both Dingman and Taylor had already deployed their TASERs.

94.    Consequently, there is no known video of what occurred between Jared, Taylor, and Dingman that preceded use of the TASERs.

95.    Upon information and belief, video was available at the time, but was later destroyed to deprive Estate and investigators of the footage.

96.    The lack of any video to document Taylor and Dingman's justification for use of the TASER is a violation of City policy for use of body and dash cameras.

97.     By July 4-5, 2019, City knew that lack of video creates an opportunity for officers to falsify the justification for using force.

98.     Between 12:04 a.m. and 12:09 a.m., Taylor and Dingman repeatedly deployed their TASERs at Jared.

99.     Repeatedly using a TASER simultaneously and in dart mode against Jared was excessive.

100.    Repeatedly using a TASER simultaneously and in dart mode against Jared was not proportional to the circumstances confronting Taylor and Dingman.

101.    Taylor and Dingman deployed their TASERs exclusively in dart mode.

102.    A TASER used in dart mode goes beyond mere pain compliance. (Ex. 6).

103.    A TASER used in dart mode is intended to incapacitate a person by overriding their central nervous system causing neuro-muscular incapacitation (NMI).

104.    Where probe spread is too far to achieve NMI, TASER training requires deployment of a second cartridge to achieve greater probe spread, or a 3-point technique using the weapon in drive-stun mode.

105.    TASER does not train law enforcement to achieve NMI through simultaneous or cumulative exposure.

106.    During exposure to the weapon, TASER trains to "cuff under power."

107.   The need for multiple TASER cycles or extended/prolonged TASER exposures can be avoided by "cuffing under power" during the "window of opportunity" that the 5-second TASER cycle provides.

108.   Taylor and Dingman repeatedly and simultaneously used the TASER on Jared without attempting to cuff Jared "under power."

109.   The City use of force policy does not require officers to make an effort to "cuff under power." (Ex. 7)

110.   By not requiring officers to make an effort to "cuff under power," the City use of force policy permits officers to the use the TASER in a manner that substantially increases the risk of death of serious bodily injury that is not proportional to the risk confronting the officer.

111.   The manner in which Taylor and Dingman deployed the TASER constitutes "simultaneous" exposure as defined by the available training material published as of July 4-5, 2019 by Axon, f/n/a TASER, Intl.

112.   The manner in which Taylor and Dingman deployed the TASER constitutes "cumulative" exposure as defined by the available training material published as of July 4-5, 2019 by Axon, f/n/a TASER, Intl.

113.   The manner in which Taylor and Dingman deployed the TASER risked causing cardiac capture as defined by the available training material provided as of July 4-5, 2019 by Axon f/n/a TASER, Intl.

114.   The City use of force policy precluded Taylor and Dingman from using a TASER without first "successfully completing a CLEET approved course of instruction . . ."

115.   As of July 4-5, 2019, both Taylor and Dingman had actual knowledge of the risks associated with "cumulative" exposure.

116.   As of July 4-5, 2019, both Taylor and Dingman had actual knowledge of the risks associated with "simultaneous" exposure.

117.   As of July 4-5, 2019, both Taylor and Dingman had actual knowledge of the risks associated with "cardiac capture."

118.   Taylor and Dingman knew use of the TASER on Jared could result in death if the they used the TASER improperly or contrary to guidelines.

119.   The City use of force policy considered the TASER a Level 3 use of force on a scale of  1-6. Level 1 is officer presence; Level 2 includes verbal commands.

120.   City policy limits use of TASERs to circumstances where use is "necessary and justified to subdue a subject who is threatening violence, resisting arrest, or physically interfering with an arrest, or to prevent the possibility of injury to any person."

121.   Under the City use of force policy, a Level 3 use of force "includes control and restraint defensive tactics that have a minimal chance of causing serious physical injury."

122.   Under the City use of force policy, Level 4 and 5 encounters are considered "non-deadly." Level 6 is deadly force.

123.   Use of a TASER under the circumstances described in Dingman's narrative prior to Duggan's arrival would be excessive.

124.   Use of a TASER under the circumstances described in Dingman's narrative prior to Duggan's arrival would not be proportional to the circumstances confronting Taylor or Dingman.

125.   At 12:09 a.m., radio logs document Duggan's arrival on scene.

126.   According to Duggan's incident report, he heard Taylor tell dispatch that he deployed his TASER before calling for Dingman.

127.   According to Duggan's incident report, when Duggan arrived "Josh and Brandon stated they had tased [Jared] 2 times . . ."

128.   Upon information and belief, Taylor and Dingman continued triggering their TASERs following Duggan's arrival.

129.   Upon information and belief, Taylor and Dingman continued to expose Jared to cumulative and simultaneous TASER deployments despite Duggan's presence.

130.   Use of a TASER after Duggan's arrival and prior to use of the neck restraint was excessive.

131.   Use of a TASER after Duggan's arrival and prior to use of the neck restraint was not proportional to the circumstances confronting Taylor or Dingman.

132.   At 12:10 a.m., radio logs document a call out to Mitchell and Tucker.

14

133.  At 12:11 a.m., radio logs document Dunn's arrival on scene.

134.  At 12:12 a.m., radio logs document use of neck restraint.

135.  The neck restraint was applied by Duggan.

136.  At the time Duggan applied the neck restraint, Jared was not a threat to anyone.

137.  Upon information and belief, at the time Duggan applied the neck restraint, he had observed at least some of the TASER deployments by Taylor and Dingman.

138.  Upon information and belief, Duggan knew the difference between a TASER used in drive stun mode versus use in probe mode.

139.  Upon information and belief, Duggan knew about the risks associated with cumulative TASER exposure.

140.  Upon information and belief, Duggan knew about the risks associated with simultaneous TASER exposure.

141.  Upon information and belief, Duggan knew about the risks associated with cardiac capture and TASER use.

142.  At the time Duggan applied the neck restraint, Jared was sitting down.

143.  At the time Duggan applied the neck restraint, Jared was not disobeying any commands.

144.  At the time Duggan applied the neck restraint, Jared was not actively resisting any officer.

145.   At the time Duggan applied the neck restraint, Jared was not verbally threatening any officer.

146.   At the time Duggan applied the neck restraint, Jared was not attempting to flee.

147.   At the time Duggan applied the neck restraint, Jared was not suspected of committing any violent crime.

148.   Upon information and belief, the restraint Duggan attempted to apply was a lateral vascular neck restraint (LVNR).

149.   The Council on Law Enforcement Education and Training (CLEET) provides training to defensive tactics instructors on use of the LVNR, but it does not endorse the technique.

150.   Use of the LVNR is known to cause or contribute to citizen deaths.

151.   Use of the LVNR is considered deadly force.

152.   Upon information and belief, the CCSO policy or practice authorized Duggan to use the LVNR where deadly force was not justified.

153.   Upon information and belief, Bryant adopted, ratified, enforced, and maintained a policy or practice authorizing employees to use the LVNR even where deadly force was not justified.

154.   Upon information and belief, Bryant and the CCSO expected Duggan to use the LVNR as part of his job duties, and to use the LVNR in circumstances where deadly force was not justified.

155.   Upon information and belief, after applying the LVNR, Duggan maintained his hold for more than 15 seconds.

156.   Upon information and belief, if a LVNR is used, its application should not exceed 15 seconds.

157.   Bryant approved use of the LVNR as applied by Duggan.

158.   Bryant was aware of the risks associated with use of the LVNR.

159.   Bryant was aware that he authorized use of the LVNR as applied by Duggan.

160.   Bryant was aware that CCSO deputies like Duggan were authorized to use the LVNR under circumstances that did not call for the use of deadly force.

161.   Bryant expected Duggan to use the LVNR against people like Jared.

162.   Use of the LVNR against Jared was consistent with the official practice of Carter County.

163.   At 12:15 a.m., radio logs document that Jared was not breathing.

164.   At 12:19 a.m., radio logs document a call out to Bryant.

165.   At 12:22 a.m., ambulance records document the arrival of EMS.

166.   According to the EMS run sheet, "[t]he officers advised that they tased [Jared] 4 times total before they were able to get him on the ground and restrain him."

167.   The statement to EMS that Jared was only subjected to the TASER four times is demonstrably false; upon information and belief, the true number of exposures was closer to twenty and possibly more.

17

168.    At 12:43 a.m., ambulance records document leaving the scene with Jared in route to Healdton Mercy Hospital.

169.    At 12:53 a.m., ambulance records document arrival at Healdton Mercy Hospital.

170.    Upon arrival, medical providers were informed that Jared "was tasered x4 total - law enforcement says 1st was about 11:30."

171.    The statement that Jared was only subjected to the TASER four times is demonstrably false.

172.    Communicating to medical providers that Jared was subjected to a TASER four times was knowingly false or made with reckless disregard for the truth.

173.    No reasonable law enforcement officer responding to questions by medical providers inquiring about the number of TASER exposures, would instead communicate the number of TASER cartridges used.

174.    A law enforcement officer communicating the number of TASER cartridges used in response to questions from medical providers inquiring about the number of TASER exposures, will predictably mislead inquiring medical providers about the factual circumstances they are attempting to treat.

175.    At 3:35 a.m., records document that Jared's care was transferred from Healdton Mercy to an air ambulance service.

176.    Records from the air ambulance service state that Jared "potentially did shrooms, meth" and that he "was tasered 4xs"

18

177.   The statement that Jared was only subjected to the TASER four times is demonstrably false.

178.   The statement that Jared was engaged in illegal drug use was made either knowing it was false or with reckless disregard for the truth.

179.   At 5:03 a.m., records document Jared's arrival at OU Medical Center.

180.   Records from OUMC show that Jared died at 6:32 a.m. on July 6, 2019.

181.   The post-mortem toxicology for Jared performed by the Office of the Chief Medical Examiner was negative for all illegal drugs.

182.   Contrary to the toxicology, however, medical records from Headlton Mercy indicate that "law enforcement" informed medical providers that Jared was under the influence of illegal drugs.

183.   Contrary to the toxicology, however, medical records from OUMC indicate that law enforcement reported that Jared "had taken some kind of drugs (either mushrooms or PCP) and was combative with police therefore he was tazered 4 times . . ."

184.   Upon information and belief, communicating to medical providers that Jared was under the influence of illegal drugs was knowingly false or made with reckless disregard for the truth.

185.   Upon information and belief, Frank Schaaf communicated with medical providers or others in the community and told them Jared was under the influence of illegal drugs.

186.   Upon information and belief, the decision to tell medical providers or others in the community that Jared was under the influence of illegal drugs was used as pretext to mislead medical providers, influence the course of subsequent treatment, disparage Jared, cast him in a false light, and further justify the use of excessive force.

187.   Jared was employed at the time of his death and left behind a loving mother, father, and three brothers.

188.   Upon information and belief, no person was ever disciplined, which is consistent with the policies and practices of City and Carter County.

## IV.

### STATEMENT OF CLAIMS

### First Claim
### Fourth Amendment – Excessive Force
### Municipal claims
### 42 U.S.C. § 1983

189.   Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

190.   As detailed above, City has a written policy or unwritten practice that authorized police officers to use force that is unreasonable considering the totality of circumstances confronting the officer. This written policy or unwritten practice was the moving force behind injuries and damages suffered by Jared and the Estate for which City is liable pursuant to 42 U.S.C. § 1983.

**Second Claim**
**Fourth Amendment – Excessive Force**
**Individual claims**
**42 U.S.C. § 1983**

191.   Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

192.   As detailed above, Taylor, Dingman, and Duggan used force that is unreasonable under the totality of circumstances confronting them. Their actions were the direct and proximate cause of injuries and damages suffered by Jared and the Estate for which Taylor, Dingman, and Duggan are liable pursuant to 42 U.S.C. § 1983.

**Third Claim**
**Fourteenth Amendment – Civil conspiracy**
**Individual and Municipal claims**
**42 U.S.C. § 1983**

193.   Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

194.   As detailed above, Taylor and Dingman acted in concert to do an unlawful act, or do a lawful act by unlawful means when they conspired to falsely report the sequence and number of TASER exposures to both medical providers and responding law enforcement.

195.   Taylor and Dingman falsely reported the sequence and number of TASER exposures to conceal Fourth Amendment violations, violations of policy, and to mislead responding law enforcement and medical providers.

21

196.   The civil conspiracy between Taylor and Dingman was the direct and proximate cause of injuries and damages suffered by Jared and Estate for which these Defendants are liable.

197.   As the final policymaker or authorized decisionmaker for City, the acts of Taylor are properly attributable City for which City is liable as well.

**Fourth Claim**
**Fourth Amendment – Failure to train**
**Municipal claims**
**42 U.S.C. § 1983**

198.   Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

199.   As detailed above, City, and Taylor in his official capacity, expected City police officers to use TASERs on citizens, but do not adequately train those officers on appropriate use despite actual knowledge officers will predictably and routinely encounter and use TASERs on persons at risk from cumulative and simultaneous exposure.

200.   Despite actual or constructive notice of the risk from TASERs, the policies or practices relative to TASER training authorized Taylor and Dingman to use their weapons against Jared in manner that substantially increased the likelihood of death or serious injury, despite the absence of any corresponding threat to the officers.

201.   The failure to implement adequate training protocols and guidance relative to cumulative and simultaneous use, the failure to require officers to obtain and maintain TASER certification, and the failure to discipline officers for excessive

22

and unnecessary use of the weapon, individually and collectively, are the moving force behind injuries and damages suffered by Jared and Estate for which City, and Taylor in his official capacity, are liable pursuant to 42 U.S.C. § 1983.

**Fifth Claim**
**Fourth Amendment – Excessive force**
**Municipal claims – authorized decisionmaker**
**42 U.S.C. § 1983**

202.    Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

203.    As detailed above, Taylor was a final policymaker or authorized decisionmaker for City sufficient to confer liability for his actions under 42 U.S.C. § 1983.

204.    As detailed above, Taylor's actions were unreasonable under the totality of circumstances confronting him for which the City is liable pursuant to 42 U.S.C. § 1983 through Taylor acting as a final policymaker or authorized decisionmaker.

**Sixth Claim**
**Fourth Amendment – Excessive force**
**Entity liability**
**42 U.S.C. § 1983**

205.    Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

206.    As detailed above, Bryant was a final policymaker for Carter County sufficient to confer liability on the County for his actions under 42 U.S.C. § 1983.

207.   As detailed above, Bryant, in his official capacity, adopted, ratified, maintained, and enforced an official policy or practice of Carter County authorizing Duggan to use a LVNR where the totality of the circumstances did not warrant that level of force.

208.   The promulgation and enforcement of the policy or practice authorizing the use of deadly force was the moving force behind injuries and damages suffered by Jared and the Estate for which Bryant, in his official capacity, is liable pursuant to 42 U.S.C. § 1983

### Seventh Claim
### Fourth Amendment – Excessive force
### Supervisory liability – final policymaker
### 42 U.S.C. § 1983

209.   Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

210.   As detailed above, Bryant was a final policymaker for Carter County sufficient to confer liability on the County for his actions under 42 U.S.C. § 1983.

211.   Despite knowledge that use of an LVNR can predictably result in death, Bryant, in his individual capacity, nevertheless permitted Duggan to use the LVNR under circumstances that did not warrant deadly force, or where the person was effectively subdued.

212.   Bryant's personal involvement in the promulgation and enforcement of policies and practices approving this level of force was the direct and proximate cause of injuries and damages suffered by Jared and Estate for which Bryant and the County are liable pursuant to 42 U.S.C. § 1983.

24

**Eighth Claim**
**Fourth Amendment – Failure to Train**
**Entity liability**
**42 U.S.C. § 1983**

213.   Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

214.   As detailed above, Bryant, in his official capacity, adopted, ratified, maintained, and enforced an official policy or practice of Carter County authorizing Duggan to use a LVNR where the totality of the circumstances did not warrant that level of force.

215.   Despite the expectation that Duggan would use an LVNR in the absence of any need to use that level of force, Bryant, in his official capacity, failed to adopt training protocols for use of LVNRs under predictable and reoccurring circumstances that include a person recovering from multiple TASER exposures.

216.   By failing to train deputies on the risk of using a LVNR on a person recovering from multiple TASER exposures, Bryant, in his official capacity, substantially increased the risk of harm to Jared by authorizing a LVNR, a technique that purposefully deprives the person of oxygen, at the same time that person's body is experiencing a substantial increase in lactic acid from the TASER exposures.

217.   The predictable increase in lactic acid in a person recovering from multiple TASER exposures, in combination with use of a LVNR that purposefully deprives the person of oxygen, substantially increases the risk of serious bodily injury or death from acidosis and ultimately organ failure.

25

218.   The failure to Bryant, in his official capacity, to train on the appropriate use of LVNRs was a policy or practice of Carter County, and the direct and proximate cause of injuries and damages suffered by Jared and Estate for which the County is liable pursuant to 42 U.S.C. § 1983.

### Ninth Claim
### Negligent performance of a law enforcement function
### Municipal liability
### Oklahoma Governmental Tort Claims Act

219.   Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

220.   As detailed above, the force used by Taylor and Dingman constitutes the negligent performance of a law enforcement function. The actions of Taylor and Dingman were the direct and proximate cause of the damages and injuries suffered by Jared and Estate for which the City is liable under state law.

### Tenth Claim
### Statutory excessive force - 22 O.S. § 34.1(b)
### Municipal liability
### Oklahoma Governmental Tort Claims Act

221.   Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

222.   As detailed above, some or all of the force used by Taylor and Dingman violated agency policy and constitutes statutory excessive force under Oklahoma law. The violation of agency policy was the direct and proximate cause of the damages and injuries suffered by Jared and the Estate for which the City is liable under state law.

**Eleventh Claim**
**Defamation**
**12 O.S. 1441 *et seq*., Common law**

223.   Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

224.   As detailed above, Schaff's statement regarding drug use exposed Jared to public hatred, contempt, ridicule or disgrace, Schaff communicated the statement to persons other than Jared or the Estate, those persons reasonably understood the statement to be about Jared, the statement was false, and, Schaff did not exercise the care which a reasonably careful person would use under the circumstances to determine whether the statement was true or false, and the statement caused damage to Jared and the Estate for which Schaff is liable under state law.

## V.

### RELIEF REQUESTED

Estate respectfully requests the following relief:

A.   An award of compensatory damages against each Defendant in excess of $75,000.00 to be determined by a jury;

B.   An award of punitive damages against each Defendant sued in their individual capacity in excess of $75,000.00 to be determined by a jury;

C.   A declaration that Taylor, Dingman, and Duggan violated Jared constitutional rights;

D.   A declaration that Bryant violated Jared's constitutional rights;

27

E.     A declaration that Carter County's LVNR policy or practice is unconstitutional;

F.     A declaration that City's use of force policy or practice is unconstitutional;

G.     An award of reasonable attorney fees;

H.     An award of reasonable costs;

I.     Any other legal or equitable relief available.

Respectfully submitted,

BRYAN & TERRILL

By:     s/J. Spencer Bryan
        Steven J. Terrill, OBA # 20869
        J. Spencer Bryan, OBA # 19419
        BRYAN & TERRILL LAW, PLLC
        3015 E. Skelly Dr., Suite 400
        Tulsa, OK 74105
        Tele/Fax:     (918) 935-2777
        Email: sjterrill@bryanterrill.com
        Email: jsbryan@bryanterrill.com