## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1)   CYNTHIA LAKEY AND DOUGLAS LAKEY, as co-Special Administrators for the Estate of Jared Lakey, | |
| Plaintiffs, | |
| v. | Case No.: 20-cv-152-RAW |
| (2)   CITY OF WILSON, | |
| (3)   JOSHUA TAYLOR, in his official and individual capacities, | ATTORNEY LIEN CLAIMED |
| (4)   BRANDON DINGMAN, in his individual capacity, | JURY TRIAL DEMANDED |
| (5)   CHRIS BRYANT, in his official and individual capacity as Sheriff of Carter County, | |
| (6)   DAVID DUGGAN, in his individual capacity, | |
| (7)   LONE GROVE, | |
| (8)   TERRY MILLER, in his individual capacity, | |
| (9)   KEVIN COOLEY, in his official and individual capacity, | |
| Defendants. | |

---

### THIRD AMENDED COMPLAINT

---

Pursuant to ECF No. 81, Cynthia and Douglas Lakey, as co-Special Administrators for the Estate of Jared Lakey (Estate), for their cause of action against the above-named Defendants, state as follows:

# I.

## PARTIES, JURISDICTION, VENUE

1.      Cynthia and Douglas Lakey are the court appointed co-Special Administrators for the Estate of Jared Lakey in Stephens County District Court Case No. PB-2019-134. They are the parents of Jared Lakey.

2.      The City of Wilson (Wilson) is a municipal corporation subject to 11 O.S. § 9-101 *et seq*. To the extent the police chief is not the final policymaker under an aldermanic form of government as applied, adopted, and implemented by Wilson, the city council is the final policymaker in the realm of law enforcement,

3.      Wilson is located in Carter County, Oklahoma.

4.      Wilson follows the aldermanic form of government where the police chief is an independently elected official. On July 4, 2019, Kevin Coley (Coley) was the elected police chief but, upon information and belief, he was legally prohibited from performing any of the actions of police chief due to a planned and extended medical leave. To the extent Coley had ongoing responsibilities while on leave, those responsibilities included the promulgation, creation, implementation, or possession of responsibility for the continued operation of the Wilson use of force policy as applied by his subordinate officers. Coley is sued in both his official and individual capacity.

5.      Under the aldermanic form of government, the office of police chief is a mandatory office absent merger, and upon information and belief, no merger occurred in Wilson prior to July 4, 2019.

6.      Upon information and belief, the Wilson city council had not enacted any policies or ordinances prior to July 4, 2019 that altered the statutory powers vested in the mandatory office of police chief, or enacted any law enforcement policies in the realm of use of force.

7.      Under the aldermanic form of government in Wilson, the police chief is solely responsible for the adoption, enforcement, and promulgation of the Wilson use of force policy, which was enacted by the office of the police chief in 2014. The 2014 council minutes for Wilson do not identify any action by the city to review, adopt, or approve the Wilson use of force policy prior to its enactment.

8.      Prior to July 4, 2019, the Wilson police chief took a planned and extended medical leave of absence and, upon information and belief, vested all final policymaking authority to the next highest-ranking officer to comply with the mandatory statutory requirement that an aldermanic form of government have a police chief.

9.      Upon information and belief, vesting all responsibility from the police chief to the next highest-ranking officer was required under the official chain-of-command policy in effect prior to 2019, and consistent with long-standing practice in Wilson's government that existed for years.

10.     On July 4-5, 2019, Josh Taylor (Taylor) was the acting police chief for Wilson, or alternatively, was the police chief's authorized decisionmaker as required by Wilson's written chain-of-command policy and longstanding practice.

11.     On July 4, 2019, Taylor was solely responsible for enforcement of Wilson's use of force policy, and how that policy should be enforced.

3

12.     On July 4, 2019, and upon information and belief, none of Taylor's actions relative to use of force scenarios were meaningfully constrained by policies enacted by another office.

13.     On July 4, 2019, and upon information and belief, Taylor's decisions relative to use of force scenarios were final and not subject to any meaningful review.

14.     On July 4, 2019, and upon information and belief, Taylor's decisions relative to use of force scenarios were firmly within the realm of his authority.

15.     The position of Wilson Police Chief, or the chief's authorized decisionmaker, is a final policymaker under Wilson's form of government and not subject to discipline by the city council.

16.     Brandon Dingman (Dingman) was an employee of Wilson on July 4-5, 2019.

17.     On July 4-5, 2019, Wilson employed Dingman as a reserve peace officer subject to 70 O.S. § 3311, until Wilson promoted Dingman following Lakey's death.

18.     On July 4-5, 2019, Frank Schaff (Schaff) was Wilson's elected mayor.

19.     On July 4-5, 2019, Schaff was Taylor's landlord.

20.     On July 4-5, 2019, the Carter County Sheriff's Office (CCSO) employed David Duggan (Duggan) as a deputy.

21.     Chris Bryant (Bryant) is the elected Sheriff of Carter County. He is sued in his official and individual capacities. As Sheriff for Carter County, Bryant is a final policymaker for Carter County and responsible for the adoption, promulgation, maintenance, and enforcement of CCSO policies and practices related to use of force and training CCSO deputies.

22.     Lone Grove is a municipality located in Carter County, Oklahoma. Lone Grove is responsible for the adoption, promulgation, maintenance, and enforcement of Lone Grove

4

policies and practices related to use of force and training Lone Grove police officers. Upon information and belief, at the time of the incident, Lone Grove employed Defendant Terry Miller (Miller) as a police officer.

23.     Miller was an employee of Lone Grove on July 4-5, 2019.

24.     On July 19, 2019, a preservation letter was served on Wilson.

25.     On July 19, 2019, a preservation letter was served on CCSO.

26.     On August 30, 2019, a notice of tort claim was served on Wilson and Carter County.

27.     No response to the notice of tort claims was received and the claims were denied by operation of law.

28.     Estate has timely satisfied all prerequisites to filing suit.

29.     At all times discussed herein, all Defendants were acting under color and authority of state law and within the scope of employment.

30.     The events complained of occurred in Carter County, Oklahoma and some of the claims herein arise under federal law making jurisdiction and venue proper.

## II.

### STATEMENT OF FACTS

31.     Estate adopts and incorporates the preceding paragraphs as if fully set forth herein.

32.     Jared Lakey was 28 years old on July 4, 2019.

33.     As of that date, Jared was employed full time and regularly contributing to his 401k.

34.     Jared was the youngest of three brothers and the son of Cynthia and Doug.

35.     On July 4, 2019, radio logs show that at 11:49 p.m. "Johnna" called to report a male running down the street.

36.     "Johnna" did not report that the man was naked.

37.     Radio logs show that at 11:52 p.m., there was a call out to Taylor in response to the report from "Johnna."

38.     A report prepared by Taylor states that he was dispatched in response to a male screaming and yelling.[1]

39.     Taylor's report does not include any facts suggesting he was dispatched in response to a naked man.

40.     Radio logs show that at 11:55 p.m. Taylor was "out with the subject."

41.     Upon information and belief, the "subject" was Jared Lakey.

42.     Taylor was wearing a Wilson-issued body camera at the time.

43.     Wilson policy required Taylor to activate his body camera before any police-citizen encounter.

44.     Wilson policy mandated that officers are required to activate their body cameras to record all contacts with citizens.

45.     Taylor was required under the Wilson policy to record the entire contact and interaction with Jared Lakey.

46.     According to Wilson policy, when an officer fails to activate their body camera, fails to record the entire contact, or interrupts the recording, the officer must document why the recording was not made, was interrupted, or terminated.

---

[1] Pursuant to Fed. R. Civ. P. 10(c), Estate adopts and incorporates by reference the exhibits attached to Estate's previous pleadings.

47.     There is no video memorializing how the encounter began between Jared Lakey and Josh Taylor.

48.     Taylor violated Wilson policy and failed to document why there is no video from the beginning of the encounter with Jared Lakey.

49.     Taylor's body camera was operational and capable of recording the entire encounter with Jared Lakey.

50.     Upon information and belief, the police vehicle used by Taylor was also equipped with a dash camera. Upon information and belief, the dash camera would capture events occurring in front of the vehicle when activated.

51.     Upon information and belief, Wilson policy required Taylor to activate the dash camera when he responded to the call from "Johnna."

52.     It is not clear why there is no video from Taylor's dash camera.

53.     Taylor did not document or provide any explanation for why there is no video from his vehicle's dash camera that recorded his interactions with Jared Lakey.

54.     A report prepared by Taylor detailed his narrative of events once Taylor engaged Jared.

55.     Taylor's report omits all references to the fact that his brother in-law was in the patrol vehicle with him as a so-called "ride-along."

56.     Taylor's narrative claimed Jared was naked with socks on before the encounter began.

57.     Taylor's narrative claimed Jared appeared agitated.

58.     Taylor's narrative claimed Jared went to the front of the patrol vehicle and pushed down on the pumper guard.

59.     Taylor's narrative claimed Jared was "aggressive" and said "Okay we are going to do this."

60.     Taylor's narrative claimed he unholstered his TASER and ordered Jared to the ground and to put his hands behind his back.

61.     Taylor's narrative claimed Jared got on the ground and laid on his back and rolled over several times.

62.     Taylor's narrative does not include any statement or suggestion that Taylor, or anyone else, ever communicated to Jared that he was under arrest.

63.     Upon information and belief, Taylor's brother-in-law observed Jared and believed Jared was drifting in and out of consciousness.

64.     Taylor's narrative claimed he called for Dingman and held Jared at "TASER point."

65.     Taylor's dash camera would have captured Jared Lakey's actions upon arrival and while Jared was allegedly in front of Taylor's vehicle.

66.     Taylor's body camera, which should have been activated before encountering Jared, would have captured the entirety of his interactions with Lakey.

67.     There is no independent evidence to verify Taylor's reported interactions with Jared, or his condition, when the encounter began.

68.     By July 4-5, 2019, Wilson knew the lack of video creates an opportunity for officers to falsify the justification for using force.

69.     Estate specifically disputes that Jared was naked when the encounter began, and that he behaved as described in Taylor's narrative. *Cf.*, *Pauly v. White*, 814 F.3d 1060, 1079 (10th Cir. 2016) (*vacated on other grounds*) ("[S]ince the victim of deadly force is unable to

testify, courts should be cautious on summary judgment to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story-the person shot dead-is unable to testify.") (citations omitted).

70. Upon Dingman's arrival at the scene, his dash camera and body camera were both operational and recording.

71. A report prepared by Dingman detailed his narrative of events after he arrived on scene.

72. Dingman's narrative claimed that he approached Lakey "to place him into cuffs."

73. This portion of Dingman's narrative is not supported by his body camera and dash camera.

74. Dingman's body camera and dash camera show him approach Lakey and place his right foot on Jared's back instead of handcuffing him.

75. Dingman is the first officer on any recording to speak to Jared and requested that Lakey put his arms behind his back.

76. The video showed Jared was not resisting, threatening, or fighting.

77. Instead of handcuffing Jared when Dingman arrived, Taylor continued to hold Jared at TASER point.

78. For the first time in any recording, Taylor spoke to Jared saying, "Non-compliance is going to get you tased."

79. Dingman kept his right foot on Jared for approximately 18 seconds.

80. Dingman did not attempt to handcuff or secure Jared during this time.

81. At this point in Dingman's video, it appears that Taylor activates his body camera; it begins to record a few seconds later.

9

82.    The cameras depict Jared attempting to get to his knees and elbows.

83.    It appears Jared was attempting to stand up and present himself for handcuffing.

84.    Jared's movements were not accompanied or preceded by any verbally or physically aggressive behaviors.

85.    At this time, Taylor deployed his TASER in dart mode and began to continuously administer TASER applications to Jared.

86.    Taylor continued to trigger the TASER in dart mode as Jared falls to the ground with both officers yelling for Jared to put his hands behind his back.

87.    With Taylor continuing to trigger the TASER, Jared rolled onto his back.

88.    At this same time, Dingman deployed his TASER in dart mode and began to continuously and simultaneously shock Jared along with Taylor.

89.    Taylor then changed out his TASER cartridge as Dingman continued to shock Jared, who is visibly writhing in pain on the ground.

90.    Taylor instructed Jared to roll over and put his hand behind his back while Dingman radioed that two TASERs were deployed.

91.    Taylor instructed Jared to put his hands behind his back or he will get tased again.

92.    The moment Jared moved consistent with Taylor's instructions, Dingman triggered the TASER again.

93.    In response, Jared screamed in pain.

94.    The video continued, depicting Jared face-down on the ground with the laser sight of Taylor's TASER on Jared's right side.

95.    Dingman instructed Jared to put his hands behind his back several times while Jared was not moving.

96.    Dingman followed these commands with additional TASER applications for non-compliance.

97.    Without any attempt to secure Jared while he's lying face down on the ground, Dingman and Taylor continued instructing Jared to put his hands behind his back.

98.    Jared then attempted to get to his feet.

99.    In a fraction of a second, Lakey is again hit with Taylor's TASER and accompanying shocks.

100.    Jared fell to the ground, again in visible pain.

101.    The video then showed Jared face-down on the ground with both officers continuing to yell orders for Jared to put his hands behind his back.

102.    Both Taylor and Dingman continued using the TASER against Lakey as they barked commands.

103.    Dingman then replaced the cartridge on his TASER.

104.    Both officers continued to tell Jared to put his hands behind his back or they are going to use their TASER's again.

105.    Lakey's physical size and his mental condition would make it difficult, if not impossible, for him to comply with commands to put his hands behind his back without assistance.

106.    Taylor and Dingman repeatedly deployed their TASERs on Lakey because he did not put his hands behind his back.

107.    The repeated, cumulative, and simultaneous use of both TASERs was not proportional to the circumstances confronting Taylor or Dingman, but it was consistent with the Wilson use of force policy.

108.   While Jared was not moving and face-down on the ground, Dingman requested additional units.

109.   Jared then attempted to get to his knees and Dingman triggered another TASER deployment.

110.   Dingman administered additional shocks simultaneously with Taylor's TASER applications.

111.   The video showed that Jared was again on his stomach and not moving.

112.   The two officers made no attempt to secure or handcuff Jared.

113.   Dingman can be heard using his radio reporting, "He keeps attempting to fight with us. We have three TASERs deployed at this time, still combative."

114.   Dingman's radio account of what transpired is demonstrably false.

115.   Jared was not verbally or physically threatening either officer.

116.   Jared was not combative toward either officer.

117.   The number of TASER deployments Dingman radioed is misleading as four TASER cartridges were used, but all were deployed with continuous and simultaneous TASER applications by both officers.

118.   The body and dash cameras continued to record additional TASER applications by both officers while Jared was on the ground and not a threat to either officer.

119.   Jared continued to beg the officers for help and continued to cry out in pain as the officers utilized their X26P TASERs to send repeated electrical shocks through his body.

120.   After both officers had deployed more than forty TASER applications, Dingman told Taylor, "Don't let him get up."

121.    Dingman's narrative claimed the two officers continued using their TASERs "to attempt to keep [Jared] from getting up and giving him the opportunity to come at Cpt. Taylor of myself."

122.    Dingman's narrative claimed that along with Taylor, the two decided to keep Lakey on the ground until more units could arrive "for officer safety."

123.    Dingman's narrative claimed, "In the state of mind Lakey was in he was not going to comply with our commands and wanted to fight Captain Taylor and I."

124.    This portion of Dingman's narrative is contradicted by his body camera and dash camera video.

125.    There was never any aggressive move or action by Jared toward the officers or anyone else.

126.    The videos demonstrate the absence of any justification for using a TASER by either officer based upon the contention that Jared was acting aggressively toward the officers or anyone else.

127.    At this point in the encounter, Jared desperately grabbed a chain-link fence.

128.    Jared fell to the ground after Taylor ordered him to get down.

129.    Despite Taylor stating that they need to go, "hands on," neither officer approached Jared to handcuff him.

130.    Before the arrival of additional law enforcement officers, Taylor and Dingman had approximately six minutes where Jared was face-down on the ground and capable of being secured or handcuffed.

131.    No attempt was ever made by Dingman or Taylor to put handcuffs on Jared.

13

132.   Use of the TASER under the circumstances described in Paragraphs above was excessive, but consistent with the Wilson use of force policy, and approved by Coley and the city council after having a complete opportunity to review the incident and video.

133.   Use of a TASER under the circumstances described in Paragraphs above was not proportional to the circumstances confronting Taylor or Dingman, but consistent with the Wilson use of force policy, and approved by Coley and the city council after having a complete opportunity to review the incident and video.

134.   Dingman's narrative claimed both officers continued to give Jared commands to place his hands behind his back.

135.   Dingman's narrative, like Taylor's, never suggested that Jared was told he was under arrest.

136.   Dingman's narrative claimed that Jared was "still being combative."

137.   Jared was never combative and never made any aggressive actions towards either officer.

138.   Dingman's narrative that Jared "wanted to fight" is not supported by or consistent with Jared's actions on the video.

139.   Dingman's assertions in his report are an attempt to justify his excessive use of a TASER against Jared.

140.   At no point during the interaction with Jared did Dingman or Taylor have any reasonable basis to suspect Jared was attempting to flee.

141.   At no point during the interaction with Jared did Dingman or Taylor have any reasonable basis to suspect that Jared was committing or was about to commit any violent crime or felony crime.

142.    At no point during the interaction with Jared did Dingman or Taylor have any reasonable basis to suspect that Jared was a danger to them or anyone else.

143.    Upon information and belief, Jared appeared to be confused or disoriented during his encounter with Dingman and Taylor.

144.    Upon information and belief, Jared's confusion or disorientation contributed to his understanding the circumstances and directions given to him.

145.    Upon information and belief, both Taylor and Dingman recognized and appreciated that Jared was disorientated and confused.

146.    The video does not show Taylor or Dingman taking any steps to modify their behavior based on Jared's mental status.

147.    Upon information and belief, Jared did not disobey any lawful commands.

148.    Jared was effectively subdued throughout the encounter.

149.    The Oklahoma State Bureau of Investigation (OSBI) investigated the incident involving the use of force against Jared.

150.    On July 1, 2020, Tony Navarro provided an Affidavit which included the OSBI's investigative findings.

151.    OSBI reviewed the TASER data logs for Dingman and Taylor.

152.    The TASER logs revealed that Dingman triggered his TASER 23 times with a cumulative total of 114 seconds of tasing activity.

153.    The TASER logs revealed that Taylor triggered his TASER 30 times for a cumulative total of 122 seconds of tasing activity.

154.    The TASER data logs indicate that Taylor and Dingman combined to trigger their TASERs at least 53 times.

155.    The TASER data logs indicate that Taylor and Dingman deployed their TASERs for nearly four minutes over a nine-minute time frame.

156.    Paragraph seven of the OSBI Affidavit concludes that, "[d]uring this critical 9-minute time frame, Lakey never strikes, grabs or makes any aggressive move towards either officer, and neither officer ever attempts to control Lakey by placing his hands on Lakey."

157.    The dash camera and body cameras indicate that Dingman and Taylor had over six minutes of combined time where Jared was face-down on the ground and could have been secured or handcuffed.

158.    Despite these opportunities, neither officer attempted to handcuff Jared.

159.    Kent Cochran (Cochran) is an AXON Academy accredited Master Instructor of the TASER X26P Conducted Energy Weapon (CEW) used on Lakey. Cochran has served as a Less Lethal Weapons Coordinator for the Oklahoma City Police Department since 2012.

160.    Cochran teaches courses on TASER and CEW products.

161.    The Carter County District Attorney's Office retained Master Sergeant Cochran to review the evidence involving the arrest of Jared Lakey and to offer his expertise on the use of force utilized against Lakey.

162.    The OSBI referenced Cochran's report in its affidavit.

163.    Cochran's report included three main concepts which are emphasized during CEW training.

164.    The first is to avoid multiple, repeated or extended duration deployments.

165.    The second is controlling and cuffing under power.

166.    The last is each activation of CEW must be legally justifiable.

16

167.    Cochran further detailed in his report that the application of CEW exposure is a physically and psychologically stressful event, and that it is recommended that officers work together by quickly trying to physically restrain or handcuff the suspect.

168.    The Cochran report detailed that if the CEW is not having the intended or desired effect, officers should be prepared to transition to other force options.

169.    Cochran detailed that there are cumulative effects associated with the use of CEW exposures.

170.    The effects become greater when a person is exposed to extended, repeated, or prolonged CEW cycles.

171.    Cochran identified 15 seconds of CEW exposure as a significant safety point, and that any decision to go beyond that 15 seconds must require a compelling reason.

172.    The investigative results by the OSBI include that, "[d]uring the time frame of Officers Taylor and Dingman's encounter with Lakey, neither officer ever attempted to utilize any physical force to restrain, contain, control, or handcuff Lakey, although each had multiple opportunities to use physical force to attempt to handcuff him as he lay motionless on the ground, at times seemingly less than fully conscious."

173.    OSBI concluded that, "[t]he investigation into the aforementioned use of force incident against Jared Lakey reveals that he was tased unnecessarily numerous times throughout his contact with Officers Taylor and Dingman. Furthermore, the excessive amount of tasing administered to Lakey was dangerous conduct that constituted a substantial factor in bringing about his death."

174.    The videos show that neither officer worked quickly or efficiently to secure or handcuff Jared.

175.    The videos show that neither Dingman nor Taylor utilized other use of force options.

176.    Despite subjecting Jared to extended, repeated, and prolonged TASER cycles, the video shows there were no compelling reasons for Dingman and Taylor to continue their TASER applications.

177.    As the OSBI concluded, Dingman and Taylor never attempted to restrain, contain, control, or handcuff Jared.

178.    As the OSBI concluded, Jared never made any aggressive move or action toward either Taylor or Dingman.

179.    Upon information and belief, Wilson and Coley expected Taylor to use the TASER as part of his job duties.

180.    Upon information and belief, Wilson and Coley expected Dingman to use the TASER as part of his job duties.

181.    Repeatedly using a TASER simultaneously and in dart mode against Jared was excessive, but consistent with the Wilson use of force policy, and approved by Coley and the city council after having a complete opportunity to review the incident and video.

182.    Repeatedly using a TASER simultaneously and in dart mode against Jared was not proportional to the circumstances confronting Taylor and Dingman, but consistent with the Wilson use of force policy, and approved by Coley and the city council after having a complete opportunity to review the incident and video.

183.    Taylor and Dingman deployed their TASERs exclusively in dart mode.

184.    A TASER used in dart mode goes beyond mere pain compliance.

185.    A TASER used in dart mode is intended to incapacitate a person by overriding their central nervous system causing neuro-muscular incapacitation (NMI).

186.    Where probe spread is too far to achieve NMI, TASER training requires deployment of a second cartridge to achieve greater probe spread, or use of a 3-point technique with the weapon in drive-stun mode.

187.    TASER does not train law enforcement to achieve NMI through simultaneous or cumulative exposure.

188.    During exposure to the weapon, TASER trains to "cuff under power."

189.    The need for multiple TASER cycles or extended/prolonged TASER exposures can be avoided by "cuffing under power" during the "window of opportunity" that the 5-second TASER cycle provides.

190.    This is consistent with the Cochran report as referenced in the affidavit from the OSBI.

191.    Taylor and Dingman repeatedly and simultaneously used the TASER on Jared without attempting to cuff Jared "under power."

192.    The Wilson use of force policy does not require officers to make an effort to "cuff under power."

193.    By not requiring officers to make an effort to "cuff under power," the Wilson use of force policy is unconstitutionally vague and further permits officers to the use the TASER in a manner that substantially increases the risk of death or serious bodily injury in circumstances where the use is not proportional to the risk confronting the officer.

194.    Upon information and belief, this was not the first time Taylor had used the TASER in this manner, and use in this manner is consistent with the policies and practices of Wilson and/or Coley.

195.    Upon information and belief, Taylor had previously used the TASER in this manner at the direction of Kevin Coley.

196.    The manner in which Taylor and Dingman deployed the TASER constitutes "simultaneous" exposure as defined by the available training material published as of July 4-5, 2019 by Axon, f/n/a TASER, Intl.

197.    The manner in which Taylor and Dingman deployed the TASER constitutes "cumulative" exposure as defined by the available training material published as of July 4-5, 2019 by Axon, f/n/a TASER, Intl.

198.    The manner in which Taylor and Dingman deployed the TASER risked causing cardiac capture as defined by the available training material provided as of July 4-5, 2019 by Axon f/n/a TASER, Intl.

199.    The Wilson use of force policy precluded Taylor and Dingman from using a TASER without first "successfully completing a CLEET approved course of instruction . . ."

200.    As of July 4-5, 2019, both Taylor and Dingman had actual knowledge of the risks associated with "cumulative" exposure.

201.    As of July 4-5, 2019, both Taylor and Dingman had actual knowledge of the risks associated with "simultaneous" exposure.

202.    As of July 4-5, 2019, both Taylor and Dingman had actual knowledge of the risks associated with "cardiac capture."

203.    Taylor and Dingman knew use of the TASER on Jared could result in death if they used the TASER improperly or contrary to guidelines.

204.    The Wilson use of force policy considered the TASER a Level 3 use of force on a scale of 1-6. Level 1 is officer presence; Level 2 includes verbal commands.

205.    The Wilson use of force policy permits use of TASERs where use is "[1] necessary and justified to subdue a subject who is threatening violence, [2] resisting arrest, or [3] physically interfering with an arrest, or [4] to prevent the possibility of injury to any person."

206.    Under the Wilson use of force policy, a Level 3 use of force "includes control and restraint defensive tactics that have a minimal chance of causing serious physical injury."

207.    Under the Wilson use of force policy, Level 4 and 5 encounters are considered "non-deadly." Level 6 is deadly force.

208.    Use of a TASER, under the circumstances depicted in the body and dash cameras prior to Duggan's arrival, was excessive, but consistent with the Wilson use of force policy, and approved by Coley and the city council after having a complete opportunity to review the incident and video.

209.    Use of a TASER, under the circumstances depicted in the body and dash cameras prior to Duggan's arrival, was not be proportional to the circumstances confronting Taylor or Dingman, but consistent with the Wilson use of force policy, and approved by Coley and the city council after having a complete opportunity to review the incident and video.

210.    At 12:09 a.m., radio logs document Duggan's arrival on scene.

211.    According to Duggan's incident report, when Duggan arrived "Josh and Brandon stated they had tased [Jared] 2 times . . ."

212.   Audio from the cameras recorded Dingman telling Duggan on arrival, "[w]e just deployed four TASERs, he's not giving up."

213.   In contrast to what Dingman told Duggan, the TASER logs for Dingman and Taylor showed Jared was subjected to fifty-three TASER applications combined between Dingman and Taylor.

214.   Upon information and belief, the decision by Dingman to tell Duggan the number of TASER cartridges versus the number of TASER applications was calculated to soften the severity of the use of force used up to that point.

215.   Dingman underreported the number of TASER applications used on Jared to additional persons that arrived on scene.

216.   Upon information and belief, Duggan also knew about the risks associated with cumulative TASER exposure, and knew that triggering a TASER 4 times using 5 second cycles would exceed the 15 seconds of exposure referenced in the TASER training materials and in Cochran's report.

217.   Upon information and belief, Duggan also knew about the risks associated with simultaneous TASER exposure.

218.   Upon information and belief, Duggan knew about the risks associated with cardiac capture and TASER use.

219.   Duggan is seen on the videos observing Jared seated on the ground trying to recover from the numerous TASER applications.

220.   On the video, Jared is located a few feet in front of Dingman's vehicle and near a chain-link fence.

221.   The videos show Duggan putting on his gloves and walking around the back of Dingman's vehicle.

222.   As the video continues, Duggan is seen walking along the side of Dingman's vehicle and slowly approaching Jared from behind.

223.   Duggan then paused for a few seconds behind Jared before quickly putting his left arm around Jared's neck and securing his left hand in the crook of his right arm.

224.   Upon information and belief, the restraint Duggan attempted to apply was a carotid chokehold.

225.   A carotid chokehold is a dangerous technique that can predictably result in death or serious bodily injury, and should never be used on an obese person.

226.   As a result of the extraordinary and predictable risk associated with use of a carotid chokehold, the Council on Law Enforcement Education and Training (CLEET) does not instruct on its use as part of CLEETs basic curriculum.

227.   The video then shows Duggan sink the carotid chokehold from behind Jared as Dingman secured a handcuff on Jared's right wrist.

228.   Duggan continued to apply the carotid chokehold causing Jared to lose consciousness. Duggan then pushed Jared onto his stomach.

229.   While Jared was on his stomach, Duggan continued to apply the carotid chokehold as Terry Miller watched and stood on Jared's legs.

230.   Taylor then appears in the video securing Jared's left wrist to handcuff both wrists together.

231.   Upon information and belief, two handcuffs were used and joined together to secure Jared's wrists based upon his size.

23

232.   Duggan applied the carotid chokehold to Jared for over forty seconds.

233.   Prior to applying the carotid chokehold, Duggan did not attempt to talk to Jared or evaluate whether he was being non-compliant at the time force was used.

234.   Prior to applying the carotid chokehold, Duggan made no attempt to handcuff or secure Jared.

235.   At the time Duggan applied the carotid chokehold, Jared was not disobeying any commands.

236.   At the time Duggan applied the carotid chokehold, Jared was not actively resisting any officer.

237.   At the time Duggan applied the carotid chokehold, Jared was not verbally threatening any officer.

238.   At the time Duggan applied the carotid chokehold, Jared was not a threat to anyone.

239.   At the time Duggan applied the carotid chokehold, Jared was not attempting to flee.

240.   At the time Duggan applied the carotid chokehold, Jared was not suspected of committing any violent crime.

241.   CLEET provides training to defensive tactics instructors on use of the carotid chokehold, but it does not endorse the technique.

242.   Use of the carotid chokehold is known to cause or contribute to citizen deaths.

243.   Use of the carotid chokehold is considered deadly force.

244.   Upon information and belief, the CCSO policy or practice did not prohibit Duggan from using the carotid chokehold against obese people in circumstances where deadly force was not justified.

245.   Upon information and belief, Bryant adopted, ratified, enforced, and maintained a policy or practice that permitted employees like Duggan to use the carotid chokehold against obese people even where deadly force was not justified.

246.   Upon information and belief, Bryant expected Duggan to use the carotid chokehold as part of his job duties, and to use the carotid chokehold in circumstances where deadly force was not justified.

247.   Upon information and belief, if a carotid chokehold is used, its application should not exceed 15 seconds.

248.   Bryant did not prohibit use of the carotid chokehold as applied by Duggan with respect to Jared, and he did not discipline Duggan for using the chokehold on Jared.

249.   Bryant was aware of the risks associated with use of the carotid chokehold, and upon information and belief, had a policy or practice that allowed CCSO deputies to use the chokehold without demonstrating competency in use of the technique, and without requiring continuous training to maintain competency on its use.

250.   Bryant was aware that his policy or practice authorized use of the carotid chokehold as applied by Duggan.

251.   Bryant was aware that CCSO deputies like Duggan were permitted to use the carotid chokehold under circumstances that did not call for the use of deadly force.

252.   Bryant expected Duggan to use the carotid chokehold against people behaving like Jared.

253.    Use of the carotid chokehold against Jared was consistent with the official practice of Carter County.

254.    Upon information and belief, Bryant's chokehold practice was sufficiently vague and unclear that dangerous use resulting in death or serious bodily injury was a highly predictable or plainly obvious consequence of Bryant's decision to permit use of the technique.

255.    Bryant was aware of the manner in which Duggan used the carotid chokehold, and further knew that Jared died following the encounter.

256.    Upon information and belief, Bryant did not terminate or discipline Duggan for the using the carotid chokehold against Jared.

257.    At approximately the same time as Duggan's arrival on scene, Terry Miller also arrived on scene sufficient to observe and participate in Duggan's application of the chokehold.

258.    The videos show that after applying the carotid chokehold in excess of forty seconds, Duggan released Jared's neck and the officers moved Lakey back to a seated position.

259.    The video recorded one of the officers stating that Jared was unconscious following the carotid chokehold applied by Duggan.

260.    The video recorded Jared's labored breathing while seated and handcuffed behind his back.

261.    Jared's labored breathing was obvious to anyone near him, including Miller, who was present during use of the chokehold, and who had actual knowledge that Jared was exposed to at least 4 TASER applications in dart mode immediately prior to its use.

262.    As soon as Jared was moved to the seated position, Duggan placed his hand on the back of Jared's neck forcing his head down as Jared struggled to breathe.

263.   Miller briefly attempted to pull Jared's head up, but let go after approximately four seconds.

264.   Dingman then put his left hand on the back of Jared's head, pushing it down with his right hand, and applying pressure on Jared's upper back.

265.   Dingman then pushed Jared's head down for over thirteen seconds before releasing his left hand and continuing to push on Lakey's back with his right hand.

266.   While Jared is gasping and struggling to breathe, Duggan repeatedly slaps Jared on the back.

267.   Video then shows Miller and Dingman putting their hands on Jared's back and shoulders to force him forward into a jackknife position.

268.   As a result, the video demonstrates that Jared was pushed forward, almost doubled over, as he struggled to breath.

269.   Shortly after being doubled over, Jared attempted to straighten his back to breathe.

270.   Dingman and Miller applied more force to his back, pushing Jared back into in a jackknife position.

271.   Upon information and belief, Dingman and Miller prevented Jared from breathing by pushing him forward into this jackknife position.

272.   Video then recorded an officer stating that Jared was awake.

273.   Jared's labored breathing increased as he struggled to catch his breath.

274.   Dingman then moved his hand from Jared's back to the base of his neck to force Jared's head downward.

275.   On three separate occasions, Jared attempted to straighten his body and move his head back so he could breathe, but Dingman and Miller continued to force him forward each time.

276.   While Jared struggled to breathe, Dingman again forced Jared's body downward into a jackknife position making it more difficult for Jared to breathe.

277.   This continued for approximately two minutes and fifty-four seconds.

278.   Despite video showing that Dingman and Miller had an opportunity to provide a clear airway for Jared, move him to rescue position, and give him an opportunity to catch his breath, Miller continued to force Jared's body down preventing him from breathing.

279.   While Jared struggled to breathe, Miller continued to force Jared's body down in a jackknife position making it more difficult for him to breathe for approximately two minutes and thirty-seven seconds.

280.   While the officers discussed how they got to the scene and speculate that Jared was on drugs, Jared stopped breathing.

281.   Upon information and belief, the contrast from Jared's loud gasping and desperate moaning to complete silence would have alerted any reasonable officer to check Jared's condition or to assess his status.

282.   No officer checked Jared's condition or assessed his status when he became quiet.

283.   Instead, Jared was continually pushed downward, doubled over, and placed in a position that increased the risk of death or serious bodily injury.

284.   In response to the lack of any audible noise coming from Jared, the officers continued to talk among themselves while Taylor went to secure a camera and take pictures of Jared struggling to breathe and stay alive.

285.   The video recorded an officer asking, "Is he still going? Is he still good?"

286.   Despite the confusion of whether or not Jared is breathing or is conscious, nobody positioned his body into a rescue position or make it easier to breathe.

287.   Instead of assessing Jared, one officer yelled for him to just "wake up."

288.   At this point, the video shows Miller pulling Jared's body more upright and lifting his chin up.

289.   Upon information and belief, the recording picked up Dingman commenting, "He is out again."

290.   Miller then began hitting Jared on the back telling him to, "wake up."

291.   At this point, Miller asked if the ambulance (SOAS) is in route.

292.   Duggan is seen on video walking over and asking if Jared is breathing and Miller responds, "No, you might want to tell them to step it up."

293.   Approximately three minutes and fifty seconds pass from the time Miller announced that Jared is not breathing until someone begins any life-sustaining measures.

294.   The video recorded one officer asking if someone should start CPR.

295.   In spite of this comment, nobody began CPR for over another minute.

296.   The cuffs are not removed from Jared and he was not placed onto his back until right before CPR is started.

297.   Upon information and belief, when Jared stopped breathing there were five officers on the scene.

298.   While Miller eventually begins CPR, Taylor is seen on his body camera looking for Jared's clothes and making a personal call to state that he might be late getting home.

299.   After locating a pair of shorts, Taylor searches them and finds no evidence of drug use or any identification.

300.   Upon information and belief, the position of Jared's body while handcuffed, and while forcing his head down, made it difficult for Jared to breathe and recover from the TASER applications and carotid chokehold.

301.   Upon information and belief, Dingman and Miller's use of force on Jared's back and head while handcuffed was excessive and exposed Jared to a substantial risk of serious harm.

302.   At 12:22 a.m., ambulance records document the arrival of EMS.

303.   According to the EMS run sheet, "[t]he officers advised that they tased [Jared] 4 times total before they were able to get him on the ground and restrain him."

304.   Upon EMS arrival, the recording documented Dingman telling EMS, "He has to be under the influence of something, we've had to tase him several times."

305.   The statement to EMS that Jared was only subjected to the TASER "several times" is demonstrably false. The OSBI affidavit demonstrates that Dingman and Taylor's TASER logs revealed 53 trigger pulls.

306.   Upon information and belief, the video recorded Dingman telling EMS that Jared was still breathing after the TASER applications and that they had to strongarm him to get him into cuffs.

307.   Upon information and belief, Dingman continued his version of events to EMS stating, "We put him in cuffs. After we got him in cuffs, that's when he knocked out for us, on us. Started hitting him on the back, he came back to, started groaning and trying to fight with us again."

30

308.    Dingman's version of events provided to EMS, that Jared was trying to fight after being handcuffed, seated in a hunched-over posture, and struggling to breathe, is blatantly untrue and contradicted by video from the body cameras.

309.    When asked at the scene, Dingman stated that his second TASER cartridge didn't make full contact, and he stated that Jared was tased, "a few times."

310.    At 12:43 a.m., ambulance records document leaving the scene with Jared in route to Healdton Mercy Hospital.

311.    At 12:53 a.m., ambulance records document arrival at Healdton Mercy Hospital.

312.    Upon arrival, medical providers were informed that Jared "was tasered x4 total - law enforcement says 1st was about 11:30."

313.    The statement that Jared was only subjected to the TASER four times is demonstrably false.

314.    Communicating to medical providers that Jared was subjected to a TASER four times was knowingly false or made with reckless disregard for the truth.

315.    No reasonable law enforcement officer responding to questions by medical providers inquiring about the number of TASER exposures, would instead communicate the number of TASER cartridges used.

316.    A law enforcement officer communicating the number of TASER cartridges used in response to questions from medical providers inquiring about the number of TASER exposures, will predictably mislead inquiring medical providers about the factual circumstances they are attempting to treat.

317.    At 3:35 a.m., records document that Jared's care was transferred from Healdton Mercy to an air ambulance service.

318.   Records from the air ambulance service state that Jared "potentially did shrooms, meth" and that he "was tasered 4xs."

319.   The statement that Jared was only subjected to the TASER four times is demonstrably false.

320.   The statement that Jared was engaged in illegal drug use was made to medical providers either knowing it was false or with reckless disregard for the truth.

321.   At 5:03 a.m., records document Jared's arrival at OU Medical Center.

322.   Records from OUMC show that Jared died at 6:32 a.m. on July 6, 2019.

323.   The post-mortem toxicology for Jared performed by the Office of the Chief Medical Examiner was negative for all illegal drugs.

324.   Contrary to the toxicology, however, medical records from Headlton Mercy indicate that "law enforcement" informed medical providers that Jared was under the influence of illegal drugs.

325.   Contrary to the toxicology, however, medical records from OUMC indicate that law enforcement reported that Jared "had taken some kind of drugs (either mushrooms or PCP) and was combative with police therefore he was tazered 4 times . . ."

326.   Upon information and belief, communicating to medical providers that Jared was combative was knowingly false or made with reckless disregard for the truth.

327.   Upon information and belief, communicating to medical providers that Jared was under the influence of illegal drugs was knowingly false or made with reckless disregard for the truth.

328.   Upon information and belief, the members of the city council and Coley reviewed the full video of the police-citizen encounter between Jared and Taylor and Dingman.

329.   Upon information and belief, after reviewing the video, all city councilors and Coley affirmatively approved and ratified Taylor and Dingman's use of force as depicted in the video, and they further reviewed and approved of the reasons why Taylor and Dingman used the amount of force against Jared.

330.   At least one city councilor publicly posted to social media that the city councilors had reviewed all the video there is to review, and that Taylor and Dingman are "well trained officers and have been very good . . . for our community."

331.   To emphasize that the city councilors knew more than the public, and to further demonstrate support for the actions of Taylor and Dingman, the city councilor publicly posted to people who disagreed with him to "SLIDE BACK INTO YOUR SNAKE HOLE AND LEARN SOMETHING!!!!!!"

332.   There was no effort to oust or discipline Taylor or terminate or discipline Dingman because all the city councilors and Coley had no authority to do so, or alternatively, because they fully agreed that the use of force as depicted in the video was consistent with city policy or practice.

333.   To show their approval and agreement with Taylor and Dingman's actions as depicted on the video, the city council promoted Dingman to a full-time officer in October 2019.

334.   Upon information and belief, all Wilson city councilors and Coley endorsed, ratified, and approved the conduct of both Dingman and Taylor and determined that the actions of the officers were consistent with how Wilson expects its community to be policed.

335.   Upon information and belief, after reviewing the video, the Wilson city councilors and Coley could have taken steps to publicly denounce actions of Taylor and Dingman, and to exert political pressure to end the practices seen on the video, but rather than take steps to protect

the citizens of Wilson, the city councilors and Coley ratified and approved of the events depicted in the videos. The approval by Coley is further memorialized in text messages about Doug Lakey exchanged between Coley and city councilor David Newby, who wrongly claimed that Jared was "ran off" from a family function earlier in the evening:



336.    Upon information and belief, Carter County Sheriff Chris Bryant also reviewed video of the encounter following the use of force incident with Jared.

337.    Upon information and belief, Bryant determined that Duggan's actions were consistent with the official policies and practices of Carter County as evidenced by his failure to impose any discipline, by failing to revise its policies and practices, and by failing to update any training curriculum.

338.    Upon information and belief, Lone Grove endorsed the conduct of Miller and determined that his actions were consistent with the Lone Grove policies and procedures by

34

providing no discipline, by failing to revise its policies and practices, and by failing to update any training curriculum.

339.   Upon information and belief, the policy manual for Lone Grove does not provide any guidance for officers like Miller who are expected to respond to post-restraint medical issues as part of their routine duties.

340.   Upon information and belief, an adequately trained officer, or one provided with written guidance about post-restraint medical issues, would have avoided using force against Jared's head and instead moved Jared to rescue position when Jared's agonal breathing began.

341.   Had Lone Grove provided adequate training to Miller, or provided him access to such guidance, he would not have pressed Jared's head downward, or disregarded Jared's respiratory distress, but would have instead avoided using force and placed Jared in rescue position.

342.   Alternatively, adequate training would have led Miller to solicit guidance from first responders in route, or inquire of others how to respond to the significant risk of harm confronting Jared from acute respiratory distress.

343.   Lone Grove knew "to a moral certainty" that its officers would be required to respond to post-restraint medical issues following a use of force incident before the arrival of EMTs.

344.   Lone Grove knew there was no EMT with officers on patrol, and that EMTs could not reasonably or routinely respond to emergent calls within three minutes.

345.   Lone Grove also expected Miller and other officers to make front-line decisions about the need for medical care, and Lone Grove knew there is no medical staff with them on patrol.

346.    Lone Gove knew that arrestees like Jared would be left at the mercy of the officers' decision-making following a use of force incident that resulted in a medical emergency.

347.    The need to train officers to recognize and respond to emergent medical problems involving respiratory distress is obvious, and the failure to provide that training constitutes deliberate indifference to the rights of arrestees like Jared.

348.    On July 1, 2020, the District Attorney for Carter County filed Second Degree Murder charges against both Joshua Taylor and Brandon Dingman.

349.    Despite charges of Second Degree Murder pending against the two officers, neither the Wilson city council nor Coley took any action against Taylor or Dingman.

350.    On July 14, 2020, CLEET moved to summarily suspend the licensure of Taylor and Dingman based on the murder charges.

351.    On July 15, 2020, Coley filed a notice with CLEET acknowledging that Taylor and Dingman were no longer officers as of July 15, 2020.

352.    Based on the documents Wilson provided to CLEET, Wilson intended to allow both Taylor and Dingman to continue working as police officers with charges of second degree murder pending against them.

### IV.

### STATEMENT OF CLAIMS

### FIRST CLAIM
### FOURTH AMENDMENT – EXCESSIVE FORCE
### MUNICIPAL POLICY OR PRACTICE CLAIMS
### 42 U.S.C. § 1983

353.    Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

354.   As detailed above, Wilson has a written policy or unwritten practice that authorized police officers to use force that is unreasonable considering the totality of circumstances confronting the officer. This written policy or unwritten practice, either on its face or as applied, was the moving force behind injuries and damages suffered by Jared and the Estate for which Wilson is liable pursuant to 42 U.S.C. § 1983.

355.   Alternatively, Wilson's written policy or unwritten practice was sufficiently vague that it authorized the use of excessive force as applied to Jared.

356.   As detailed above, Lone Grove had a written policy or unwritten practice that authorized police officers to use force that is unreasonable considering the totality of circumstances confronting the officer. This written policy or unwritten practice, either on its face or as applied, was the moving force behind injuries and damages suffered by Jared and the Estate for which Lone Grove is liable pursuant to 42 U.S.C. § 1983.

357.   Alternatively, Lone Grove's written policy or unwritten practice was sufficiently vague that it authorized the use of excessive force as applied to Jared.

358.   As detailed above, Carter County had a written policy or unwritten practice that authorized police officers to use force that is unreasonable considering the totality of circumstances confronting the officer. This written policy or unwritten practice, either on its face or as applied, was the moving force behind injuries and damages suffered by Jared and the Estate for which Lone Grove is liable pursuant to 42 U.S.C. § 1983.

359.   Alternatively, Bryant's written policy or unwritten practice was sufficiently vague that it authorized the use of excessive force as applied to Jared.

360.    As detailed above, the Defendants acted jointly and in concert to bring about Jared's death, and to the extent damages cannot be apportioned among them, liability is joint and several.

## SECOND CLAIM
### FOURTH AMENDMENT – EXCESSIVE FORCE
### INDIVIDUAL CLAIMS
### 42 U.S.C. § 1983

361.    Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

362.    As detailed above, Taylor, Dingman, Duggan, and Miller used force that is unreasonable under the totality of circumstances confronting them. Their actions were the direct and proximate cause of injuries and damages suffered by Jared and the Estate for which Taylor, Dingman, Miller, and Duggan are liable pursuant to 42 U.S.C. § 1983.

363.    As detailed above, the Defendants acted jointly and in concert to bring about Jared's death, and to the extent damages cannot be apportioned among them, liability is joint and several.

## THIRD CLAIM
### FOURTEENTH AMENDMENT – CIVIL CONSPIRACY
### INDIVIDUAL AND MUNICIPAL CLAIMS
### 42 U.S.C. § 1983

364.    Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

365.    As detailed above, Taylor and Dingman acted in concert to do an unlawful act, or do a lawful act by unlawful means when they conspired to use excessive force and interfere with Jared's right to adequate medical care as evidenced by falsely reporting the sequence and number of TASER exposures to both medical providers and responding law enforcement.

366.     Taylor and Dingman falsely reported the sequence and number of TASER exposures to conceal Fourth Amendment violations, violations of policy, and to mislead responding law enforcement and medical providers to deprive Jared of his right to adequate medical care.

367.     The civil conspiracy between Taylor and Dingman was the direct and proximate cause of injuries and damages suffered by Jared and Estate for which these Defendants are liable.

368.     As the final policymaker or authorized decisionmaker for Wilson, the acts of Taylor are properly attributable Wilson for which Wilson is liable as well.

369.     As detailed above, the Defendants acted jointly and in concert to bring about Jared's death, and to the extent damages cannot be apportioned among them, liability is joint and several.

**FOURTH CLAIM**
**FOURTH AMENDMENT – FAILURE TO TRAIN**
**MUNICIPAL CLAIMS**
**42 U.S.C. § 1983**

370.     Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

371.     As detailed above, Wilson, and Taylor in his official capacity, expected Wilson police officers to use TASERs on citizens, but did not adequately train those officers on appropriate use despite actual knowledge officers will predictably and routinely encounter and use TASERs on persons at risk from cumulative and simultaneous exposure.

372.     Despite actual or constructive notice of the risk from TASERs, Wilson's policies or practices relative to TASER training authorized Taylor and Dingman to use their weapons against Jared in manner that substantially increased the likelihood of death or serious injury, despite the absence of any corresponding threat to the officers.

373.    The failure to implement adequate training protocols and guidance relative to cumulative and simultaneous use, and the failure to discipline officers for excessive and unnecessary use of the weapon, individually and collectively, are the moving force behind injuries and damages suffered by Jared and Estate for which Wilson, and Taylor in his official capacity, are liable pursuant to 42 U.S.C. § 1983.

374.    As detailed above, Lone Grove expected officers to encounter citizens following use of force events and to provide assistance to citizens to ensure their medical safety following a use of force event. Despite Lone Grove's expectations, it did not adequately train officers on appropriate body positioning of people in restraints and exhibiting signs of difficulty breathing, or appropriately providing medical aid following a use of force event to prevent the risk of serious injury or death.

375.    The failure to implement adequate training protocols and guidance relative to positioning and medical aid following a use of force event, and the failure to discipline officers for failing to appropriately position, or render medical aid following a use of force event, are the moving force behind injuries and damages suffered by Jared and Estate for which Lone Grove is liable pursuant to 42 U.S.C. § 1983.

376.    As detailed above, Bryant, in his official capacity, adopted, ratified, maintained, and enforced an official policy or practice of Carter County authorizing Duggan to use a chokehold where the totality of the circumstances did not warrant that level of force.

377.    Despite the expectation that Duggan would use an chokehold in the absence of any need to use that level of force, Bryant, in his official capacity, failed to adopt training protocols for use of chokeholds under predictable and reoccurring circumstances that include a person recovering from multiple TASER exposures.

378.    By failing to train deputies on the risk of using a chokehold on a person recovering from multiple TASER exposures, Bryant, in his official capacity, substantially increased the risk of harm to Jared by authorizing a chokehold, a technique that purposefully deprives the person of oxygen, at the same time that person's body is experiencing a substantial increase in lactic acid from TASER exposures.

379.    The predictable increase in lactic acid in a person recovering from multiple TASER exposures, in combination with use of a chokehold that purposefully deprives the person of oxygen, substantially increases the risk of serious bodily injury or death from acidosis and ultimately organ failure.

380.    Bryant further knew that CCSO deputies who received prior training to use chokeholds would continue to do so while employed with CCSO. Despite that knowledge, and with indifference to the consequences, Bryant maintained a policy or practice that did not require CCSO deputies like Duggan to receive ongoing maintenance or competency training to properly use chokeholds, nor did Bryant take any steps to prohibit use of chokeholds by CCSO deputies who lacked maintenance or competency training.

381.    The failure to Bryant, in his official capacity, to train on the appropriate use of chokeholds was a policy or practice of Carter County, and the direct and proximate cause of injuries and damages suffered by Jared and Estate for which the County is liable pursuant to 42 U.S.C. § 1983.

382.    As detailed above, the Defendants acted jointly and in concert to bring about Jared's death, and to the extent damages cannot be apportioned among them, liability is joint and several.

383.    Jared Wayne Lakey was 28 years old when he was senselessly killed. At the time of his death, Jared was employed at Cimarron Trailers and actively contributing to his retirement planning account. His mother, father, brothers and other loved ones lost essential part of their family that cannot be replaced.

### FIFTH CLAIM
### FOURTH AMENDMENT – EXCESSIVE FORCE
### MUNICIPAL CLAIMS – AUTHORIZED DECISIONMAKER
### 42 U.S.C. § 1983

384.    Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

385.    As detailed above, Taylor was a final policymaker or authorized decisionmaker for Wilson sufficient to confer liability for his actions under 42 U.S.C. § 1983.

386.    As detailed above, Taylor's actions were unreasonable under the totality of circumstances confronting him for which the Wilson is liable pursuant to 42 U.S.C. § 1983 through Taylor acting as a final policymaker or authorized decisionmaker.

387.    Alternatively, either Coley or Wilson was the final policymaker for the city and, as detailed above, promulgated, created, implemented, or possessed responsibility for the continued operation of the Wilson use of force policy as applied by Taylor and Dingman, and each of them further approved all actions and inactions of Taylor and Dingman as depicted in the videos.

388.    As detailed above, the Defendants acted jointly and in concert to bring about Jared's death, and to the extent damages cannot be apportioned among them, liability is joint and several.

42

**SIXTH CLAIM**
**FOURTH AMENDMENT – EXCESSIVE FORCE**
**ENTITY LIABILITY**
**42 U.S.C. § 1983**

389.    Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

390.    As detailed above, Bryant was a final policymaker for Carter County sufficient to confer liability on the County for his actions under 42 U.S.C. § 1983.

391.    As detailed above, Bryant, in his official capacity, adopted, ratified, maintained, and enforced an official policy or practice of Carter County authorizing Duggan to use a chokehold where the totality of the circumstances did not warrant that level of force.

392.    The promulgation and enforcement of the policy or practice authorizing the use of deadly force was the moving force behind injuries and damages suffered by Jared and the Estate for which Bryant, in his official capacity, is liable pursuant to 42 U.S.C. § 1983.

393.    In addition to, or as an alternative to municipal liability conferred by Taylor as final policymaker or authorized decisionmaker, Wilson approved and ratified the actions of Taylor and Dingman as depicted on the video as being consistent with and motivated by the official policies and practices of City, for which City is liable pursuant to 42 U.S.C. § 1983.

394.    As detailed above, the Defendants acted jointly and in concert to bring about Jared's death, and to the extent damages cannot be apportioned among them, liability is joint and several.

SEVENTH CLAIM
FOURTH AMENDMENT – EXCESSIVE FORCE
SUPERVISORY LIABILITY – FINAL POLICYMAKER
42 U.S.C. § 1983

395.    Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

396.    As detailed above, Bryant was a final policymaker for Carter County sufficient to confer liability on the County for his actions under 42 U.S.C. § 1983.

397.    Despite knowledge that use of a chokehold can predictably result in death, Bryant, in his individual capacity, nevertheless permitted Duggan to use the chokehold under circumstances that did not warrant deadly force, or where the person was effectively subdued.

398.    Bryant's involvement in the promulgation and enforcement of policies and practices approving this level of force was the direct and proximate cause of injuries and damages suffered by Jared and Estate for which Bryant and the County are liable pursuant to 42 U.S.C. § 1983.

399.    As detailed above, to the extent Coley had supervisory responsibility while on leave, then he maintained responsibility for the promulgation, creation, implementation, or possession of responsibility for the continued operation of the Wilson use of force policy as applied by his subordinate officers.

400.    By perpetuating a use of force policy or practice that authorized the force used by Taylor and Dingman, Coley's actions set in motion a series of events that he knew, or reasonably should have known, would cause the deprivation of constitutional rights.

401.    As a TASER instructor, Coley also knew the level of force he condoned presented an obvious risk of death or serious bodily injury under circumstances that did not justify the

amount of force used, and that people subjected to that amount of force would inevitably result in an injury of the type suffered by Jared for which Coley is liable.

402.    As detailed above, the Defendants acted jointly and in concert to bring about Jared's death, and to the extent damages cannot be apportioned among them, liability is joint and several.

### EIGHTH CLAIM
### NEGLIGENT PERFORMANCE OF A LAW ENFORCEMENT FUNCTION
### MUNICIPAL LIABILITY
### OKLAHOMA GOVERNMENTAL TORT CLAIMS ACT

403.    Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

404.    As detailed above, the force used by Taylor, Dingman, and Duggan constitutes the negligent performance of a law enforcement function. The actions of Taylor, Dingman, and Duggan were the direct and proximate cause of the damages and injuries suffered by Jared and Estate for which Wilson and Bryant in his official capacity are liable under state law.

### NINTH CLAIM
### STATUTORY EXCESSIVE FORCE - 22 O.S. § 34.1(B)
### MUNICIPAL LIABILITY
### OKLAHOMA GOVERNMENTAL TORT CLAIMS ACT

405.    Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

406.    As detailed above, some or all of the force used by Taylor, Dingman, and Duggan violated agency policy and constitutes statutory excessive force under Oklahoma law. The violation of agency policy was the direct and proximate cause of the damages and injuries suffered by Jared and the Estate for which the Wilson and Bryant in his official capacity are liable under state law.

45

### TENTH CLAIM
### FOURTH/FOURTEENTH AMENDMENT - FAILURE TO INTERVENE
### INDIVIDUAL AND ENTITY CLAIMS
### 42 U.S.C. § 1983

407.   Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

408.   As detailed above, Taylor in his official and individual capacity, Miller, and Dingman, observed a use of excessive force, had a realistic opportunity to intervene, and failed to do so. The failure to intervene by these Defendants was the direct and proximate cause of the damages and injuries suffered by Jared and the Estate for which the Wilson, Taylor, Miller, and Dingman are liable.

### ELEVENTH CLAIM
### FOURTEENTH AMENDMENT - DELIBERATE INDIFFERENCE
### INDIVIDUAL CLAIM
### 42 U.S.C. § 1983

409.   Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

410.   As detailed above, Miller, in the presence of Dingman, acknowledged that Jared was not breathing after participating in or observing Duggan apply a deadly chokehold, and despite acknowledging that Jared was suffering from an objectively serious medical condition, Miller and Dingman took no action whatsoever for almost 4 minutes with indifference to the consequences in violation of clearly established law. The indifference by Miller and Dingman was the direct and proximate cause of the damages and injuries suffered by Jared and the Estate for which Miller and Dingman are liable.

# V.

### RELIEF REQUESTED

Estate respectfully requests the following relief:

A.     An award of compensatory damages against each Defendant in excess of $75,000.00 to be determined by a jury, or alternatively, and in the event of default judgment, $53,000.000.00;

B.     An award of punitive damages against each Defendant sued in their individual capacity in excess of $75,000.00 to be determined by a jury;

C.     A declaration that Wilson, Taylor, Dingman, Miller, Duggan, and Coley violated Jared's constitutional rights;

D.     A declaration that Bryant violated Jared's constitutional rights;

E.     A declaration that Carter County's chokehold policy or practice, on its face and as applied, is unconstitutional;

F.     A declaration that Wilson's TASER use of force policy or practice, on its face and as applied, is unconstitutional;

G.     A declaration that Lone Grove's policy or practice in failing to render medical aid following a use of force event, on its face and as applied, is unconstitutional;

H.     An award of reasonable attorney fees;

I.     An award of reasonable costs;

J.     Any other legal or equitable relief available.

Respectfully submitted,

BRYAN & TERRILL

By:     *s/J. Spencer Bryan*
        Steven J. Terrill, OBA # 20869
        J. Spencer Bryan, OBA # 19419
        BRYAN & TERRILL LAW, PLLC
        3015 E. Skelly Dr., Suite 400
        Tulsa, OK 74105
        Tele/Fax:      (918) 935-2777
        Email: sjterrill@bryanterrill.com
        Email: jsbryan@bryanterrill.com