# EXHIBIT 3

**CYNTHIA LAKEY and DOUGLAS LAKEY**

**V.**

**CITY OF WILSON, JOSHUA TAYLOR, BRANDON DINGMAN,** *et al.*

**UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

**Case No. 20-cv-152-RAW**

**EXPERT WITNESS REPORT**

**BY**

**DEFENSE EXPERT GREG MEYER**

**March 31, 2022**

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

## INTRODUCTION and QUALIFICATIONS

As requested by defense counsel who engaged me as an expert witness on behalf of the Defendants. I have reviewed and analyzed case documentation for this incident by applying my combined 46 years of knowledge, skills, education, training, and experience as a law enforcement officer along with my continuing involvement as a police procedures expert.

My opinions are based on my analysis of the documentation and evidence in this case, then applying my knowledge and understanding of generally accepted professional standards and practices in law enforcement. My opinions are offered with a reasonable degree of professional certainty and are based on:

1. My 46 years of law enforcement experience as a sworn police officer, detective, sergeant, lieutenant, captain, reserve officer, and specialist volunteer at the Los Angeles Police Department (LAPD), subject-matter expert and expert witness or consultant; including my experience as captain at the LAPD Academy in charge of tactical training to include lethal and nonlethal Use of Force.  I chaired LAPD's Use of Force Best Practices Work Group and LAPD's Tactics Training Review Committee, and I continued to serve as a member of both committees for several years after I retired.

2. For two years (2015-2017) I was the designated independent law enforcement expert for the United States Department of Homeland Security's Division of Civil Rights and Civil Liberties where I conducted special investigations involving Use of Force by such agencies as the Border Patrol, ICE, and the Federal Protective Service.

3. On 16 occasions I have conducted outside reviews of police Use of Force cases as requested by four District Attorney offices that were considering whether to file criminal charges against police officers; and on five occasions I have conducted outside reviews of police or sheriff Use of Force cases as requested by the heads of law enforcement agencies for internal affairs purposes.

4. Nearly 43 years of experience with various TASER devices (including shooting or deploying them) in my official law enforcement capacity and my consulting capacity, including research, static testing, field testing, actual field usages, designing and revising lesson plans for users and instructors, training users in many cities throughout the country, training instructors in many cities throughout the country, writing published articles, lecturing on this subject, conducting demonstrations (including voluntary exposures) for political officials and the media, and personally experiencing the TASER effects.

5. I am designated by the California Peace Officer Standards and Training Commission (POST) as a subject matter expert on positional asphyxia.

6. I wrote the tactical "Lessons Learned" sections of a series of books authored by a former Los Angeles County District Attorney detailing the murders of two dozen peace officers in Los Angeles County over the past several decades.

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

7.  I hold the Force Science Analyst certification from the Force Science Institute (FSI) and have held the Certified Litigation Specialist credential from Americans for Effective Law Enforcement (AELE).

8.  I have taught law enforcement and other professionals (including lawyers and judges) about police Use of Force on more than 70 occasions throughout the United States.

9.  I am a member of and receive frequent professional education updates from the International Association of Chiefs of Police (IACP, life member), the Police Executive Research Forum (PERF, life member), the Peace Officers Association of Los Angeles County (POALAC, life member), the International Law Enforcement Educators and Training Association (ILEETA), and the California Force Instructors Association (CALFIA).

10. Each year (except 2020 because of COVID) I produce and instruct at Use of Force and Police Video Evidence and other seminars for POALAC, where I have been a board member for 19 years and chaired the Training Committee for 10 years.

11. I was a member of the design committee and taught classes for the revised California Peace Officer Standards and Training (POST) course on the investigation of officer-involved shootings and arrest-related deaths.

12. My training and experience from attending the LAPD Force Investigation Division's multi-day course on the investigation of officer-involved shootings and arrest-related deaths.

13. I have specific experience with respect to the investigation, administrative review, and adjudication at the supervisory and command levels at the LAPD for police use of force incidents including officer-involved shootings and arrest-related deaths.

14. I have prior and ongoing work as an expert witness or consultant on police procedures, policy, training, equipment, tactics, supervision investigation, documentation, review processes and the law as taught to peace officers, in federal, state, and local courts, both civil and criminal.

15. I have been an expert witness or consultant for more than 400 cases for 32 years, mostly involving police officers using lethal and nonlethal uses of force.  More than 30 of my cases have pertained to arrest-related deaths, and more than 100 of my cases have pertained to TASER use.

16. I have testified in court as an expert on police procedures matters more than 60 times, and I have been deposed in such matters more than 70 times.

17. While the majority of my expert work involves the defense of police officers, approximately 10 percent of my work is adverse to law enforcement officers and their agencies.

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

## **LIMITATIONS**

1. If, after submission of this report, I am asked to consider other relevant materials and/or documents, I may either modify my stated conclusions or offer additional opinions via a supplemental report, if deemed appropriate.

2. I do not offer legal conclusions.  To the extent that my report may refer to statutes or case law, it is in the context of law enforcement training that refers to such matters.

3. There are factual disputes among the parties and witnesses regarding their memories of specific events during the incident.  I do not make determinations of the credibility of parties and witnesses, for that is the province of the trier of fact.

4. I prepared quoted material from audio/video evidence on a best-efforts basis, not from a certified transcript unless a certified transcript was provided.

## **DOCUMENTS REVIEWED**

1) Third Amended Complaint
2) Taylor body-worn camera video.mp4
3) Dingman combined video.mp4 (Dingman dash-cam & body-worn; and Taylor body-worn)
4) Case Master Report OSBI 2019-805
5) Dingman report narrative
6) Taylor report narrative
7) Wilson Police Department (WPD) use of force policy 05.01.2014
8) Audio: initial call to dispatch 7-04-2019
9) Transcribed depositions of
    a) David Duggan
    b) Robert Oldham
    c) Richard Batt
    d) Tommy Handke
    e) Billy Mitchell
    f) Sterling Tucker
    g) Doug Lakey
    h) Cynthia Lakey
    i) Justin Lakey
    j) Joshua Lakey
    k) Cody Helms
    l) Brandon Dunn
    m) Terry Miller

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

10) Taylor and Dingman criminal case transcript
11) Two TASER download printouts
12) Axon report by Bryan Chiles dated May 7, 2021
13) Plaintiff's expert Scott DeFoe report
14) Plaintiff's expert Michael Leonesio report
15) Plaintiff's expert Dr. Sperry report
16) TASER product warnings (10-30-2018)
17) SOAS EMS records
18) Mercy Hospital records
19) OU Medical Center records
20) Medical examiner's report and file
21) Defense expert Dr. Richard M. Luceri report
22) National Consensus Policy and Discussion Paper on Use of Force (originally published
    October 2017; revised July 2020.)


**INCIDENT SUMMARY**[1]

On the evening of July 4, 2019, Jared Lakey and his longtime friend Cody Helms were hanging out drinking some beers with other friends. Lakey left and went to Helms' house. When Helms got home, he observed that Lakey "was acting weird. He was breathing heavy. I think he was sweating. … I know he had his shirt off. He was standing in the living room, him and *[another friend]* Duff were both moving around. He was breathing heavy. … Jared punched the inside of Helms' door and dented it." Helms called Lakey's brother and told him, "That Jared was acting wild and started walking down the road and I didn't know what was wrong with him, I believe."[2]

Late night on July 4, 2019, approximately 10 minutes before midnight, a woman called the Carter County Sheriff's Office dispatcher to report a male running down the street and screaming. WPD Captain Joshua Taylor was dispatched. Taylor located Jared Lakey (male, 5'9", 343 pounds, 28 years of age) who was naked except for wearing a pair of socks. Taylor exited his police vehicle and asked Lakey what was going on. Lakey appeared agitated and said that he was looking for his pants. Lakey grabbed the police vehicle's front bumper guard and began rocking the police vehicle up and down. Taylor asked Lakey where he lost his clothes, and Lakey stated, "Okay, we're going to do this." Taylor assessed that Lakey was becoming aggressive. Taylor unholstered his TASER and ordered Lakey to the ground and to put his hands behind his back. Lakey laid down on his back and rolled over several times. Taylor requested WPD Officer Brandon Dingman to respond as back-up. Taylor notified dispatch that he had "one at TASER point." Taylor repeatedly ordered Lakey to put his hands behind his back, without compliance. Officer Dingman arrived. The officers continued to order Lakey to put his hands behind his back, without compliance.

---

[1] This summary was constructed using the reports by the involved officers, the video evidence, the criminal trial transcript, the transcribed depositions of Cody Helms, David Duggan and Terry Miller, and the TASER download printouts.
[2] Transcribed deposition of Cody Helms, p. 50, 52, 55, 56 [with p. 55 quoting from Helms' interview with OSBI]

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

At counter 01:40 [minutes:seconds] on the "Dingman combined video," Dingman approaches Lakey and lightly places his right foot on Lakey's upper-left back to "test the waters"[3] [i.e., assess whether Lakey would be cooperative if Dingman moved down to the ground to handcuff him] and began to draw his handcuffs. Lakey raises himself up, and Dingman attempts to apply pressure with his foot to keep him down, but as Lakey raises himself up, Dingman loses his balance.

Taylor considered Lakey's upward movement as an act of aggression.[4] As Taylor's body-worn camera (BWC) turns on at 02:04 on the Dingman combined video,[5] Taylor discharges a TASER cartridge as Dingman regains his balance and quickly steps back as Taylor asks Dingman, "Did I get ya?" [i.e., with a TASER probe; Dingman was not struck]. Taylor assessed that the TASER use did not result in the expected neuro-muscular incapacitation (NMI) that is indicative of an effective TASER application that would have allowed the officers to control and handcuff Lakey.[6]

At 03:16 on the Dingman combined video, Lakey rises completely to his feet and turns to face Dingman. Taylor deploys the TASER again, and Lakey goes back to the ground.

Over the course of the event Lakey is seen on video attempting to get up off the ground 10 times, and successfully getting completely up on his feet two times. Over the course of approximately nine minutes, Taylor activated his TASER 30 times including one cycle extended beyond the default five-second cycle and 12 "short cycles" (meaning that the officer de-activated the TASER prior to completion of the default five-second cycle); Officer Dingman activated his TASER 23 times including one extended cycle and one "short cycle." Loud clicking sounds that indicate that there was no electricity being delivered to Lakey on at least seven occasions because one or both probes were not connected to him (which typically occurs because a probe missed him, or one or both probes fell out while Lakey was moving on the ground, or because Lakey pulled one or both probes out of himself).

The final TASER discharge of the incident is heard at counter 09:13 on Taylor's BWC. Loud clicking is heard, meaning that this activation was not effective. Lakey gets completely off the ground and onto his feet and takes several steps toward a fence as Taylor says, "Gonna have to go hands on." At counter 09:24, Lakey falls to the ground near the fence, rolls himself to a semi-prone position, then to a supine position at counter 09:53 as Taylor says to Lakey, "Let us put handcuffs on you, bro' … let us put handcuffs on you." Lakey is seen moving his arms and legs. At counter 10:28, Lakey sits himself up.

At Taylor BWC counter 10:20, Carter County Sheriff's Office Captain David Duggan arrives as back-up. Lakey remains sitting, is moving around, and is obviously breathing. Dingman tells Duggan, "We deployed four TASERs, he's not givin' up." Duggan returns to his vehicle to obtain his gloves. At Taylor BWC counter 11:00, Duggan begins to approach Lakey from behind.

At Taylor BWC counter 11:14, Duggan applies a locked-carotid neck restraint on Lakey, then Taylor and Dingman move in and they apply two sets of handcuffs to Lakey. Lone Grove Police

---

[3] Dingman trial testimony transcript, p. 722
[4] Taylor's trial testimony transcript, p. 650
[5] It would have been preferable for Taylor to activate his BWC at the beginning of the incident.
[6] Taylor's trial testimony transcript, p. 652

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report


Department Officer Terry Miller (who arrived right after Duggan) testified at his deposition (p. 72 and 80) that Lakey was resisting the officers during the handcuffing process, "They've both got an arm, but he's actively resisting allowing them to put the hands behind his back."

Duggan testified at his deposition (p. 108) that he applied the neck restraint for four seconds resulting in Lakey becoming unconscious.[7]  However, the video evidence does not make clear how long Duggan maintained the carotid hold on Lakey.

After that, Lakey did not regain consciousness as normally happens after a properly applied carotid neck restraint, based upon my knowledge, skill, education, training and experience.  At Dingman combined video counter 14:08, an officer says, "Roll him over.  Raise him up."  Officers do that, and Lakey is now in a sitting position but is apparently still unconscious.  Multiple pushes and slaps are given to his back to try to make him conscious.  Then Lakey is heard making "grunting" sounds.  At 15:55 Lakey is making no more sounds and appears not to be moving.  At 17:28 an officers says "Hey, wake up, wake up."  At 17:40, an officer says, "He's out again."  At 17:54, an officer says, "Hit him on the back."  The sounds of slaps are heard, and an officer says, "Wake up, wake up."  At  18:18, an officer asks, "Is he breathing," and an officer replies, "No."

Medical treatment efforts including CPR are documented in the below timeline.


## PLAINTIFF'S COMPLAINT ISSUES
- Excessive force (Taylor, Dingman)
- Deliberate indifference to medical needs (Dingman)
- Monell violations (WPD policy/practice/training)


## POTENTIAL LIMITATONS OF VIDEO EVIDENCE
This case involves video evidence. My training and experience are that video evidence of a police use of force incident is generally very valuable to an investigation, but it has several significant, potential limitations that investigators and adjudicators must be aware of:

- Videos are made with two-dimensional technology, but we live in a three-dimensional world.
- Videos do not always capture the involved officer's point of view.
- Videos may capture objects and events that the officer did not see.
- Videos do not always capture objects and events that the officer did see.
- Video cameras do not capture objects and movements that are blocked from the camera lens.
- Videos may document different lighting conditions than the human eye.
- Video devices are not always pointed at the action.
- Video devices often capture voices and other sounds that are more valuable to the investigation than what is seen on the video.

---

[7] See also the criminal trial transcript at p. 364, where Duggan testified that he applied pressure during the neck restraint for three or four seconds resulting in Lakey becoming unconscious, then he maintained the position without exerting pressure during the handcuffing process.

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

> Video cameras are neutral, inanimate objects; thus, videos do not experience the bio-mechanical, physiological and psychological aspects that the involved human being experiences under stress in terms of perception, fear, adrenaline-influenced physiological changes (such as breathing, heart rate, and blood pressure), interpretation of contextual cues, narrowly focused attention ("tunnel vision"), time distortion, sound distortion, memory (formation, storage, and retrieval), and other human performance phenomena.

> Videos of use-of-force incidents tend to cause emotion-based (not fact-based) reactions by viewers, because use of force is generally not pleasant to view.

> Videos are not "the ultimate truth." Investigators and adjudicators must determine what the officer perceived at the time and apply the totality of the circumstances along with policy, training and the law to determine whether or not the officer's perceptions and actions were objectively reasonable.


**TIMELINE**

Primarily from the Dingman combined videos with Dingman's dashcam in the lower-left quadrant (which is the camera for the below notes unless otherwise indicated); and Dingman's BWC in the lower-right quadrant[8]; and Taylor's BWC in the upper left quadrant, I created this TIMELINE:

00:56   Dingman arrives at scene with dashcam activated (no sound).  Taylor has Lakey on ground at TASER-point.

01:03   Lakey rolls himself from the supine position to prone.

01:07   Dingman enters video frame, then turns back to his car to get his gloves as Taylor tells Lakey clearly, "Put your hands behind your back," but there is no compliance by Lakey.[9]

01:40   Dingman approaches Lakey while Taylor covers with TASER and repositions.  Dingman tells Lakey clearly, "Put your hands behind your back for me.  Put your hands behind your back.  Put your hands behind your back."[10] Lakey does not comply.  Dingman places his right foot lightly in Lakey's upper-back (where a knee would usually go) to "test the water"[11] and with his right-hand appears to be drawing his handcuffs.

02:00   Taylor tells Lakey, "Noncompliance is going to get your tased."[12]  Lakey starts moving upward, Dingman loses his balance and falls back from Lakey, and Taylor's BWC (with sound) turns on.

02:04   Taylor deploys a TASER cartridge.[13]

---

[8] For reasons unknown to me, the Dingman BWC footage does not appear in the Dingman combined video.mp4 file until counter 04:36; however, Dingman's BWC was running the whole time, as can be seen in the video exhibit to the transcribed deposition of Terry Miller.

[9] Although the Dingman combined video.mp4 is still silent at this point, Taylor's command to Lakey is heard at counter 02:01 on the video exhibit to the transcribed deposition of Terry Miller.

[10] Although the Dingman combined video.mp4 is still silent at this point, Dingman's commands to Lakey are heard at 02:34 on the video exhibit to the transcribed deposition of Terry Miller.

[11] Dingman trial testimony transcript, p. 722

[12] Although the Dingman combined video.mp4 is still silent at this point, Taylor's TASER warning is heard at counter 02:44 on the video exhibit to the transcribed deposition of Terry Miller.

[13] On the Dingman combined video.mp4 at counter 02:04, for reasons unknown to me a loud TASER clicking sound is briefly heard prior to the "pop" sound of Taylor deploying a TASER cartridge.  However, the loud TASER clicking

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

02:13   Dingman deploys a TASER cartridge. Officers are heard to tell Lakey numerous times over the next few minutes, "Put your hands behind your back."

02:25   Taylor replaces his TASER cartridge.

02:30   Dingman radios, "Two TASERS deployed."

02:35   An officer says, "Put your hands behind your back or you're gonna get tased again."

NOTE: Regarding any TASER overlaps, each officer likely did not know that the other officer was deploying the TASER at the same time, because with a good connection the TASER is quiet (i.e., you cannot hear the clicking with a good connection like you can hear it with a bad one).

03:13   "You're gonna get tased again."          .

03:16   Lakey says, "Man, I'm sorry, dude" then he quickly rises to his feet and turns to face Dingman. Taylor then triggers a second TASER cartridge, Lakey goes back to the ground.

03:45   "You're gonna get it again" after continued noncompliance with commands to "Put your hands behind your back."

03:53   Dingman radios a request for additional units.

04:00   Loud TASER clicking sound is heard, indicating no good electrical connection.  (This occurs at least seven times throughout the incident.)

04:17   Dingman radios, "We have three TASERs deployed at this time" [meaning three cartridges], "still combative" [actually Lakey was noncompliant and actively resisting the control efforts].

06:09   Lakey gets up onto his feet very aggressively and begins to move toward the officers.  He appears to be stopped by TASER use (TASER is quiet, clicking is not heard, indicating a good connection.)

06:25   Lakey appears to be trying to get up again, a quiet TASER stops him.

06:40   Lakey appears to try to get up again, a quiet TASER stops him.

06:50   More commands to "put your hands behind your back."

06:57   "Put your hands behind your back and you'll quit getting tased."

07:12   Lakey tries to get up again, a quiet TASER stops him.  This occurs again at 7:33 and 7:50.

07:56   "You'll quit getting tased, just put your hands behind your back and let us get you in cuffs.  That's all we want, to put you in handcuffs."

08:30   Lakey raises his head and shoulders and looks around for 16 seconds, no TASER used.

08:46   "Let us put you in handcuffs."

09:07   Lakey rolls his body to the right as if attempting to get up, a quiet TASER stops him.

---

sound is not heard just prior to Taylor triggering the TASER at counter 02:58 on the video exhibit to the transcribed deposition of Terry Miller.

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

09:12   Lakey attempts to get up while moving in Taylor's direction, a quiet TASER stops him.

09:20   "Let us put you in handcuffs."

09:31   "Let us help you by putting you in handcuffs.  Don't fight us, put your hands behind your back and let us handcuff you."

09:42   "Let us put you in handcuffs."

09:50   While prone, Lakey makes a "growling" noise and moves his hands from near his shoulders to down his sides and appears to start trying to get up, a quiet TASER stops him (and a loud clicking TASER sound is also heard).

10:00   Lakey rolls to his left and appears to be trying to get up, a quiet TASER stops him.  A loud clicking TASER is heard right after that.  (Lakey is seen reacting to the quiet TASER, but he did not react to the loud clicking TASER; this is an example of the difference between the two.)

10:07   One officer says, 'We're about to have to just go hands-on," the other officer responds, "I know."

10:11   Lakey rolls onto his left side and appears to be trying to get up, a quiet TASER stops him.

10:26   Lakey rolls to his right and attempts to get up, a quiet TASER stops him.

10:42   Lakey reaches his arm up to the chain link fence as if trying to get up, a quiet TASER stops him.

11:10   Lakey appears to attempt to get up, a medium TASER clicking sound is heard, an officer says, "Don't let him get up, don't let him get up."

11:18   Lakey quickly gets all the way up, both officers back further away from Lakey, an officer says, "Gonna have to go hands-on."  A loud clicking TASER is heard.  "Get on the ground."  "Go hands on."  "Get on the ground."

11:27   Lakey trips or falls to the ground by the fence.  The officers approach closer to him.

11:55   An officer says, "Let us put cuffs on you bro' … let us put handcuffs on you."

12:23   Deputy Duggan radios 10-97 (at scene).  Officer Miller arrives shortly thereafter.

12:30   Dingman tells Duggan, "We deployed four TASERs, he's not giving up … he's broken all the barbs off." An officer says, "Let us put the handcuffs on you."

13:05   Deputy Duggan approaches Lakey from behind.

13:17   Deputy Duggan puts a locked carotid hold on Lakey and renders him unconscious.  The video evidence is not clear about how long Duggan maintained the carotid hold on Lakey.  Taylor and Dingman approach and handcuff Lakey using two sets of cuffs because of Lakey's size.

14:00   An officer says, "Got it," indicating that the handcuffing process is complete.

14:03   And officer says, "Alright. Roll him over.  Raise him up."  The officers do so, and Lakey is now in a sitting position but apparently still unconscious.

14:15   Multiple pushes and slaps are given to his back to try to make him conscious until counter 14:40.  Lakey is heard making "grunting" sounds.

14:17   Dingman radios, "Terry, get SOAS enroute" (meaning Dingman requests EMS response).

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

16:19   Lakey is off-camera for more than a minute.

17:23   Lakey is seen very briefly, still in the same sitting position

17:28   An officer says, "Hey, wake up, wake up."

17:45   An officer says, "He's out again."

17:54   An officer says, "Hit him on the back." The sounds of slaps are heard. "Wake up. Wake up."

18:18   "Is he breathing?" "No."

18:28   Dingman radios, "Ask SOAS to step it up, we've got one not breathing right now."

19:20   An officer is heard slapping Lakey, saying, "Hey … hey."

21:00   An officer says, "I can't feel a pulse," and the decision is made to start CPR.

21:30   Handcuffs get removed.

22:05   An officer radios that he needs SOAS (EMS) to respond as quick as they can, starting CPR.

29:50   Someone (a medic?) asks, "How long was he still breathing after the TASERs?" Dingman responds, "Well, he was still breathing after the TASERs, ah …" [Interrupted by unintelligible question.] Dingman says, "When got assistance here, we had to go into the strongarm [i.e., Duggan's neck restraint], it came down that way, we put on cuffs, after we got him in cuffs, that's when he knocked out for us, on us, so I hit him on the back, he came back to, started groanin', tryin' to fight with us again, and then when we had him in cuffs, that's when we noticed he was not responsive."


## OPINIONS
Below are my Opinions and supporting rationale.

### Opinion No. 1
**If Captain Taylor reasonably feared that it was unsafe to approach to within contact range of Mr. Lakey without sufficient numbers of officers present to safely control Mr. Lakey, then it was reasonable for Captain Taylor to repeatedly use the TASER in an attempt to keep Mr. Lakey on the ground and put his hands behind his back so that he could be approached and handcuffed.**


### Opinion No. 2
**If Officer Dingman reasonably feared that it was unsafe to approach to within contact range of Mr. Lakey without sufficient numbers of officers present to safely control Mr. Lakey, then it was reasonable for Officer Taylor to repeatedly use the TASER in an attempt to keep Mr. Lakey on the ground and put his hands behind his back so that he could be approached and handcuffed.**

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

## RATIONALE COMMON TO OPINIONS NO. 1 and 2

Confronting a naked man of any size who is acting irrationally is a very dangerous situation, based upon my knowledge, education, training and experience.  I have personally been involved in physical altercations with such subjects.  A recent article entitled, "Assessing Use-of-Force Liability and Law Enforcement Response to the Naked Subject" affirmed the dangers presented by and the difficulties of controlling naked subjects. **[See EXHIBIT NO. 1]**

It takes at least six officers to effectively use hands-on tactics to control a person who is experiencing a mind-body disconnect, based upon my knowledge, skills, education, training and experience.  Such persons are "unsafe to approach" by fewer officers.  The use of normal hands-on tactics tends not to work in these situations because of the dangers such persons present to officers.  For example:

> In 1977, a police officer was disarmed and shot in the face by a naked man who was under the influence of phencyclidine (PCP), an illegal drug reputed to give some users "super-human" strength.  That same year, four police officers responding to a single incident suffered an assortment of broken bones and concussions at the hands of a naked PCP suspect.  Another officer shot and killed a naked man on PHP (a PCP analog); the man had twice taken the officer's baton and was about to overpower him. In 1978, a deputy sheriff was disarmed and shot to death in a fight with a PCP suspect.[14]

Based upon my 43 years of nonlethal weapons experience, such devices (including TASERs) are appropriate to use when (1) the use of deadly force is not reasonable or necessary; (2) conventional tactics have failed or will likely fail under the circumstances; (3) it is unsafe to approach to within contact range of the subject.[15]

Mr. Lakey was a very large, naked, sweaty man who weighed 343 pounds, and who was exhibiting bizarre behavior consistent with a person acting out while under the influence of stimulant drugs.  Such persons are notoriously hard to control using traditional hands-on tactics which often fail, especially when trying to control a naked and sweaty person because officers cannot achieve the grips necessary to make hands-on tactics successful.  Subjects who engage in bizarre behavior and appear to be acting under the influence of stimulant drugs present serious dangers to officers and the subject himself when there are not enough officers present to safely provide effective  physical control.  Among those dangers are situations where officers have been overwhelmed by the strength and combativeness of the subject, resulting in serious injuries to officers including being beaten and even being disarmed of their weapons which are then used against them; and dangers to the subject himself when officers must resort to hard-hands force tactics and impact weapons that have proven to be far more injurious than TASERs.

The written reports of Captain Taylor and Officer Dingman make clear that they feared being attacked if Lakey were not controlled on the ground, and that Dingman and Taylor at different times

---

[14] Greg Meyer, "Your Nonlethal Weapons Alternatives," Journal of California Law Enforcement 15, No. 1 (1981): 126.
[15] Los Angeles Police Department nonlethal weapons policy written by Greg Meyer in 1980 (and replicated in many agency policies I have seen across the United States).

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

approached Lakey intending to handcuff him, and that some of the TASER wires were not properly connected to Lakey (meaning that he would not be receiving effective TASER electricity from those probes).

The officers' testimony in the criminal trial was that they used their TASERs to attempt to keep Lakey from getting up and attacking them. Without effective TASER NMI, they did not believe they could safely control Lakey via hands-on tactics; rather they would have to resort to more injurious tactics (i.e., punches, kicks, knee strikes, elbow strikes) which are at a higher level than TASER on the WPD use of force policy; and that doing so would be dangerous for Lakey and the officers themselves, including concerns for their handgun retention.[16]

In the United States from 2011-2020, the Federal Bureau of Investigation (FBI) has documented that 20 officers were overpowered and murdered with their own weapon, and 23 other officers were disarmed and wounded or injured with their own weapon.[17] There were likely other such incidents that were not reported to the FBI, because it is widely known in the profession that not all agencies are diligent in making such reports.

When it is unsafe to approach a resisting or noncompliant subject like Lakey, it is important to keep him on the ground until sufficient back-up officers arrive, and a TASER is the best way to do that because it allows officers to keep their distance from the subject pending the arrival of sufficient back-up officers.[18] Two officers are not enough to safely approach and control a person of Lakey's size, demeanor, and apparent drug intoxication. I have personally been in situations where even six officers found it very challenging to control such a person, regardless of the person's size.

At counter 11:10 on the Dingman combined video, as Lakey appears to attempt to get up again while a TASER clicking sound is heard, Taylor tells Dingman, "Don't let him get up, don't let him get up." This indicates that the TASER was not keeping Lakey down, and it was entirely appropriate for Taylor to tell Dingman to not let Lakey get up, because the officers needed to wait for back-up units to arrive in order to handle the incident more safely.

The officers followed their agency's use of force policy, and the Plaintiff's Third Amended Complaint admitted that they did (in Paragraphs 107, 132, and 133). The use of force policy of the WPD places TASERs at Level 3 (out of six levels) of its use of force continuum ("Progression of Force"). The policy states, "Level 3 includes control and restraint defensive tactics that have a minimal chance of causing serious physical injury," and it lists "Electronic Restraint Device (ERD)" (i.e., TASER) as a Level 3 force option.

It is clear to me from the evidence that the officers' repeated uses of the TASER were done to attempt to keep Mr. Lakey on the ground and put his hands behind his back so that he could be handcuffed. Mr. Lakey never did put his hands behind his back. There were more TASER uses documented in this incident than are usually seen, but the officers were only equipped with

---

[16] Taylor trial testimony transcript, p. 652-655; and Dingman trial testimony transcript, p. 723-726
[17] https://crime-data-explorer.app.cloud.gov/pages/downloads [accessed 03-19-2020 by GM]
[18] **See EXHIBIT No. 2**, a compendium of references of treatise chapters, papers, and documents of TASER Conducted Energy Weapon (CEW) use on persons exhibiting signs of Excited Delirium Syndrome (ExDS)

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

TASERs and handguns, and the suspect kept trying to get up and was sometimes successful at doing so.

My timeline established that some of the TASER uses were effective at preventing Mr. Lakey from getting up, and some of the TASER uses caused Mr. Lakey to return to the ground after he tried or successfully got up. Despite the unusual number of TASER activations in this case, doing so was proportionate to the level of Lakey's noncompliance and resistance because he was unsafe to approach without more officers present. It was clear from the video evidence that the officers used the TASERs in an effort to overcome Mr. Lakey's resistance while awaiting the arrival of back-up officers, not to injure him or punish him. Mr. Lakey continued to resist the officers' control commands despite repeated TASER uses.

> Note: During and after the course of the event, Officer Dingman stated on the radio and to various people that Lakey had been "combative," was "fighting us," and words to that effect, when it would have been more accurate to say words like "noncompliant" and "actively resisting." However, on the occasions where Lakey got up or attempted to get up, an officer in this situation could reasonably assess that behavior as a pre-assault indicator, and Taylor and Dingman so testified, as previously noted. Also, Officer Dingman should have more accurately conveyed that the TASER was used on Lakey many times, not "a few" or "several"; when he said the officers used "four TASERs," I interpret that to mean four TASER <u>cartridges</u> were used (two from each TASER).

The video evidence established that the officers warned Lakey multiple times that the TASER would be used if he did not submit to control, as admitted in the Plaintiff's Third Amended Complaint (paragraphs 78 and 104).

At least seven of the TASER uses featured loud clicking sounds that indicate the TASER was not effectively delivering electricity, based upon my knowledge, education, training and experience. Mr. Lakey received TASER applications or attempted TASER applications over the course of approximately nine minutes, but he continued to be noncompliant or actively resist (and at least twice appeared to aggressively resist by getting up and turning toward an officer). My timeline established that Mr. Lakey quickly got all the way up on his feet two times causing both officers to back away further. The second time occurred approximately nine minutes after the first TASER use.

Plaintiffs argue that the officers should have attempted the TASER tactic known as "cuffing under power." The reality of the cuffing under power tactic is that it cannot be completed during a standard five-second TASER cycle. Rather it takes an extended cycle or multiple cycles to accomplish. In addition, Mr. Lakey remained unsafe to approach, and two officers are not an adequate number to achieve cuffing under power in these circumstances. I am personally aware of several cases when officers attempted cuffing under power, but one or more of the officers themselves received the TASER electricity and had to back off. It is interesting that Plaintiff's argue that the officers should have used the cuffing under power tactic (which by definition requires TASER use), and they also argue that the officers should not have used a TASER at all.

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

**Opinion No. 3:**
**Based upon my knowledge, skill, education, training and experience, Mr. Lakey recovered from each of the TASER applications in the normal manner, but he did not recover from Officer Duggan's neck restraint in the normal manner.**

Recovery from TASER exposures tends to be immediate after the TASER turns itself off or the officer uses a "short cycle."  Throughout the event prior to Duggan arriving, Lakey remained conscious, breathing, occasionally talking or audibly reacting to the TASER pain, occasionally moving, and trying to get up or successfully getting up.  After the final use of the TASER, Lakey stood all the way up, took a few steps, then tripped or fell to the ground near a home, stayed on the ground for a period of time, then he leaned forward and sat up.  It is typical that when subjects have experienced the TASER electricity, even multiple times, recovery is immediate.

Mr. Lakey only became unresponsive after Duggan placed a locked carotid neck restraint on him and rendered him unconscious.  Based upon my knowledge, skill, education, training and experience at using carotid neck restraints and observing other officers use them, it was very unusual for Mr. Lakey to not regain consciousness on his own within a few seconds of being rendered unconscious. I noted that after the officers took extraordinary steps to revive Lakey, he appeared only semi-conscious, and his breathing and responsiveness appeared and sounded greatly diminished.

> Note: None of the records from the SOAS EMS, Mercy Hospital, or OU Medical Center reports mentioned that Mr. Lakey had been subjected to a neck restraint, and that he had become unresponsive shortly thereafter.

**Opinion No. 4:**
**Officer Dingman attended to Mr. Lakey's medical needs.**

Officer Dingman requested an ambulance to respond.  After that, Officer Dingman requested that the ambulance response be "stepped up" (i.e., come to the scene faster).  Officer Dingman assisted with providing CPR to Mr. Lakey.

**Opinion No. 5**
**Captain Taylor and Officer Dingman received reasonable and adequate law enforcement training.**

Both officers were CLEET-certified, as required by the City of Wilson.  CLEET certification means the officers were adequately trained according to the requirements of the State of Oklahoma, which also requires 25 hours of annual in-service education and training courses that are approved by CLEET.  The City of Wilson reasonably relied on the CLEET-certification process to train its officers to perform law enforcement duties.  Oklahoma law enforcement agencies must meet CLEET training requirements, but there is no requirement to exceed them.  Especially, in a very small police department like WPD, there is no requirement or expectation to exceed the education and training hours required by CLEET.

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

With respect to TASER training, both officers had been trained and certified in TASER use prior to the incident with Mr. Lakey. The TASER manufacturer suggests and promotes annual re-certification, but there is no statutory requirement to do so. Officers are trained in and possess and use a variety of other nonlethal weapons without any specific retraining requirement.

## Opinion No. 6:
**The Wilson Police Department's use-of-force policy was reasonable and adequate.**

The policy (which took effect May, 1, 2014, i.e. five years prior to the Lakey incident) is reasonable and adequate and meets the *Graham* requirements and national law enforcement guidelines regarding use of force. More specifically, it is consistent with the guidelines set forth in the National Consensus Policy and Discussion Paper on Use of Force, originally published October 2017 and revised July 2020.

The policy specifically lists a six-level continuum of force options, ranging from those that are considered in the profession to be non- or less-injurious, up to those that are considered in the profession to be more-injurious up to and including deadly force. The policy places Electronic Restraint Devices (i.e., TASERS) at Level 3, along with other tools and tactics "that have a minimal chance of causing serious physical injury" (e.g., joint locks, pressure points, pepper spray, and leverage applications of batons).

The Wilson policy is similar to most agencies that place TASERS on the same level as pepper spray. (Note that Captain Taylor and Officer Dingman did not possess pepper spray.)

For decades, when I have taught use-of-force classes to national or local law enforcement audiences, I ask how many of them were sprayed with pepper spray during training; how many were TASERed during training; and for those that had both, the answer is generally about 90% of them would much prefer being TASERed again instead of pepper-sprayed if they had a choice, because the TASER effects are brief, while pepper spray effects typically last for an hour or more.

## Opinion No. 7:
**TASER is a generally safer alternative to other types of force.**

There is a plethora of research studies that show that TASER produces fewer and less severe injuries to subjects and officers, compared to conventional tools and tactics.

One of those studies is my own master's thesis, an internationally recognized study that shows that TASER deployment on a resisting suspect typically results in fewer and less severe injuries to officers and suspects, compared to other nonlethal police tools and tactics (including batons, kicks, punches, flashlights, the "swarm" technique, and miscellaneous bodily force such as ground-fighting, grappling, tackling, and other hands-on tactics).[19]

Retrospective studies (including over 40,000 uses of force) find a 65% reduction in subject injuries versus batons, manual control, and "pepper" spray. A major 2019 peer-reviewed article states:

---

[19] "Nonlethal Weapons vs. Conventional Police Tactics: The Los Angeles Police Department Experience," by Greg Meyer (California State University, Los Angeles, 1991)

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

Subject injury rates are significantly lower with the adoption of the CEW.[20] The MacDonald study covered 12 US law enforcement agencies and 24,380 uses of force. They found that the CEW reduced subject injury by 65%. Taylor et al. analyzed data from 13 US agencies including 16,918 uses of force and described a reduction in injuries requiring medical attention of 75%. Numerous other studies have documented similar reductions in subject injury rates.[21]

A major National Institute of Justice (NIJ) funded TASER safety study included six law enforcement agencies across the United States and was completed in October 2007.[22] A tactical physician at each participating agency reviewed police and medical records after each successful application of a Taser. The study was reported in "Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects," Bozeman, et al., Annals of Emergency Medicine. The article reports (on p.7) that:

> "A rapidly evolving body of literature has examined a range of physiologic and cardiovascular effects of conducted electrical weapon exposure in human volunteers (Table 6). These studies, which include articles and published preliminary reports in abstract form, demonstrate no evidence of dangerous respiratory or metabolic effects using standard (5-second), prolonged (15- second), and extended (up to 45-second) conducted electrical weapon discharges."

The same article also reports that in 1,201 field incidents that occurred in six cities, 99.75% involved no serious injury from the TASER. Quoting from the announcement of the completion of the study:

> "This study is the first large, independent study of injuries associated with Tasers. It is the first injury epidemiology study to review every Taser deployment and to reliably assess the overall risk and severity of injuries in real world conditions," said William Bozeman, M.D., the lead investigator and an emergency medicine specialist at Wake Forest University School of Medicine. "The injury rate is low and most injuries appear to be minor. These results support the safety of the devices."

A 2007 journal article reported a study that analyzed 1,645 use-of-force incidents involving conducted energy weapons (CEDs) and pepper spray from two law enforcement agencies.[23] The article abstract reported:

---

[20] "CEW" means "Conducted Energy Weapon," which is one of several descriptors in the literature to generically describe a TASER

[21] Kroll M, Brave M, Pratt H, Witte K, Kunz S, Luceri R. "Benefits, Risks, and Myths of TASER® Handheld Electrical Weapons. Human Factors and Mechanical Engineering for Defense and Safety." 2019;3(1):7. [internal citations omitted]

[22] "Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects," Bozeman, et al., Annals of Emergency Medicine, Volume XX, Issue X (2008)

[23] "The impact of conducted energy devices and other types of force and resistance on officer and suspect injuries," article, by Smith, Kaminski, Rojek, Alpert and Mathis, Policing: An International Journal of Police Strategies & Management, Vol. 30, No. 3, 2007, ppg. 423-446

Lakey v. Wilson, Taylor, Dingman, *et al.*                Defense Expert Greg Meyer's Report

"The analysis suggests that relative to other forms of force, the use of CEDs and pepper spray can reduce the risk of injury to both suspects and law enforcement officers. This information should prove useful to law enforcement agencies considering adopting CEDs and suggests that agencies should consider the use of these less lethal alternatives in place of hands-on tactics against actively resistant suspects."

A major National Institute of Justice (NIJ) study in 2008[24] (conducted by a prominent group of doctors and medical examiners) reported:

> Although exposure to CED is not risk free, there is no conclusive medical evidence within the state of current research that indicates a high risk of serious injury or death from the direct effects of CED exposure. Field experience with CED use indicates that exposure is safe in the vast majority of cases. . . .
>
> All CED use should conform to agency policies. **The decision to use a CED or another force option is best left to the tactical judgment of trained law enforcement at the scene.** *[emphasis added]*

## Opinion No. 8
**As indicated by my Opinions above, I generally disagree with and rebut the opinions and conclusions offered by Plaintiff's expert Scott DeFoe's report; and I specifically rebut his report on the following points:**

1. p. 8, para. 20-24 –He does not acknowledge Dingman was using his right foot to "test the waters" and determine if Lakey was going to comply with handcuffing before Dingman got down close to Lakey; and he does not acknowledge that Dingman appears to be reaching for his handcuffs, and that Dingman so testified.

2. p. 9, para. 34 –He does not acknowledge that Lakey was 343 pounds and acting bizarrely.

3. p. 10, para. 38 –He does not acknowledge the length of time Duggan held the "locked-carotid" hold (meaning Duggan was using both arms to apply the hold); he does not acknowledge that it is unusual after a properly applied carotid hold for the subject not to regain consciousness on his own after a few seconds of unconsciousness, thus the need to use physical efforts (like hitting him on the back) to bring the subject back to consciousness was extraordinary.

4. p. 14, Opinion 2 -- Taylor and Dingman were CLEET certified.  So by law, they properly and adequately trained to work as police officers.  There is no expectation or requirement for additional crisis intervention training beyond the basic police academy.  Also, it is unreasonable to suggest or expect that a department the size of WPD (2-4 full-time officers)  would have a Crisis Intervention Team.

---

[24] "Study of Deaths Following Electro Muscular Disruption: An Interim Report," National Institute of Justice (2008)

Lakey v. Wilson, Taylor, Dingman, *et al.*                     Defense Expert Greg Meyer's Report

5.  p. 19, Opinion 5 – His report is internally conflicted when he fails to acknowledge that earlier in his own report (p. 8, para. 22), Dingman gave a TASER warning.

6.  p. 23, Opinion 8 -  He claims that Lakey presented no resistance, but noncompliance and trying to get up from the ground are acts of resistance.  In addition, Lakey was modeling aggressive behavior when he grasped the police vehicle push bar and rocked the vehicle up and down and said, "Okay, let's do this."  DeFoe claims there was no assaultive behavior, but in the officers' perception, getting up from the ground and turning toward an officer instead of complying with instructions can reasonably be interpreted to be pre-assault indicators.

7.  p. 23, last sentence – DeFoe is not qualified to claim that use of the TASER caused/contributed to the death.  This subject requires medical expertise.

8.  p. 26, middle – He includes his boilerplate about the use of <u>lethal</u> force, as if this case were a shooting.  TASERs have been acknowledged by the law enforcement profession and the courts for decades as nonlethal, intermediate force options.

9.  p. 26, bottom to page 27 – His entire boilerplate for the use of lethal force is irrelevant to this case.

10. p. 29, Opinion 9 – He opines that Lakey was not given a warning prior to use of the TASER, but he is apparently unaware that the Plaintiff's Complaint twice admits (at paragraphs 78 and 104) that TASER warnings were given; and he ignores the audio/video evidence that proves the officers gave TASER warnings to Lakey multiple times (Dingman combined video at counter 02:00, 02:35, 03:13, and 03:45; and the video exhibit from the Miller deposition at counter 02:44).

11. p. 43, Opinion 13 – It is for medical experts (not police procedures experts) to determine if the timing of medical treatment would have made any difference in this case.

12. p. 45-46, Opinion 14 – Taylor and Dingman were CLEET certified.  So by law, they properly and adequately trained to work as police officers.  There is no expectation or requirement for additional training on the specific topics listed by DeFoe beyond the basic police academy and the expectation that officers will meet the annual CLEET training requirements, which can be on a variety of topics including, but not limited to, those listed by DeFoe.  The practical reality of a small town police department is that meeting CLEET requirements is the best they can do, and that training is adequate and sufficient for officers to do their job safely and reasonably.

13. p. 49-52, Opinion 16 – He attempts to equate the concept of "failure to intervene/intercede in excessive force" with making sure that Lakey receives immediate medical care.  I am a great believer in intervention when appropriate, but DeFoe is mixing apples and oranges in his Opinion 16.

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

**Opinion No. 9**

**As indicated by my Opinions above, I generally disagree with and rebut the opinions and conclusions offered by Plaintiff's expert Michael Leonesio's report; and I specifically rebut his report on the following points:**

1. p. 8, after the bullet list:  He fails to acknowledge the well-known dangers of approaching a naked man who appears to be under the influence of stimulant drugs.

2. p.8, last line – His assertion that this incident involved "relatively routine circumstances" completely ignores law enforcement training and experience that for decades has experienced and appreciated the dangers of confronting and controlling a naked man who appears to be under the influence of stimulant drugs.

3. p. 9, end of para. at the top – His assertion that a large, naked man who is apparently under the influence of stimulant drugs does not present an "immediate threat" completely ignores more than a half-century of law enforcement training and experience.

4. p. 23, second-to-last para. – His assertion that the officers' uses of force were outside WPD policy are at odds with Plaintiff's Third Amended Complaint (at paragraphs  107, 132 and 133) which admit that TASER use was within WPD policy.

5. p. 24, first full para. – He is apparently unaware that research for many years has shown that the majority of police departments put OC on same level as TASER; and he is apparently unaware that Dingman and Taylor did not have OC.

6. p. 24, third full para. -  He is apparently unaware that there are no "industry standards" for law enforcement.  There are organizations like PERF and IACP that promulgate guidelines or recommendations, but they are not "standards."

7. p. 26, Opinion 5 Conclusion, para. 1 -- The policy is adequate and is consistent with *Graham* requirements and limitations on use of force, as well national guidelines including but not limited to the National Consensus Policy and Discussion Paper on the Use of Force (originally published October 2017 and revised July 2020).

8. p. 26, Opinion 5 Conclusion, para. 2 – There is no evidence that the City of Wilson lacks interest in the training of its officers.  To the contrary, Wilson requires its officers to meet the training requirements and expectations of the State of Oklahoma, which is reasonable and appropriate.

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

## EXHIBITS

1.  Darrell L. Ross & Michael Brave, "Assessing Use-of-Force Liability and Law Enforcement Response to the Naked Subject," Law Enforcement Executive Forum, 2020 – 20(1)

2.  Brave, M. (2022). Conducted Energy Weapon (CEW) Use on Excited Delirium Syndrome (ExDS) Subjects, Reference Bundle. LAAW International, LLC.

3.  Curriculum Vitae (Greg Meyer), redacted per Rule 26

## EXPERT QUALIFICATIONS, PUBLICATIONS, AND OTHER CASES

My *curriculum vitae* (see **EXHIBIT NO. 3**) documents my qualifications, the relevant publications I have authored in the past 10 years (per Rule 26), and it lists all cases in which I have testified at trial or deposition in the past 4 years (per Rule 26). A brief summary of my qualifications appears on pages 2-3 of this report.

During my service as a police officer, detective, sergeant, lieutenant, and captain, I have personally been present at dozens of incidents featuring persons in bizarre, agitated states due to stimulant drugs, disabilities and/or mental illness. In dozens of these incidents, I was personally involved in controlling or attempting to control such persons. In other incidents, I personally observed the incidents as they unfolded while other personnel were engaged in the control efforts. I have seen the injury outcomes from these incidents, and I have studied, lectured and published on the subject of injury outcomes for use of force incidents. Many of the incidents I participated in, observed or studied featured use of TASERs. I have personally used TASERs or watched and/or directed others to use TASERs. To further my knowledge, education and training, I have personally attended many law enforcement seminars (featuring emergency room doctors, medical examiners, and medical researchers) that lectured on the subject of people in bizarre, agitated states and issues of how to control and restrain them.

I am a consultant and expert witness who specializes in police procedures, including use of force, including TASERs. I have nearly 43 years of experience with various TASER devices in my official law enforcement capacity and my consulting capacity, including research, static testing, field testing, actual field usages, designing and revising lesson plans for users and instructors, training instructors and users in many cities throughout the country, writing published articles and lecturing on this subject, conducting demonstrations (including voluntary exposures) for political officials and the media, and personally experiencing the TASER effects. I have both supervised and adjudicated internal investigations of TASER usage incidents.

In my capacity as a commanding officer at the Los Angeles Police Academy, I observed and participated in TASER training including TASER exposures conducted by instructors who worked for me. I have personally been exposed to a TASER device approximately eight times over the past four decades, including being exposed to early TASERs in the 1980's and 1990's; and an ADVANCED TASER M-26 at an instructor course at the Los Angeles Sheriff's Academy (2001) and at an instructor course at the Alhambra (CA) Police Department (2003); and with the TASER X26 at an instructor course at the Los Angeles Police Academy (2005); and at an

Lakey v. Wilson, Taylor, Dingman, *et al.*                    Defense Expert Greg Meyer's Report

instructor course at TASER International headquarters (2009).  I attended a TASER training course (featuring lecture and demonstrations including voluntary human exposures to the TASER X-2) in August 2012 taught to California Department of Justice personnel by Advanced Officer Training Course experts of the California Highway Patrol.

I have been a consultant and expert witness on police use of force issues for more than 32 years. Out of more than 400 engagements as an expert consultant or witness, I have participated in more than 380 criminal and civil actions in federal and state courts.  More than 100 of those cases have involved TASERs or various other "stun-guns" that use the TASER technology.

## COMPENSATION

My normal fee for work including document review, research, meetings, and reports is $450 per hour after a $5,000 retainer for the first eight hours.  Travel to Oklahoma requires a $2,000 flat fee per round trip plus direct travel and *per diem* expenses.

Depositions are charged at a flat rate of $1,800 for up to four hours, or $3,600 for four to eight hours and must be paid 10 days in advance.  (If the amount of time for the deposition is less than the prepaid amount, or if the deposition is cancelled, I will quickly send a refund.)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 31, 2022 at Glendale, California.

GREG MEYER

MEYER EXHIBIT NO. 1

# Assessing Use-of-Force Liability and Law Enforcement Response to the Naked Subject

**Darrell L. Ross, PhD, Professor, Sociology, Anthropology, and Criminal Justice, Valdosta State University**
**Michael Brave, Esq. MS, LAAW International, LLC**

## Abstract

*Confronting a naked person in public can be one of the most difficult and potentially dangerous calls a police officer may encounter. While rare in occurrence, these contacts can pose higher risks of violence to responding officers as in some of these incidents, the person is non-compliant and is exhibiting bizarre behaviors combined with explosive violence, requiring the officer to respond with varying force measures, including deadly force. As a result, the responding officer(s) are likely to face a civil lawsuit and potential criminal prosecution. Using a content analysis, 215 published and unpublished Section 1983 federal court decisions from 1997 to 2019 were examined. The outcome and the pattern of these court decisions are discussed, including the trends of how the courts review a claim of excessive force during and/or after the confrontation and how federal appellate courts apply use-of-force criteria in assessing these incidents. The confrontation circumstances and force options commonly applied during the encounter and the common liability issues which emerge from these incidents are discussed. The implications of these court decisions, which impact agency policy and practice as well as officer training issues, are also discussed.*

## Introduction

An ongoing and complex issue facing law enforcement officers (LEOs) is the nature and frequency of contacts with mentally ill subjects and individuals severely under the influence of a chemical substance, intoxicant, or hallucinogen, or those experiencing a mind–body disconnect. Frequently, LEOs are summoned to respond to an individual acting strangely or who is running in traffic. In a majority of these contacts, LEOs are successful in assisting the subject in acquiring mental health assistance or in seizing the subject as warranted. The probability of a law enforcement contact with a mentally ill person is estimated to account for about 10 to 20% of the calls for service (Cordner, 2006; Deane et al., 1999; LEXIPOL, 2019; Morabito & Socia, 2015). Engel and Silver (2001) estimated that one out of 27 contacts with law enforcement were with the mentally ill. LEXIPOL (2019) researchers surveyed 4,209 LEOs nationally and found that 60% reported that mentally ill persons accounted for about 20% of their contacts with the public, 80% of the contacts were repeated with the same person, 87% reported responding to a call for which the use of force was required, and 32% reported being injured during a call involving a mentally ill person.

Compounding these contacts between LEOs, the mentally ill, and drug abusers is a sub-population which involves a naked person. While the likelihood of LEOs encountering or being confronted by an unexpected or aggressive naked subject during a call for service is extremely rare, an LEO is predominantly the first responder when dispatched to the call. This type of contact is considered a high-risk situation as it can be one of the most unpredictable, violent, and dangerous confrontations

LEOs may experience. In a significant number of incidents, the individual is experiencing an extreme psychological episode or may be under the influence of a chemical substance, and/or a combination of both or other factors, which can result in violent and assaultive behaviors and potentially combative resistance when LEOs respond or intervene.

Because of the potential dangerousness, hostility, and assaultive behaviors associated with these individuals and the risks of serious harm posed by the person, responding LEOs may often be required to use higher levels of force, including deadly force, resulting in serious injuries and/or death. An LEO's safety risk is jeopardized, and the risk of the LEO being assaulted is also elevated during the confrontation. The controversy that foreseeably emerges is that since the person is naked, and often unarmed, allegations arise which imply that the LEO should have recognized the person's conditions or impairments; that the LEO overreacted; and that the LEO used excessive force, should be disciplined and/or terminated, should be held civilly liable, and should be criminally prosecuted. There is a societal interest in providing LEOs with current information on how the criminal justice system reviews the totality of circumstances surrounding claims of excessive force during these potentially volatile confrontations.

Responding to a call of an unexpected naked subject threatening or attacking someone or hurting himself, running down the street, prowling through the neighborhood, or attempting to illegally enter or damage someone's property or vehicle can be problematic for LEOs. While these incidents often involve either a person severely under the influence of a chemical substance or experiencing a psychotic episode or mind–body disconnect, it can be a serious mistake to underestimate the situation, the condition and capabilities of the subject, or the level of immediate threat or danger, even if the person is unarmed. From a risk management perspective, these types of contacts are very rare in occurrence; however, they represent a high-profile incident, require a law enforcement response, present a threatening and dangerous situation for LEOs, and pose a dangerous situation for the community (Shane & Swenson, 2019). LEOs are more likely to use force in these situations than in other civilian contacts.

## Purpose of the Study

LEOs' response to an incident involving an unexpected naked subject often contains numerous complex medical, mental, and physical health issues, as well as chemical substance, legal, and law enforcement practices. These issues often emerge as important concerns in law enforcement culpabilities and liabilities, and a primary focus of these issues is whether responding LEOs used objective reasonable force during the contact.

Using published Section 1983 lower federal court decisions as a unit of analysis, the purpose of this study is twofold: (1) to provide an assessment of the nature and circumstances surrounding these encounters, as well as the common conditions and behaviors exhibited by these subjects, and (2) to assess the LEOs' responses, including the use of force and the outcomes of the incident. In accordance with the U.S. Supreme Court's establishment of the objective reasonableness standard in their decision in *Graham v. Connor* (1989), common civil liability claims filed against LEOs, supervisors, administrators, and government agencies are examined; how the lower federal courts apply the *Graham* standard to these seizure incidents is assessed; how the courts often consider the diminished capacity of the subject is studied; and how they determine granting of qualified immunity is addressed. The trends of these court decisions are also analyzed along with the implications for law enforcement administrators and LEOs.

## Overview of the Problem

Efforts to study calls of an unexpected naked subject in public are problematic as no central repository exists that specifically collects, analyzes, and reports on these incidents. Using a content analysis approach, which involved assessing multiple sources of information on the topic, patterns and trends of law enforcement and civilian contacts emerge providing useful background information. In this section, published substance abuse and mental health research, media accounts, and published law enforcement use-of-force research are discussed to provide a brief overview of the problem. While each source contains various limitations, within their collective totality, these combined data sources provide a broad and diverse characterization of the topic and provide useful insights, underscoring the nature of the contact.

In 2019, the National Alliance on Mental Illness (NAMI) reported that about 47 million people in the U.S. experience a mental illness annually. McCance-Katz (2018) reported that about 8% of the American population have been diagnosed with a substance abuse disorder and about 3.4% experience a comorbidity of mental illness and substance abuse. It is not uncommon for a mentally ill person to abuse illicit drugs. Drugs that are widely used/abused include marijuana, synthetic marijuana, psychotherapeutic drugs, cocaine, hallucinogens, inhalants, phencyclidine (PCP), methamphetamine, and heroin. Lysergic acid diethylamide (LSD) is also reportedly increasing in abuse. Bronson et al. (2017) reported that 58% of the state prisoners and 63% of jail detainees met the criteria for drug dependence or drug abuse. About 40% of the offenders reported using drugs at the time of the offense. The most regularly abused drugs by both groups included marijuana, cocaine/crack, heroin/opiates, depressants, methamphetamine, and hallucinogens, which parallels the national drug abuse trends.

The Substance Abuse and Mental Health Services Administration (SAMHSA) (2018) reported that

*in 2017, 30.5 million people aged 12 or older used an illicit drug in the past 30 days (i.e. current use), which corresponds to about one in nine Americans (11.2 percent). About one in four young adults aged 18 to 25 were current illicit drug users. Regardless of age, the estimates of current illicit drug use for 2017 were driven primarily by marijuana use and the misuse of prescription pain relievers. Among the 30.5 million people aged 12 or older who were current drug users, 26 million were current marijuana users and 3.2 million were current misusers of prescription pain relievers. Smaller numbers of people were current users of cocaine, hallucinogens, methamphetamine, inhalants, or heroin or were current misusers of prescription tranquilizers, stimulants, or sedatives.*

The percentage of adults in 2017 with any mental illness (AMI) was similar in 2016, but it was higher than the percentage in all but three years from 2008 to 2015. The percentage of adults in 2017 with some mental illness (SMI) was higher than the percentage in most prior years. The percentages of young adults aged 18 to 25 who had AMI or SMI were greater than the corresponding percentages in each year from 2008 to 2016.

In its Drug Abuse Warning Network (DAWN) report, SAMHSA (2013) reported that in 2011, over 125 million visits were made to hospital emergency departments (EDs) in general purpose, non-federal hospitals operating 24-hour EDs in the U.S. DAWN estimated that over five million of these visits, or about 1,626 ED visits per 100,000 (1 in 62) population, were related to drugs, a 100% increase since 2004. In 2011, drug-related visits ranged from a low of 288 visits per 100,000 (1 in 347) population aged 6 to 11 to a high of 2,477 visits per 100,000 population (1 in 40) aged 18 to 20. In 2011, DAWN estimated that about 2.5 million ED visits resulted from medical emergencies involving

drug misuse or abuse, the equivalent of 790 ED visits per 100,000 (1 in 127) population. For those aged 20 or younger, the rate is 500 visits (1 in 200); and for those age 21 or older, the rate is 903 visits (1 in 111).

Further, psychiatric patients are five times as likely to experience sudden unexpected death as individuals from the general population, and exposure to antipsychotic drugs exacerbate the risk even at low doses (Ruschena et al., 1998; Vaille et al., 2008). Krexi et al. (2015) found that in 20% of the stress- and restraint-related deaths, the individual had a psychiatric history and was on psychotropic drugs. The World Health Organization (WHO) (2018) reported that people with severe mental disorders on average tend to die earlier than the general population. There is a 10- to 25-year life expectancy reduction in persons with severe mental disorders. About eight million mentally ill persons die annually, and the chronic abuse of illicit drugs compounds the reduction in life expectancy.

The national media has been reporting on incidents involving LEOs and a naked subject for many years. Accessing media reports was performed through an advance search of major national newspapers by using ProQuest's database. The search of media sources was conducted from 1998 to 2018 using the terms "police arrest a naked man" and "police shoot naked man." A total of 397 media stories were reviewed, averaging about 20 incidents annually. The trends of these reports revealed that in about 55% of the incidents, the person was under the influence of an illicit drug; while about 30% were mentally ill and about 15% showed comorbidity. In about 80% of the incidents, the subject charged, actively fought, and assaulted the responding LEOs; and in about 36% of the incidents, the person attempted to disarm the LEO. The subject was unarmed in 75% of the incidents, was armed with a firearm in 15% of them, and possessed an edged weapon in 10% of them. In about 80% of the incidents, the LEOs were required to use a level of force, which included a conducted electrical weapon (CEW) in 50%, a firearm in about 38%, and empty-hand control measures in about 12% of the incidents. In the LEO-involved shootings, 90% of the subjects died; and in the other incidents, 36% of the subjects died. The average age of the subjects was 30 years old. Sixty percent of the subjects were white, 25% were African American, 5% were Hispanic, and 5% were not reported. One incident drew national attention when a LEO shot and killed a naked man in Miami, Florida, who attacked another man and was discovered mauling and chewing his face (Cranshaw, 2012). Moreover, a deputy in Georgia was prosecuted, convicted, and sentenced to 20 years in prison for shooting and killing a naked, unarmed man who unexpectedly and quickly charged him as the deputy exited his patrol car (Rojas, 2019).

The research on mental illness and aggressive behaviors has been mixed. Several researchers have reported that people with SMI are more violent than others who are not mentally ill and are more violent toward themselves, but the large majority are not more hostile or violent toward others (Mulvey, 1994; Pilgram, 2003; Swanson et al., 2015). There are, however, exceptions to this general statement, and several published studies show that a subpopulation of the mentally ill exists who are more likely to engage in violent behaviors and are more likely to instigate a contact with law enforcement (Engel & Silver, 2001; Link et al., 1992; Monahan et al., 2001; Novak & Engel, 2005; Silver et al., 2008; Swanson et al., 1996; Swartz et al., 1998). Collectively, these studies found persons exhibiting psychotic and delusional symptoms were three to six times more likely to engage in violence than non-mentally ill persons; were non-compliant with taking their medications, tripling the likelihood of violence; chronically used and abused illicit drugs and alcohol, also tripling violence; that substance abuse of those diagnosed with schizophrenia or psychotic personality disorders was significantly associated with serious violent acts; that they were more likely to display a hostile and violent demeanor and resistance during a law enforcement interaction; and that LEOs were highly more likely to use physical force against this subpopulation

over non-disordered persons. Study findings revealed that LEOs disproportionately used force against this subpopulation because the individuals were disproportionally violent toward the LEO during the contact. Consistent with other research, Johnson (2011) found that the greatest predictor of LEOs' use of force with the mentally ill was subject resistance, the hostility level of the person, if the subject grappled with or struck the LEOs, and if the subject possessed a weapon. The likelihood of using force in these situations was 20 times as likely.

The behaviors and symptoms of the mentally ill subpopulation, including naked subjects, is closely associated with the Excited Delirium Syndrome (ExDS), which has been used in the forensic literature to describe a constellation of a subject's behaviors who experienced often-deadly consequences for their untreated severe agitation. ExDS has been recognized as a medical condition and is defined as a state of extreme mental and physiological excitement, characterized by extreme agitation, hyperthermia, hostility and combativeness, and exceptional strength and endurance without apparent fatigue (DiMaio & DiMaio, 2006; Mash, 2016; Mash et al., 2009; Ross, 1998; Vilke et al., 2012, 2019; Wetli, 2006; Wetli & Fishbain, 1985; Wetli et al., 1996). Clinical findings often include delirium with severe agitation, violence and assault toward others, sweating, hyperthermia, tolerance to significant pain, disorientation or hallucinations, rapid breathing, hyperactivity, noncompliance with LEOs or medical personnel, superhuman strength, nudity or partial nudity, incoherence and disorganized speech, and extreme stamina. These behaviors have been observed in interactions with the mentally ill, those under the influence of an illicit drug, and/or the mentally ill abusing illicit drugs. Individuals exhibiting these symptoms are at a high risk of sudden death (Vilke et al., 2019).

Researchers have performed prospective field studies to examine the frequency of ExDS symptoms during a law enforcement contact and a use-of-force incident in three separate studies (Baldwin et al., 2016; Hall et al., 2012; Ross &

Hazlett, 2018). The research findings showed ExDS symptoms were observed in those subjects exhibiting a mental disorder or behaviors consistent with being under the influence of an illicit drug and/or both (excluding alcohol); that all subjects exhibited violent behavior; that about 65% of the subjects contacting LEOs exhibited three to four symptoms; that as the frequency of the symptoms increased from six or more, the likelihood of violence increased, and they were about four times as likely to threaten great bodily harm; and that subjects exhibiting a combination of six or more of the following symptoms accounted for about 9 to 12% of the law enforcement contacts resulting in the use of force: bizarre behaviors, hyperthermia, sweating, nudity or partial nudity, superhuman strength, hyperactivity, severe agitation, non-responsive to law enforcement, high pain tolerance, rapid breathing, and incoherent speech. Ross and Hazlett (2018) reported that subjects who were nude and/or partially nude, presenting with seven or more symptoms, were significantly associated with higher levels of subject violence and resistance, including actively resisting, fighting the LEOs, and assaulting LEOs, and the symptoms were associated with LEOs responding in kind with higher levels of non-deadly force to control the subject.

This brief overview has shown that from 10 to 20% of the calls for service involve mentally ill subjects (estimated), indicating that it is common for LEOs to interact with this population. The population is more likely to abuse illicit drugs and alcohol; commonly have been diagnosed with a substance abuse disorder; have an increased probability of sudden, unexpected death; and have a life reduction expectancy of about 25 years.

A subpopulation of the mentally ill not only exhibit these factors, but they also are more likely to have stopped taking their medication; and when combined with experiencing a psychotic episode and consuming illicit drugs, they are more likely to exhibit extreme violence, necessitating a law enforcement

response. The manifested symptoms and behaviors of this subpopulation, including the naked or partially naked subject, are associated with an individual exhibiting six or more ExDS symptoms, combined with violence, and active and assaultive resistance. While it is very rare for LEOs to encounter a naked person in this condition, the LEOs are more likely to respond with higher levels of force to capture, control, and restrain the violent person. Beyond the naked person being diagnosed with an SMI and a substance abuse disorder, it is common for a majority to also possess various untreated medical problems, increasing the risk of sudden death by at least five times over the general population. In cases of a sudden arrest-related death (ARD), the cause of death will commonly be disputed. An encounter with a naked person poses numerous problems for responding LEOs as frequently the person is non-compliant with verbal and intervention strategies, represents a medical emergency, poses a high risk of sudden death, and poses a risk to the safety of responding LEOs who are tasked with controlling a highly violent, unpredictable, and dangerous person.

## Methods

Using a content analysis and a longitudinal approach, 215 42 U.S.C. §1983 published case decisions involving LEOs' responses to an unexpected naked subject were examined from 1990 to 2019. This research reports on the trends and patterns of these case decisions and the nature and circumstances of the law enforcement contacts. Cases matching "police use of force and a naked man" were identified by using the Westlaw® and Americans for Effective Law Enforcement (AELE) databases using a content analysis methodology following the recommendation suggested by Maxfield and Babbie (2005). It is an appropriate procedure to employ to assess the contents of published documents. Analysis of the circumstances of the incident and the trends of courts' applications of the *Graham* criteria are discussed. The findings presented represent only published court decisions. Cases settled out of court are not published and, therefore, analysis of those decisions are not included in this assessment.

## Common Claims Filed by Plaintiffs' Counsel

While courts have not created separate classifications of subjects per se—the mentally ill and serious criminals—the mental health condition of the person or the "diminished capacity" of the person is an additional factor used as part of the *Graham* totality of circumstances criteria (*Deorle v. Rutherford*, 2001). From many courts' perspective, a core problem and issue is that the techniques employed by LEOs responding to an unarmed, emotionally distraught individual who is creating a disturbance or resisting seizure may necessarily be different from those armed and dangerous individuals who LEOs are attempting to subdue. A critical question courts often consider in a majority of the cases is "Does an unarmed and naked subject present an immediate threat to the LEO(s) or to others justifying the officer's use of force?"

In a collective analysis of the case decisions reviewed, plaintiffs' counsel generally file claims around 11 broad areas which are filed against responding LEOs, law enforcement administrators, and government entities. These cases are litigated primarily in federal court and are usually filed in accordance with the Fourth and Fourteenth Amendments. The plaintiff usually seeks compensatory and often personal punitive damages against the LEOs. First, claims may be filed alleging that the responding LEOs used excessive force in their use of physical control techniques—the use of any intermediate force options and restraints and the use of deadly force. Second, because the subject was nude, a claim may be filed alleging that LEOs failed to first use de-escalation techniques, failed to wait for back-up or retreat, and failed to call the Crisis Intervention Team (CIT). Third, a false arrest claim will often be filed. Fourth, medical experts from the plaintiff's perspective will often examine the medical and mental

health history of the decedent and, regardless of the cause and manner of death or injury, will assert that the LEOs failed to appreciate the mental condition of the individual and acted in a deliberately indifferent manner toward the subject. Fifth, a claim may be filed alleging that LEOs failed to accommodate the person, violating the Americans with Disabilities Act (ADA) of 1990. Sixth, a claim may be filed alleging that fellow LEOs failed to intervene with the LEO who allegedly used excessive force during the incident. Seventh, a claim may be filed that the LEOs failed to provide timely medical care to the person and were deliberately indifferent to the person's medical needs. Eighth, claims may be filed alleging that the law enforcement administrator directed the LEOs' actions in using force and restraint equipment in accordance with the agency's policies that were constitutionally defective. Ninth, a claim may be filed that the administrator failed to supervise and discipline the LEO and had prior knowledge that LEOs chronically acted outside the scope of their authority and agency policy without remediation or termination. Tenth, a claim may be filed that the administrator was deliberately indifferent to the subject's constitutional rights by failing to adequately train the LEOs in the use of force. And eleventh, plaintiffs may claim that the administrator ratified the LEOs' conduct by failing to perform an investigation or that he or she performed a flawed death investigation into the incident. As the lawsuit advances through the civil litigation process, many claims may be dismissed by the court, but the agency administrator and their defense counsel must be prepared to defend against each one.

**Table 1. Case Decision Findings**

| Variable | % Deadly Force ($n$ = 22/10%) | % Non-Deadly Force ($n$ = 193/90%) |
|---|---|---|
| Subject's age | 33 | 34 |
| Mentally ill | 40 | 40 |
| Illicit drugs | 40 | 50 |
| Comorbidity | 20 | 10 |
| Incident occurred outdoors | 70 | 70 |
| Features of excited delirium | 80 | 75 |
| Charge/fight/assault officer | 85 | 70 |
| Attempt to disarm officer | 45 | 45 |
| Subject unarmed | 80 | 90 |
| Edged weapon/other | 15 | 10 |
| Subject showed firearm | 10 | 0 |
| Handcuff as weapon | 0 | 25 |
| Immediate threat | 90 | 80 |
| Officer used firearm | 100 | 0 |
| Limited reaction time | 95 | 0 |
| Used CEW | 10 | 50 |
| Used impact weapon | 5 | 15 |
| Aerosol used | 20 | 40 |
| Empty-hand control | 0 | 35 |
| Subject died | 95 | 85 |
| Cause of death | 100 = Homicide | 50 = Homicide |
| Summary judgment awarded | 70 | 75 |
| Failed to train and supervise | 15 | 15 |

Table 1 shows that of the 215 cases reviewed, incidents of non-deadly force measures used by LEOs accounted for a majority of the case decisions (90%); and in 10% of the incidents, LEOs used deadly force. From these case decisions, significant patterns emerge demonstrating the criticality and the frequency of the confrontation circumstances, the condition of the subject, the types of force applied by the LEOs, and the outcome of the court decision. Responding LEOs were as likely to confront the naked subject who displayed symptoms of illicit drug use as the subject exhibiting signs of mental illness. Comorbidity was rare, and the average age of the subject was 34 years old. Associated with being naked and showing symptoms of mental illness and illicit drug use, subjects manifested six to 11 features of ExDS in 75% or more of the incidents. Cocaine, methamphetamine, LSD, marijuana, and PCP were commonly reported in an autopsy as the chemical substance found in the subject's system.

In each incident, the naked subject presented an immediate threat to the LEO, although the subject was unarmed in about 85% of the incidents. In a significant percentage of the incidents, the subject charged, fought, and/or assaulted the LEO with a personal weapon(s) and attempted to disarm the LEO, underscoring that the subject presented an immediate threat. In those incidents in which the subject fought and assaulted the LEO, the subject bit, grabbed, struck, kicked, wrestled, choked, and/or threw the LEO, resulting in treatable injuries to the LEO in about 25% of the incidents.

In the deadly force incidents, the LEO had limited time to use a CEW, an impact weapon, or an aerosol; and in about 20% of the incidents, intermediate weapons were ineffective, requiring the LEO to transition to using deadly force based on the subject's assaultive nature. Empty-hand control techniques were not attempted in the deadly force incidents. In a significant percentage of deadly force incidents, the LEO's reaction time to decide to use force was less than 10 seconds without time for attempting de-escalation techniques or using non-deadly force measures. Over 70% of the incidents occurred outdoors—for example, in a yard, street, roadway, highway, wooded area, or in a parking lot. In all of the deadly force incidents, the cause of death was classified as a homicide.

Empty-hand control and the use of intermediate weapons were more likely used by the LEO in the non-deadly force incidents. De-escalation techniques were attempted in over 80% of the incidents and were ineffective in controlling the subject, resulting in the use of non-deadly force measures. On average, three LEOs responded and used a combination of empty-hand control measures (excluding a neck restraint), an aerosol, an impact weapon, a CEW, and restraints. The intermediate weapons used by LEOs were ineffective in about 50% of the incidents. The use of CEWs were ineffective in about 50% of the incidents as the subjects either pulled out the probes, the lead wires broke, or the LEOs deployed it from a close distance. In 20% of the incidents, the subject used one handcuff as a weapon against the LEOs; and in 40% of the incidents, the subject attempted to disarm the LEOs. Common circumstances for calls included a welfare check; disorderly conduct; suspicious person, domestic violence, prowler, or burglary call; and assistance at a hospital.

In 85% of the incidents, the subject died and the death was classified as a homicide (50%), natural causes (25%), undetermined (15%), and accidental (15%). About 85% of the subjects died from complications of ExDS, heart disease, cardiac arrest, acute psychotic state, substance abuse history, internal organ deficiencies, and stress associated with prone restraint. In about 20% of these deaths, the medical examiner reported that compressional asphyxia contributed to the death.

## Application of the *Graham* Criteria

In *Graham v. Connor* (1989), the U.S. Supreme Court (SCOTUS) established that a LEO's use of force, in the context of a Fourth Amendment to the U.S. Constitution seizure, is to be assessed in accordance with the Fourth Amendment's objective reasonableness standard. Generally, the objective reasonableness standard is assessed within the totality of circumstances as objectively perceived by the LEO at the moment the seizure occurred, including, but not limited to, (1) whether the subject posed an immediate threat; (2) whether the person is actively resisting the seizure; (3) whether the totality of circumstances are tense, uncertain, or rapidly evolving; (4) the severity of the crime at issue; and (5) whether the subject is attempting to evade seizure by flight (see also *Scott v. Harris*, 2007; *Graham* progeny, 1989 to present, not cited herein). SCOTUS also stressed that LEOs are frequently forced to make split-second decisions in situations which are tense, uncertain, and rapidly evolving; and such analysis is to be made from the perspective of the LEO at the moment the LEO seized the person and within the totality of the circumstances as objectively reasonably perceived by the LEO. In *Mullenix v. Luna* (2015) and *Kisela v. Hughes* (2018), SCOTUS reemphasized that the use of force is an area of the law in which the results depend very much on the facts of each case, and the LEO is entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue, placing the LEO on notice of unconstitutional force. Various published rulings by U.S. Federal Courts of Appeal have expanded several of these SCOTUS force parameters.

In accordance with the SCOTUS decision in *Anderson v. Liberty Lobby, Inc.* (1986), evidence of the non-movant party (usually the plaintiff) is to be believed, and all justifiable inferences are to be weighed in favor of the non-movant. The courts begin their review of the facts from the perspective of the plaintiff. As the review progresses, the court will review the specific facts of the case and the actions of the LEOs in accordance with the *Graham* decision and its precedential progeny keeping in mind that objective reasonableness of the use of force must also be evaluated from the on-scene LEOs' perception and not from hindsight. Moreover, the Fourth, Sixth, Ninth, and Tenth Circuit Courts of Appeal have held that while the *Graham* criteria are instructive, they are not exhaustive; and the ultimate inquiry is whether the totality of circumstances as reasonably perceived by the LEO justifies a particular seizure (including use of force). As stated by the Ninth Circuit in *Chew v. Gates* (1994),

> it is first necessary to assess the quantum of force used to arrest the subject. The three factors articulated in Graham, *and other factors bearing on the reasonableness of a particular application of force, are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure. (p. 1441)*

The most important single element of the three *Graham* specified factors is whether the person posed an immediate threat to the safety of the LEOs or others, followed by whether the subject was *actively resisting* the seizure (*Chew v. Gates*, 1994). For many courts, the threat posed by the subject is the most important to review. Because the facts of the case may be in dispute, the court will assess the specific types of behaviors and actions of the subject. A simple statement made by LEOs that they feared for their own or others' safety is not sufficient, and there must be objective factors to justify the concern based on the nature of the threat (*Kaady v. City of Sandy*, 2008). Some courts have adopted a "threat risk factor" analysis to assess the degree of threat or potential degree of threat posed by the naked person (*Gander v. Wood*, 2006). *Gander* involved the use of a canine to subdue an unarmed mentally ill subject. The court noted that using the canine would have been justified only after making attempts to calm the person through conversation and after using "less severe and potentially injurious methods such as certain holds, take-down methods, pepper spray, [and] use of additional officers using their combined force and batons" (see also *Woolfolk v. Gootee*, 2009).

Components of the courts' threat analysis may include verbal threats to harm the LEO or others; quickly advancing/charging toward LEOs; exhibiting self-injurious behaviors; size of the person; assaulting, attacking, and overpowering the LEO; scene evidence of property damage or evidence of assault against others; posing a grave danger to others, reaching/grabbing or grappling for the LEOs' duty belt; assault in progress; possessing a weapon or access to weapons; behaviors creating an immediate safety risk and escalation of violence; actions posing an immediate risk of serious physical harm or death to LEOs or others; and apparent dangerous behaviors and degree of danger presented by the person, and behaviors endangering the person, LEOs, and others. The immediacy of the threat to the safety of the LEOs or others will be considered by the courts. The courts balance the risk and the gravity of the threat factors posed by the person against the degree of force reasonably necessary to eliminate the threat.

Next, courts will often examine whether the person was actively resisting seizure (including arrest). Actively resisting often transitions the subject to being an immediate threat, and active resistance increases the likelihood of the person's injury. This factor is commonly open for definition and interpretation. In *Meyers v. Baltimore County* (2014), a LEO encountered a combative naked man and applied a CEW to control him; the subject later died. The court granted qualified immunity to the LEO and defined active resistance as physically evasive movements to defeat a LEO's attempt to control the subject, including bracing, tensing, pushing, or verbally signaling an intention to avoid or prevent being taken into or retained in custody. Other courts have defined active resistance to include combative behaviors— actively physically struggling or wrestling with LEOs; punching and kicking at them; having the strength and stamina to resist the LEOs; lunging and charging the officer; disobeying LEOs' commands; and attempting to stand up, thrashing and kicking the LEOs, or standing up during and after being restrained on the ground (*DeBoise v. Taser Int'l*, 2014).

The fourth assessment factor includes whether the subject is attempting to elude the LEO and evade seizure by flight. Components of this factor may include the person's attempts to escape from the LEO, the person posing a flight risk, the person actually fleeing from the LEO, and whether the person fleeing and escaping will result in a serious threat of injury to others. This factor is often integrated into the threat level and the active resistance behaviors exhibited by the person during contact with LEOs.

The fifth factor often considered by the court is the severity of the crime at issue. Generally, courts focus on the severity of the charges identified by the responding LEOs. The nature of the crimes the person is committing—misdemeanor or felony—will be one factor courts review to determine the basis for use of force and its reasonableness. The more severe the crime—the more assaultive the person's behaviors, the use of a weapon or access to a weapon, and when there is probable cause to arrest—the greater the weight for justifying the use of force will be assessed by the courts. When the person is not suspected of a crime, however, and the LEOs are responding to assist the person with acquiring medical assistance, the incident does not always fit within this criterion. Courts may also examine additional factors such as the need for medical attention, the seriousness of the medical needs, the scope of the requested treatment, and the interests of the LEO in controlling the person to render medical care (*Estate of Hill v. Miracle,* 2017; *Ortiz v. City of Chicago,* 2011; *Thompson v. City of Indianapolis*, 2018).

For many courts, since the person is naked and unarmed, it underscores that the person is exhibiting a "diminished capacity." While not specifically articulated in the *Graham* criteria, the Fourth, Sixth, Ninth, Tenth, and Eleventh Circuit Courts have added this factor as relevant to assess the reasonableness of LEOs' use of force. Accounting for the person's diminished capacity is premised on recognizing that a naked and unarmed emotionally disturbed person (EDP) poses a different situation than

confronting a dangerous and armed criminal (*Deorle v. Rutherford*, 2001). Components for consideration may include the disorientation or confusion exhibited by the person, the incoherent speech and bizarre behaviors of the person that appear consistent with a mental illness or being under the influence of a chemical substance, a medical condition, the inability to follow the LEO's instructions, and whether the person is exhibiting a serious psychological break with reality (*Cardall et al. v. Thompson et al.*, 2012; *Estate of Harvey v. Jones*, 2006; *Estate of Mathis v. Kingston et al.*, 2009; *Gander v. Wood*, 2006; *Nelson v. Lott*, 2018; *Roell v. Hamilton County*, 2017). While courts consider the person's diminished capacity, it does not preclude LEOs from using a reasonable amount of force to bring the person under control (*Roell v. Hamilton County*, 2017). SCOTUS ruled in *City and County of San Francisco v. Sheehan* (2015) and *Kisela v. Hughes* (2018) that even though an officer may know that a person is mentally disabled, LEOs may use force, including deadly force, in self-defense or the defense of another for protection.

Consistent with the totality of circumstance factors, courts are directed by the *Graham* standard to also consider the LEOs' perception—the LEOs' reasonable belief that their own or another's safety is in immediate jeopardy; the split-second decision-making of the LEO under rapid, tense, and unfolding circumstances; and the dynamic nature of the situation. Consideration of these factors are associated with the operating reactionary time LEOs have to make a use-of-force decision. The principle underscoring the totality of circumstances is not for the court to take the various components of the incident and assess them separately or in isolation but to take all of the components and assess them in their collective totality as confronted by the LEOs and from their perspective at the moment they decided to use a degree of force—without 20/20 hindsight. For example, in *Callwood v. Phenix City* (2016), the court reviewed ten various incident factors, including use of a CEW, and determined that because no SCOTUS

decision required LEOs to refrain from using force when dealing with an impaired person, force was used appropriately under the totality of circumstances even though the person died. In the next two sections, court decision trends addressing LEOs' use of deadly and non-deadly force measures are discussed.

## Deadly Force Case Decisions

As reported in Table 1, the courts granted qualified immunity in 70% of the deadly force litigation. Of the cases where summary judgment was denied, about 15% of the courts ruled the administrator was liable for failure to supervise or train the LEOs. The following case decisions highlight selected courts' analysis of LEO-involved shootings of violent and naked subjects.

In *Johnson v. City of Philadelphia* (2016), a LEO responded to a call about a naked man (Newsuan) running in the street at 6:00 AM. The LEO exited his patrol car with his CEW and observed that Newsuan was naked and unarmed, screaming obscenities, and flailing his hands. Newsuan ignored the officer's instructions to stop, walked into a house, and quickly came out still unarmed. Newsuan charged the LEO, the LEO instructed him to stop twice, and when he did not, the LEO deployed the CEW from about five feet. Newsuan pulled the CEW probes from his chest, attacked the LEO, striking him in the head multiple times, throwing the LEO against a parked van, slamming him into the patrol car windshield by his neck, wrestling with the LEO, and grabbing for the LEO's firearm. The LEO secured his firearm and shot Newsuan twice. Newsuan continued to fight the LEO, and the LEO fired two more rounds, killing him. The toxicology report revealed that Newsuan's blood contained PCP.

Affirming the lower court's ruling of summary judgment, the Third Circuit Federal Court of Appeal held that a reasonable LEO facing the violent confrontation created by the decedent had reason to believe and be fearful that

he faced a significant threat of serious bodily injury or death. The court opined that within the totality of circumstances, the LEO's actions were objectively reasonable and were not the proximate cause of Newsuan's death—that Newsuan brought about his own death through his own violent conduct. The court further explained that the Fourth Amendment does not require an LEO encountering an emotionally or mentally disturbed individual to passively endure a life-threatening physical assault, regardless of the assailant's mental state. Claims against the chief for failing to properly supervise and train agency LEOs failed as the officers were absolved of liability.

In *Summers v. Ramsey* (2017), three LEOs responded to a call regarding a naked man yelling in a store parking lot and throwing newspaper stands. As the LEOs responded, they found Summers lying in the street and believed that he was possibly under the influence of PCP. The LEOs positioned their patrol cars around Summers; he quickly stood up, charged one of the patrol cars, and struck the windshield with his bare hands twice shattering it, showering one LEO with glass. Just as Summers was delivering a third blow, the LEO in the patrol car shot Summers twice to protect himself. Relying on their decision in *Johnson v. Philadelphia*, the Third Circuit Federal Court of Appeal affirmed the lower court's award of summary judgment. The court concluded that Summer's pre-police aggressive behaviors coupled with shattering the windshield of the patrol car with his bare hands created an ongoing threat of attack leading a reasonable LEO to fear for his life; thus, using deadly force to stop the threat in this situation was objectively reasonable.

Examples of additional LEO-involved shooting case decisions for which the court granted summary judgment to the LEOs include *Andrade v. Miami Dade County* (2011), *Brown v. Scherrey* (2006), *Deluna v. City of Rockford, Ill.* (2006), *Dixon v. City of Lawton, Okla.* (1990), and *Wilson v. Miller* (2016). In these cases, LEOs, facing a threatening or violently combative naked person who was unarmed and/

or who possessed a weapon, fought back using pepper spray, a CEW, or strikes from an impact weapon. Using the *Graham* criteria, the courts reviewed the specific fact patterns of each case from the perception of the involved LEOs, within the totality of circumstances, and balanced the risk of bodily harm to the subject against the gravity of the threat presented to the LEOs. The courts determined that the person posed an immediate threat of violence to the LEOs, the LEOs had only seconds to make a decision to shoot, and they opined that the LEOs' use of deadly force was objectively reasonable. Citing their decision in *Long v. Slaton* (2007), the Eleventh Circuit Federal Court of Appeal summed up the collective decisions in these cases by explaining in *Wilson* that an LEO need not wait until he is attacked physically before determining reasonably that he is in imminent danger of serious injury before using deadly force. Even if non-deadly force measures are available, the LEO need not take a chance and hope for the best.

Focusing on the core issues of whether the individual presented a threat to LEOs or was actively resisting, summary judgment was denied by the courts in several cases. In *Williams v. McKinney* (2009), the court denied summary judgment to an LEO who used deadly force against a half-naked man acting strangely but who was not threatening the officer. On location, the LEO observed Williams and asked for his identification. Williams threw his wallet at the LEO's feet. He then laid on the ground, suddenly stood up, and the LEO handcuffed him. Other LEOs had responded at this point. Williams' sister approached him, and he struck her. The LEO attempted to pepper spray Williams without success, drew his collapsible baton, and struck Williams multiple times. One strike contacted Williams in the head. Williams grabbed the baton and moved toward McKinney. McKinney created distance between himself and Williams and, as Williams raised the baton, McKinney shot him. Williams fell to the ground, got up holding the baton, and all three of the LEOs discharged their firearms, killing Williams. The court agreed with plaintiff's counsel that as

soon as Williams fell to the ground, the other two LEOs should have restrained him, which would have prevented his death. The court concluded that even though Williams held the baton, he was not threatening the LEOs, was not within striking distance of the LEOs, was not in the process of attacking anyone, and, therefore, he did not present an immediate threat to the LEOs. The court found that the LEOs' use of deadly force was unreasonable. It also held the city liable, holding that the LEOs were inadequately trained and were guided by defective agency policies and practices when responding to the mentally ill and using deadly force in the absence of an immediate threat.

In *Kaady v. City of Sandy* (2008), two LEOs responded to a call of an auto accident involving a naked man who was combative and assaulted another, was high on drugs, and possibly armed. On contact with Kaady, the LEOs noted that he was bloody, injured, and sitting on the ground with his hands in the air. From the doorway of the patrol car, the LEOs ordered him to the ground with their firearms drawn. After observing Kaady's injuries from the crash and that he was unarmed, one LEO laid his shotgun on the hood of the patrol car, drew his CEW, and instructed Kaady to lay on the ground. He refused, and the LEO deployed the CEW. Kaady went to the ground, refused to roll over, and the LEO applied the CEW two more times. Kaady stood up, pulled out the CEW wires, ran to the patrol car, jumped on the hood (with the shotgun on it), and then jumped on the roof, making growling sounds and threatening to kill the LEOs as he moved back toward the hood of the patrol car. Fearing that Kaady would pick up the shotgun and/or attack them; believing Kaady was impervious to pain and was a threat to others, including the LEOs themselves, based on his behavior; and observing Kaady about to jump from the car, the LEOs simultaneously discharged their firearms from about five feet for a total of seven rounds. Kaady did not survive, and the toxicology report showed that he was not under the influence of any drugs.

The district court ruled that the LEOs did not use excessive force during the application of the CEW as the crime encountered was serious and Kaady presented an immediate threat. His getting to his feet after being exposed to the CEW posed a flight risk. The court, however, denied summary judgment on the use of deadly force as the court determined that there was contradictory witness testimony—that Kaady was on the patrol car naked, unarmed, and severely injured. He was not threatening anyone and did not present an immediate threat to the LEOs. Further, the court ruled that the incident was not dynamic or rapidly evolving and, thus, did not warrant the use of deadly force. The court denied the plaintiff's claims of municipality liability for failing to investigate the incident, failing to supervise, and failing to train the LEOs.

## Non-Deadly Force Case Decisions

In *Roell v. Hamilton County et al.* (2017), deputies responded to a call regarding a mentally ill man who had stopped taking his medications, exhibited signs of ExDS, became violent, and began destroying items in the condominium. The first two deputies on the scene saw Roell in the backyard holding a water hose and garden basket, wearing only a T-shirt; he was screaming and agitated. The deputies instructed Roell to calm down. He began swinging the water hose at them while approaching the deputies. They told him to stop or they would have to use the CEW. Roell continued to approach the deputies. He was warned again but did not stop, so the deputy holstered the CEW, and both of the deputies grabbed Roell's arms, with all three of them falling to the ground. One deputy was struck with the basket, and Roell stood up and began to move away. The deputy deployed the CEW, but Roell continued to move away from the deputies. A third deputy responded, and all three deputies attempted to control Roell but were unsuccessful. He became combative and thrashed on the ground, striking a deputy in the face. Once Roell was on the ground, one deputy used the CEW twice in the drive-stun

mode unsuccessfully. Roell continued to struggle against the deputies. The CEW probes were deployed again, striking Roell in the back; they had no effect, but collectively the deputies were able to ground him, control him, and handcuff him in the front with two sets of handcuffs. Roell began kicking, so a deputy restrained his ankles in shackles, and the deputies placed him on his side. Roell became unresponsive, so cardiopulmonary resuscitation (CPR) was administered until the paramedics arrived. He was transported to the hospital where he was pronounced dead. The autopsy revealed that the cause of death was ExDS due to schizoaffective disorder, and the manner of death was classified as natural. There was no evidence that the CEW contributed to Roell's death nor that Roell had been asphyxiated while restrained on the ground.

The Sixth Circuit Federal Court of Appeal affirmed summary judgment for the deputies. The court first determined that although Roell's diminished capacity and active resistance was caused by ExDS, there was no established case law which required the deputies to first attempt de-escalation techniques. Roell's condition did not preclude the deputies from using a reasonable amount of force to bring him under control. Assessing each of the *Graham* criteria, the court determined that Roell had committed a series of property crimes, was a threat to the deputies, and actively resisted arrest. The court ruled that a reasonable deputy on scene could conclude that the use-of-force measures applied were necessary based on the totality of circumstances. The court also concluded that the county's policies were adequate, that the deputies were provided with adequate training, and that the sheriff conducted an adequate investigation into the incident. A claim of a failure to accommodate Roell under the ADA was also rejected by the court.

Similarly, courts awarded summary judgment to LEOs and the governmental employer in confrontations involving highly violent offenders exhibiting symptoms of mental illness and ExDS—those who exhibited bizarre behaviors, extreme strength, demonstrated pain tolerance, attacked and assaulted the responding LEOs, and died after the restraint process (*Callwood v. Phenix City*, 2016; *Cook v. Bastin*, 2014; *Nelson v. Lott*, 2018; *Sanders v. City of Fresno*, 2009; *Thompson v. City of Indianapolis*, 2018; *Thompson v. Cope*, 2018). In these case examples, LEOs were confronted with active resistance, encountered an immediate personal threat and/or a threat to others, and used various non-deadly force measures in response, including, in a majority of incidents, applying the CEW for an average of two trigger pulls in the probe mode (15 seconds), and controlling and restraining the subject in the prone position, with the death of the subject occurring after this encounter. Qualified immunity was granted in accordance with the *Graham* criteria and within the totality of circumstances. Claims filed against the government employer for implementing an unconstitutional policy, a failure to supervise or train, or a failure to conduct an adequate investigation failed.

The courts, however, have denied summary judgment to responding LEOs in the following incidents: *Burwell v. Peyton* (2015), *Cruz v. City of Laramie* (2002), *Estate of Harvey v. Jones* (2006), *Gander v. Wood* (2006), and *Martin v. City of Broadview Heights* (2013). In these case decisions, the courts' assessments focused on the diminished capacity of the subject (mentally ill or ExDS) and held it outweighed the need to use any intermediate force option such as a CEW, pepper spray, or an impact weapon to control and restrain the subject. Generally, the courts inserted their perspective over the on-scene LEOs' perceptions and opined that since the subject was outnumbered by the responding LEOs (3 or 4:1 ratio), the subject (1) was not engaged in any serious crime or it was minor; (2) did not pose an immediate threat; (3) did not pose a flight risk; and (4) being unarmed, was not actively resisting the LEOs' control efforts, most intermediate force options were considered excessive. The courts noted that the "quantum of force" did not match the actions of the subject (*Estate of Harvey v. Jones*, 2006). The courts frequently criticized the LEOs

for employing the CEW or other force measures "too quickly"—not engaging the subject in conversation (*Martin v. City of Broadview Heights*, 2013).

The courts have frequently ruled that when LEOs continue to apply force on the subject after the need subsided, they will usually violate the subject's constitutional rights. In *Wroth v. City of Rohnert Park* (2019), Wroth, who was half naked, physically resisted being controlled and handcuffed, and was screaming. Responding LEOs used several distraction blows and the CEW multiple times. Once prone on the ground, a LEO placed one knee on Wroth's shoulder area and one knee on the ground; another LEO struck Wroth on the leg with a flashlight, while another LEO secured Wroth's legs in a figure-four control hold while handcuffs were secured. Wroth screamed he could not breath, and the LEO removed his knee but placed pressure on Wroth's shoulder with his hand. Wroth became unresponsive and died. The total force incident lasted about five minutes, and several LEOs were on top of Wroth for about 1½ minutes after he was handcuffed. While disputed, the cause of death was determined to be positional asphyxia, and the pathologist classified the death as a homicide. At trial, the LEOs were awarded with qualified immunity on the force applied. The jury, however, found the City, the LEOs' employer, deliberately indifferent to Wroth's constitutional rights by failing to adequately train the responding LEOs on handling foreseeable unusual and recurring situations. The failure was determined to be the moving force behind Wroth's death, and the jury awarded $4 million to the family. The decision is being appealed.

## Implications

From these case decisions, several themes emerge for responding LEOs and agency administrators. The case analysis shows that encountering a naked subject presents an unpredictable and dangerous call, although very rare in occurrence. These case decisions predominantly illustrate that the courts granted summary judgment to LEOs in a significant majority of the cases, primarily based on the threat and danger posed by the subject. Higher levels of force were often used in response to the higher levels of violence and assaultive behaviors exhibited by the subject who was either mentally ill, under the influence of an illicit drug, or both.

In a majority of the incidents, common predictive encounter components were as follows: encounter location was outdoors; the person ran from and/or charged, fought, and assaulted LEOs with personal weapons; the subject frequently attempted to disarm LEOs; and/or the subject was either mentally ill or under the influence of illicit drugs. In about 65% of the incidents, an intermediate force option was ineffective, and the subject was able to fight through those applications. The subject's actions aligned with active resistance or higher, and, thus, the subject was considered an immediate threat to LEOs, to others, and to himself. Further, in about 80% of the occurrences, the violent and assaultive behaviors of the naked subject are associated with six to 11 ExDS features equaling about four times the likelihood of violence over other mentally ill persons (i.e., extreme strength, impervious to pain, extreme stamina, sweating, non-compliant, hyperactive, and agitated with incoherent speech). Because of these features and the rapidly evolving dynamics of the encounter, verbal de-escalation techniques are frequently ineffective. The LEOs' reaction time is diminished, requiring them to often use higher levels of force in an attempt to capture, control, and restrain the person. Safety is paramount for the responding LEOs when confronting the naked subject. As feasible, it is recommended that two to four LEOs respond to capture, control, and restrain the person.

A second theme emerging from these incidents includes the court assessment of the degree of immediate threat posed by the subject and whether the subject was displaying active resistance consistent with the *Graham* criteria. Using the totality of circumstances threat-factor analysis, courts usually examine the level

of threat and the nature of the resistance the subject is presenting. Combined with these factors, many courts may also consider the subject's "diminished capacity" in determining whether the quantum of force used by LEOs was objectively reasonable. A mentally or drug-impaired person alone does not automatically equate to an immediate threat. To obtain a higher likelihood of obtaining qualified immunity, responding LEOs, keeping safety in mind, should attempt, as reasonable, to provide instructions and/or warnings to the person; and, as practical, they should allow time for compliance, selecting the force option reasonably likely to stop the immediate threat quickly and to control and restrain the person. Once the person is restrained and ceases resistance, responding LEOs should assess the person and de-escalate their force measures accordingly. LEOs should be prepared to justify each application of force and the type of force used, and to explain their reasoning for not using a less-intrusive force option. After control and restraint are established, LEOs should monitor the subject and access the subject's medical status, documenting their actions, preferably by ongoing recorded radio communications.

The third emerging theme pertains to guiding LEOs' response in these incidents through agency policy, procedure, and guidelines. In light of the nature of these encounters and the trends in court decisions, law enforcement administrators are encouraged to review and revise their response-to-resistance policies as warranted. The policy should be written in accordance with the criteria from the *Graham* decision and precedential opinions, differentiating between the levels of potential subject threats and resistance which assist in guiding LEOs' use of objective reasonable force. Moreover, administrators should also review and revise the relevant policy on responding to special populations such as the mentally ill and those under the influence of a chemical substance as warranted.

Fourth, training on agency policies pertinent to this topic should be provided by supervisors on a regular basis and documented. Training which provides instruction on relevant liability issues and how the courts apply SCOTUS and other precedential decisions should be required. Competency-based training on all authorized and improvised force options, including intermediate weapons, restraints, and firearms, should be provided on a recurring basis. Because many of these encounters involved force transitioning from the use of intermediate weapons to deadly force, and vice-versa, use-of-force transitioning training should be provided. Weapon retention training should be required as in about 40% of the encounters, the person fought and attempted to disarm the LEO.

Scenario-based training, infused with stress immersion components, should incorporate a multi-LEO response to using force measures and equipment when encountering violent mentally ill persons, those under the influence of illicit drugs, or those experiencing a mind–body disconnect. Training which focuses on observable behaviors and symptoms of mental illness, ExDS, and illicit drugs should also be provided. LEOs should be trained and reminded to fully document their force decisions; to fully describe the subject's statements, threats, and behaviors; and to document each application of force used, each force escalation, and the reasoning for not using a less-intrusive force option. Since these incidents rarely occur, agencies are encouraged to develop and use brief study and memory aides to assist their LEOs with remembering and being able to apply optimal force methods and procedures, and to document such incidents.

Law enforcement administrators are encouraged to continue to keep appraised of the legal trends in court decisions in the use of force, including controlling precedent, as it continues to be a high liability area. By expanding their knowledge base on the liability trends of responding to violent encounters involving the mentally ill, those abusing illicit drugs, or those exhibiting mind–body disconnect, administrators can assist in guiding LEOs in the most appropriate and responsible response under

the confrontation circumstances. Further, keeping agency LEOs competent in their use-of-force skills, decision-making, and reporting assists in enhancing LEOs' safety and providing the most effective and reasonable response. Integrating this combined approach can assist in reducing the negative consequences, including the number of lawsuits filed, and can place the government employer in the best litigation defense position.

## References

Baldwin, S., Hall, C. A., Bennel, C., Blaskovits, B., & Lawrence, C. (2016). Distinguishing features of excited delirium syndrome in non-fatal use of force encounters. *Journal of Forensic and Legal Medicine*, *41*, 21-27.

Bronson, J., Stroop, J., Zimmer, S., & Berzofsky, M. (2017, June). *Drug use, dependence, and abuse among state prisoners and jail inmates, 2007-2009*. Bureau of Justice Statistics, U.S. Department of Justice.

Cordner, G. W. (2006). *People with mental illness*. U.S. Department of Justice, Office of Community Oriented Policing Services.

Cranshaw, R. (2012). Naked man chews other guy's face. *TIME*. http://newsfeed.time.com/2012/05/29/naked-man-chews-other-guys-face-shot-dead-by-cops

Deane, M. W., Steadman, H. J., Borum, R., Veysey, B., & Morrissey, J. (1999). Emerging partnerships between mental health and law enforcement. *Psychiatric Services*, *50*(1), 99-101.

DiMaio, T. G., & DiMaio, V. J. M. (2006). *Excited delirium syndrome: Cause of death and prevention*. CRC Press; Taylor and Francis.

Engel, R. S., & Silver, E. (2001). Policing mentally disordered suspects: A reexamination of the criminalization hypothesis. *Criminology*, *39*, 225-252.

Hall, C. A., Kader, A. S., McHale, A. M., Stewart, L., Fick, G. H., & Vilke, G. M. (2012). Frequency of signs of excited delirium syndrome in subjects undergoing police use of force: Descriptive evaluation of a prospective, consecutive cohort. *Journal of Forensic and Legal Medicine*, *20*(1), 1-6.

Johnson, R. R. (2011). Suspect mental disorder and police use of force. *Criminal Justice and Behavior*, *38*(2), 127-145.

Krexi, L., Georgiou, R., Krexi, D., & Sheppard, M. N. (2015). Sudden cardiac death stress and restraint: The association with sudden adult death syndrome, cardiomyopathy and coronary artery disease. *Medicine, Science and the Law*, *56*(2), 85-90. https://doi.org/10.1177/0025802414568483

LEXIPOL. (2019, May). *Law enforcement response to people in crisis: Understanding the challenges of incidents involving persons with mental illness*. www.lexipol.com

Link, B. G., Andrews, H., & Cullen, F. T. (1992). The violent and illegal behavior of mental patients reconsidered. *American Sociological Review*, *57*, 275-292.

Mash, D. C. (2016). Excited delirium and sudden death: A syndrome disorder at the extreme end of neuropsychiatric continuum. *Frontiers in Physiology*, *7*, 435-444.

Mash, D. C., Duque, L., & Pablo, J. (2009). Brain bio-markers for identifying excited delirium. *Forensic Science International*, *190*, 13-19.

Maxfield, M., & Babbie, E. (2005). *Research methods for criminal justice and criminology* (4th ed.). Thompson and Wadsworth Publishing.

McCance-Kantz, S. (2018). *National survey on drug use and health, 2017*. Substance Abuse and Mental Health Services Administration. www.samhsa.gov

Monahan, J., Steadman, H. J., Silver, E., Appelbaum, P. S., Robbins, P. C., Mulvey, E. P., Loren, H. R., Thomas, G., & Banks, S. (2001). *Rethinking risk assessment: The MacArthur study of mental disorder and violence*. Oxford University Press.

Morabito, M. S., & Socia, K. M. (2015). Is dangerousness a myth: Injuries and police encounters with people with mental illness. *Criminology and Public Policy*, *14*(2), 253-276.

Mulvey, E. P. (1994). Assessing the evidence for a link between mental illness and violence. *Hospital and Community Psychiatry*, *45*, 699-704.

National Alliance of Mental Illness. (2019). *Prevalence of mental health*. www.nami.org

National Institute on Drug Abuse. (2018, August). Comorbidity: Substance use disorders and other mental illnesses. *Drug Facts*, 1-3. www.drugabuse.gov

Novak, K. J., & Engel, R. S. (2005). Detangling the influence of suspect's demeanor and mental disorder on arrest. *Policing: An International Journal of Police Strategies & Management*, *28*, 493-512.

Pilgram, D. (2003). Mental disorder and violence: An empirical picture in context. *Journal of Mental Health, 12*, 7-18.

ProQuest Database. (1998-2018). *Medical accounts of "police kill naked man."* https://www.proquest.com/libraries/academic/databases

Rojas, R. (2019, November 1). Former GA officer is sentenced to 20 years in killing of an unarmed black man. *New York Times*. https://www.nytimes.com/2019/11/01/us/robert-olsen-police-shooting.html

Ross, D. L. (1998). Factors associated with excited delirium. *Modern Pathology*, *11*(11), 1127-1137.

Ross, D. L., & Hazlett, M. H. (2018). Assessing the symptoms associated with excited delirium syndrome and the use of conducted energy weapons. *Forensic Research & Criminology International Journal*, *6*(3), 187-196.

Ruschena, D., Mullen, P. E., & Burgess, P. (1998). Sudden deaths in psychiatric patients. *British Journal of Psychiatry*, *172*, 331-336.

Shane, J., & Swenson, Z. (2019). *Unarmed and dangerous: Patterns of threats by citizens during deadly force encounters with police*. Routledge.

Silver, E., Felson, R. B., & Vaneseltine, M. (2008). The relationship between health problems and violence among criminal offenders. *Criminal Justice and Behavior*, *35*, 405-426.

Substance Abuse and Mental Health Services Administration (SAMHSA), Drug Abuse Warning Network (DAWN). (2018). *Key substance use and mental health indicators in the United States: Results from the 2017 national survey on drug use and health* (HHS Publication No. SMA 18-5068, NSDUH Series H-53). Center for Behavioral Statistics and Quality, SAMHSA. www.samhsa.gov/data

SAMHSA, DAWN. (2013). *National estimates of drug-related emergency department visits: 2011* (HHS Publication No, [SMA] 13-4760, DAWN Series D-39). SAMHSA. www.samhsa.gov/data

Swanson, J. W., Borum, R., Swartz, M. S., & Monahan, J. (1996). Violent behavior preceding hospitalization among persons with severe mental illness. *Law and Human Behavior*, *23*, 185-204.

Swanson, J. W., McGinty, E. E., Fazel, S., & Mays, V. M. (2015). Mental illness and reduction of gun violence and suicide: Bringing epidemiologic research to policy. *Annals of Epidemiology*, *25*(5), 366-376.

Swartz, M. S., Swanson, J. W., Hiday, V. A., Borum, R., Wagner, H. R., & Burns, B. J. (1998). Violence and severe mental illness: The effects of substance abuse and non-adherence to medication. *American Journal of Psychiatry*, *155*, 226-231.

Vaille, C., Vedie, C., & Azorion, J. M. (2008). Sudden death, antipsychotics and schizophrenia. *Annals of Medical Psychology*, *169*, 269-275.

Vilke, G. M., Mash, D. C., Pardo, M., Bozeman, W., Hall, C., Sloane, C., Wilson, M., Coyne, C., Xie, X., & Castillo, E. (2019). Excitation study: Unexplained in-custody deaths: Evaluating biomarkers of stress and agitation. *Journal of Forensic and Legal Medicine*, *66*, 100-106.

Vilke, G. M., Payne-James, J., & Karch, S. B. (2012). Excited delirium syndrome (ExDS): Redefining an old diagnosis. *Journal of Forensic Legal Medicine*, *19*(1), 7-11.

Wetli, C. V. (2006). Excited delirium. In D. L. Ross & T. C. Chan (Eds.), *Sudden deaths in custody* (pp. 99-112). Humana Press.

Wetli, C. V., & Fishbain, D. A. (1985). Cocaine-induced psychosis and sudden death in recreational cocaine users. *Journal of Forensic Science*, *30*(3), 873-880.

Wetli, C. V., Mash, D., & Karch, S. B. (1996). Cocaine-associated agitated delirium and the neuroleptic malignant syndrome. *American Journal of Emergency Medicine*, *1*(4), 425-428.

World Health Organization (WHO). (2018). *Premature death among people with severe mental disorders*. www.who.int/mental_health/management/info_sheet.pdf

## Cases Cited

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

*Andrade v. Miami Dade County*, WL 4345665 (S.D. Florida 2011).

*Brown v. Scherrey*, WL 3361122 (E.D. Arkansas 2006).

*Burwell v. Peyton*, 131 F. Supp. 3d 268 (D. Vermont 2015).

*Callwood v. Phenix City,* WL 1122681156115 (M.D. Alabama 2016).

*Cardall et al. v. Thompson et al.* 845 F. Supp. 2d 1182 (D. Utah 2012).

*Chew v. Gates,* 27 F.3d 1432 (CA9 [California] 1994), *cert denied*, 513 U.S. 1148, 115 S. Ct. 1097, 130 L. Ed. 2d 1065 (1995).

*City and County of San Francisco v. Sheehan*, 575 U.S. ___, 135 S. Ct. 1765, 1911 L. Ed. 856 (2015).

*Cook v. Bastin (In re Estate of Campbell)*, 590 Fed. Appx. 523 (CA 6 [Kentucky] 2014).

*Cruz v. City of Laramie, Wyoming*, 239 F.3d 1183 (CA 10 [Wyoming] 2002).

*DeBoise v. Taser Int'l, Inc.*, 760 F.3d 892 (CA8 [Missouri] 2014), *cert. denied*, U.S. 135 S. Ct. 2348, 192 L. Ed. 2d 143 (2015).

*Deluna v. City of Rockford, Ill.*, 477 F.3d 1008 (CA 7 [Illinois] 2006). *Reh'g and sugg. for reh'g en banc denied* (2006).

*Deorle v. Rutherford*, 272 F.3d 1272, 1282-1283 (CA 9 [California] 2001), *cert denied*, 536 U.S. 958, 122 S. Ct. 2660 153 L. Ed. 2d 835 (2002).

*Dixon v. City of Lawton, Okla.*, 898 F.2d 1443 (CA 10 [Oklahoma] 1990).

*Estate of Hill by Hill v. Miracle,* 853 F.3d 306 (CA6 [Michigan] 2017), *reh'g en banc denied* (2017).

*Estate of Harvey v. Jones,* WL 909980 (W. Dist. Washington 2006).

*Estate of Mathis v. Kingston et al.,* WL 1033771 (D. Colorado 2009), unpublished.

*Gander v. Wood*, 457 F. Supp. 2d 1152 (D. Oregon 2006).

*Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

*Johnson v. City of Philadelphia*, 837 F.3d 343 (CA3 [Pennsylvania] 2016).

*Kaady v. City of Sandy*, WL 5111101 (D. Oregon 2008).

*Kisela v. Hughes,* 584 U.S. ___ 138 S. Ct. 1148, 1153, 200 L. Ed. 2d 449 (2018) (*per curiam*).

*Long v. Slaton,* 508 F.3d 576, 580 (CA 11 [Alabama] 2007), *reh'g en banc denied,* 284 Fed. Appx. 805 (CA 11 [Alabama] 2008), *cert denied,* 555 U.S. 1069 S. Ct. 725, 172 L. Ed. 2d 725 (2008).

*Martin v. City of Broadview Heights*, 712 F. 3d 951, 963 (CA6 [Ohio] 2013).

*Meyers v. Baltimore, County,* WL 1348007 (D. Maryland 2014).

*Mullenix v. Luna*, 577 U.S.____, 136 S. Ct. 305, 308, 193, L. Ed. 2d 255 (2015) (*per curiam*).

*Nelson v. Lott*, 330 F. Supp. 3d 1314 (D. Alabama 2018).

*Ortiz v. City of Chicago*, 656 F.3d 523, 570 (CA 7 [Illinois] 2011).

*Roell v. Hamilton Cty, Ohio/Hamilton Cty Bd of Cty Commissioners,* 870 F.3d 471 (CA 6 [Ohio] 2017).

*Sanders v. City of Fresno*, 340 Fed. Appx. 377 (CA9 [California] 2009).

*Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769 L. Ed. 2d 686 (2007).

*Summers v. Ramsey*, 705 Fed. Appx. 92 (CA 3 [Pennsylvania] 2017).

*Thompson v. City of Indianapolis*, WL 4365967 (S.D. Indiana 2018).

*Thompson v. Cope*, 900 F.3d 414 (CA 7 [Indiana] 2018).

*Williams v. McKinney*, WL 10700196 (W.D. Texas 2009).

*Wilson v. Miller,* 650 Fed. Appx. 676 (CA 11 [Georgia] 2016).

*Woolfolk v. Gootee*, WL 10705815 (M.D. Florida 2009) (unpublished).

*Wroth v. City of Rohnert Park*, WL 1766163 (N.D. California 2019).

**Darrell L. Ross**, PhD, is a professor and the Department Head of the Department of Sociology, Anthropology, and Criminal Justice and the Director of the Center for Applied Social Sciences at Valdosta State University. He has provided training on use of force, arrest-related deaths, and liability issues in over 800 training and conference presentations, nationally and internationally. He has published over 100 manuscripts and five books. Dr. Ross routinely provides consultation to police and correctional agencies, and expert testimony on the use of force and arrest-related deaths.

**Michael Brave**, Esq., MS (attorney, consultant, trainer, officer), is involved in a wide range of comprehensive law enforcement risk/liability and litigation management services. He has been retained as an expert in over 220 cases, has been involved in reviewing over 500 law enforcement temporal death

cases, and has presented on force options and other subjects over 1,000 times in the U.S., as well as in Mexico, Canada, Panama, Austria, and the United Kingdom. He serves as the International Law Enforcement Educators and Trainers Association's (ILEETA) legal advisor and as a board member.

[Reference Bundle]
# Conducted Energy Weapon (CEW) Use
# on Excited Delirium Syndrome (ExDS) Subjects[1]

| No. | Date | Document |
|---|---|---|
| 1 | Oct. 2021 | [Book Chapter] Chapter 19 Sudden Death during or Immediately after a Struggle. Pages 433-453. DiMaio, V.J.M. and Molina, D.K. (2022) (3rd Edition) DiMaio's Forensic Pathology, Practical Aspects of Criminal and Forensic Investigations Series. CRC Press, Taylor & Francis Group. |
| 2 | Aug. 2021 | Baldwin, S., Blaskovits, B., Hall, C., Lawrence, C., & Bennell, C. (2021). Adverse outcomes in non-fatal use of force encounters involving excited delirium syndrome. *Police Practice and Research*, 1-15. |
| 3 | Feb. 2021 | Baliatsas, C., Gerbecks, J., Dückers, M. L., & Yzermans, C. J. (2021). Human health risks of conducted electrical weapon exposure: a systematic review. *JAMA network open*, 4(2), e2037209-e2037209. |
| 4 | Jan. 2021 | [Book Chapter] Wilson M.P., Vilke G.M. (2021) Excited Delirium Syndrome: Diagnosis and Treatment. Pages 167-176. In: Zun L.S., Nordstrom K., Wilson M.P. (eds) Behavioral Emergencies for Healthcare Providers. Springer, Cham. |
| 5 | Jun. 2020 | [UK] (Stevenson) Stevenson, R., & Drummond-Smith, I. (2020). Medical implications of Conducted Energy Devices in law enforcement. *Journal of Forensic and Legal Medicine*, 101948. |
| 6 | Jan. 2020 | [Book Chapter] Childers, R., Chan, T., Vilke, G. Chapter 8: TASER Conducted Electrical Weapons. Pages 279-312. January 2020, Clinical Forensic Medicine, A Physician's Guide. Editors: Stark, Margaret M. (Ed.). |
| 7 | Nov. 2019 | Vilke, G., Chan, T., Bozeman, W. P., & Childers, R. (2019). Emergency department evaluation after conducted energy weapon use: review of the literature for the clinician. *The Journal of emergency medicine*, 57(5), 740-746. |
| 8 | Oct. 2019 | Aw-Yong, D. M. (2020). Ormrod Lecture October 2019: Police restraint–causes of death. *Medicine, Science and the Law*, 0025802420915329. |
| 9 | Jul. 2018 | Baldwin, S., Hall, C., Blaskovits, B., Bennell, C., Lawrence, C., Semple, T. Excited delirium syndrome (ExDS): Situational factors and risks to officer safety in non-fatal use of force encounters. *International Journal of Law and Psychiatry* 60 (2018) 26–34. |
| 10 | Jun. 2018 | Ross DL, Hazlett MH. Assessing the symptoms associated with excited delirium syndrome and the use of conducted energy weapons. *Forensic Res Criminol Int J.* 2018;6(3):187–196. DOI: 10.15406/frcij.2018.06.00206. |
| 11 | Dec. 2017 | Bozeman, William P., Jason P. Stopyra, David A. Klinger, Brian P. Martin, Derrel D. Graham, James C. Johnson III, Katherine Mahoney-Tesoriero, and Sydney J. Vail. "Injuries associated with police use of force." *Journal of trauma and acute care surgery* 84, no. 3 (2018): 466-472. |
| 12 | Sept. 2017 | Blaskovits. B., Baldwin, S., Hall, C., Bennell, C., & Lawrence, C. (2017, September 15, 2017). Excited Delirium Syndrome (ExDS): Outcomes and Best Practices in Non-Fatal Use of Force (UoF) Encounters. Annual meeting of the society for police and criminal psychology conference, San Diego, California, United States. |
| 13 | Sept. 2017 | Baldwin, S., Walker, T., Blaskovits, B., & Bennell, C. (2017, September 14, 2017). The effects of intervention options and situational factors on outcomes in police use-of-force encounters. Annual meeting of the society for police and criminal psychology conference, San Diego, California, United States. |
| 14 | Sept. 2017 | *Roell v. Hamilton County*, 870 F.3d 471 (CA6 (Ohio) Sept. 5 ,2017) "In addition, although the deputies did not follow every OPTC [Ohio Peace Officer Training Commission] protocol, we note that the training materials acknowledge that the use of a taser might be effective in controlling an individual suffering from |

---

[1] For additional information, see current version of "Outline of Partial Selected CEW Research and Information," and all referenced or cited documents and materials.

| No. | Date | Document |
|---|---|---|
| | | excited delirium, that a physical struggle might ensue, and that force might be appropriate or necessary in order to restrain the individual." |
| 15 | Jul. 2017 | R. W. Byard, "Ongoing issues with the diagnosis of excited delirium," (in eng), *Forensic Sci Med Pathol*, Aug 03 2017. |
| 16 | Mar. 2017 | [Book Chapter] Nakajima, Y., Vilke, G.M., Chapter 12: Use of Force in the Prehospital Environment, Zeller, S.L., Nordstrom, K.D. and Wilson, M.P. (eds.) (2017) *The Diagnosis and Management of Agitation.* |
| 17 | 2016 | Roberts, E.E., Vilke, G.M. Restraint techniques, injuries and death: conducted energy devices. *Encyclopedia of Forensic and Legal Medicine* (Second Edition), 2016, pp 118-126. |
| 18 | Aug. 2016 | [Book Chapter] Vilke, G. M. and Payne-James, J. J. (2016) Chapter 6: Excited Delirium Syndrome: aetiology, identification and treatment, in Current Practice in Forensic Medicine (eds J. A.M. Gall and J. J. Payne-James), John Wiley & Sons, Ltd, Chichester, UK. |
| 19 | Aug. 2016 | House, C, Gillings, M, Grundlingh, J, Aw-Yong, M. (2016) QUALITY IN EMERGENCY CARE COMMITTEE Guidelines for the Management of Excited Delirium / Acute Behavioural Disturbance (ABD). Independent Advisory Panel on Deaths in Custody. |
| 20 | 2014 | [Book Chapter] Wyant, R.T., Burns, T. (2014) Chapter 8: Arrest-Related Death, In-Custody Death, and Excited Delirium Syndrome. Pages 201-220. Wyant, R. Burns, T. (2014) Risk Management of Less Lethal Options: Evaluation, Deployment, Aftermath, and Forensics. Edited by John Allgire. CRC Press, Taylor & Francis Group. |
| 21 | 2014 | [Book Chapter] Wyant, R.T., Burns T. (2014) Chapter 9: Forensics: Conducted Electrical Weapons (Taser). Pages 221-260. Wyant, R. Burns, T. (2014) Risk Management of Less Lethal Options: Evaluation, Deployment, Aftermath, and Forensics. Edited by John Allgire. CRC Press, Taylor & Francis Group. |
| 22 | Apr. 2013 | [Book Chapter] Wilson, M.P., Vilke, G.M. 2013. Chapter 17: The patient with excited delirium in the emergency department. Behavioral Emergencies for the Emergency Physician. Edited by Leslie Zun. 2013. |
| 23 | Feb. 2012 | Vilke, G.M., Bozeman, W.P., Dawes, D.M., DeMers, G., Wilson, M.P. 2012. Excited delirium syndrome (ExDS): Treatment options and considerations, Journal of Forensic and Legal Medicine (2012). |
| 24 | Dec. 2011 | Hughes, E.L., Special Report, Special Panel Review of Excited Delirium, Less-Lethal Devices Technology Working Group, NIJ Weapons and Protective Systems Technologies Center, Penn State. |
| 25 | Aug. 2011 | Vilke G. Pathophysiologic changes due to TASER devices versus excited delirium: Potential relevance to deaths-in-custody [LETTER]. J Forensic Leg Med. Aug 2011;18(6):291. |
| 26 | May 2011 | Vilke, G. M., Bozeman, W. P., & Chan, T. C. (2011). Emergency department evaluation after conducted energy weapon use: review of the literature for the clinician. *The Journal of emergency medicine*, 40(5), 598-604. |
| 27 | May 2011 | Five (5) year NIJ study: Laub, J., Study of Deaths Following Electro Muscular Disruption, National Institute of Justice, May 2011. |
| 28 | Feb. 2011 | Jauchem J. Pathophysiologic changes due to TASER devices versus excited delirium: Potential relevance to deaths-in-custody? J Forensic Leg Med. May 2011;18(4):145-153. |
| 29 | Dec. 2009 | Review of Conducted Energy Weapons Use in Ontario, Report of the Policing Standards Advisory Committee, Minister of Community Safety and Correctional Services, Ontario, Canada, December 11, 2009. |
| 30 | Sep. 2009 | White Paper Report on Excited Delirium Syndrome. ACEP Excited Delirium Task Force, http://ccpicd.com/Documents/Excited%20Delirium%20Task%20Force.pdf; September 10, 2009. |

| No. | Date | Document |
|-----|------|----------|
| 31 | Apr. 2009 | Bozeman, W.P., Hauda, W.E., Heck, J.J., Graham, D.D., Martin B.P., Winslow, J.E. 2009. Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects. *Annals of Emergency Medicine.* Volume 53, Issue 4, Pages 480–489, April 2009. |
| 32 | Jun. 2008 | Hagy D., Study of Deaths Following Electro Muscular Disruption: Interim Report. U.S. Department of Justice. Office of Justice Programs. June 2008. |

1. [Book Chapter] (10/2021 DiMaio) Chapter 19 Sudden Death during or Immediately after a Struggle. Pages 433-453. DiMaio, V.J.M. and Molina, D.K. (2022) (3rd Edition) DiMaio's Forensic Pathology, Practical Aspects of Criminal and Forensic Investigations Series. CRC Press, Taylor & Francis Group.[2]

   a. … While there is no evidence that the use of an EMDD has directly caused death by its electrical current, … It has been estimated that over 2 million law enforcement individuals have been voluntarily shocked with EMDDs without resulting in death or fatal arrhythmia." [page 449, highlighting emphasis added]

2. (08/2021 Baldwin) Baldwin, S., Blaskovits, B., Hall, C., Lawrence, C., & Bennell, C. (2021). Adverse outcomes in non-fatal use of force encounters involving excited delirium syndrome. *Police Practice and Research*, 1-15.

   a. "Ineffective UoF will likely result in more applications of force and a continued physical struggle, potentially leading to strenuous physical exertion (a risk factor for ARD; Ho et al., 2010; Ruttenber et al., 1999; Vilke et al., 2012). In fact, Mesloh et al. (2008) reported that 78% of the subjects that required multiple UoF interventions continued to resist the officer (e.g. punch, wrestle, pull away). This type of physical resistance by subjects also has one of the largest associations with officer injury (Castillo et al., 2012; MacDonald et al., 2009). Paoline et al. (2012) found that officers were significantly more likely to be injured as the level of citizen resistance increased. "

   b. "Moreover, individuals in a state of ExDS appear to be significantly more likely to be in possession of a weapon (Baldwin et al., 2018), posing obvious risks to subject and officer safety. The literature regarding the relationship between injury and weapon presence has found mixed results (Kaminski 2 S. BALDWIN ET AL. et al., 2004; Kaminski & Sorensen, 1995; Paoline et al., 2012). However, this could be in part because when presented with a weapon, officers opt for an intervention option that provides greater time and distance from the subject (e.g. pepper spray, conducted energy weapon) and,

---

[2] Also see, Chapter 15 Electrocution. Pages 385-392. DiMaio, V.J.M. and Molina, D.K. (2022) (3rd Edition) DiMaio's Forensic Pathology, Practical Aspects of Criminal and Forensic Investigations Series. CRC Press, Taylor & Francis Group.

consequently, experience lower injury rates when compared to the use of physical control (Baldwin et al., 2017)."

c. "… Mesloh et al. (2008) reported that subjects under the influence of substances frequently have a much higher pain tolerance, which requires a greater amount of force to be used against them. Despite this, officers are less likely to be injured when subjects displayed signs of alcohol or drug use (Paoline et al., 2012)."

d. "In comparison to subject injury, UoF encounters with probable cases of ExDS present an increased risk of officer injury. This appeared to be attributable primarily to the violent nature and co-occurring factors (i.e. substance use) common in subjects displaying various concomitant features of the syndrome (Baldwin et al., 2018). Consistent with the literature (Castillo et al., 2012; Kaminski et al., 2004; Kaminski & Sorensen, 1995; MacDonald et al., 2009; Mesloh et al., 2008; Paoline et al., 2012), drugs alone and in combination with alcohol, violent behaviour, a ground struggle, and weapons, also emerged as important predictors of several adverse outcomes."

3. Baliatsas, C., Gerbecks, J., Dückers, M. L., & Yzermans, C. J. (2021). Human health risks of conducted electrical weapon exposure: a systematic review. *JAMA network open*, 4(2), e2037209-e2037209.

4. [Book Chapter] (01/2021 Wilson) Wilson M.P., Vilke G.M. (2021) Excited Delirium Syndrome: Diagnosis and Treatment. Pages 167-176. In: Zun L.S., Nordstrom K., Wilson M.P. (eds) Behavioral Emergencies for Healthcare Providers. Springer, Cham.

a. [page 169] "Despite the many descriptions of ExDS since the time of Bell, some civil rights advocates have claimed that the syndrome was invented by police and lawyers to absolve them of guilt for sudden deaths that occurred while placing and maintaining individuals in police custody. However, in 2004, the National Association of Medical Examiners published a position paper that recognized the existence of an excited delirium syndrome as a medical diagnosis for the first time and rejected the idea that deaths were caused by restraint or TASER use [7–10]." [page 169, highlighting emphasis added]

b. [page 170] "… In the prehospital setting, the basic principles used by law enforcement to control a patient in ExDS revolve around rapid physical restraint, minimization of the patient's exertional activity, and safety for all. The use of a TASER electronic control device (ECD) is felt by many experts to be preferable to the more traditional physical wrestling and grappling for control, since fighting and heavy physical exertion with repeated flexion and extension of the large muscle groups have a more deleterious effect on a

patient's acid-base status by way of increased lactic acid production [40–43][3]. Incapacitating an individual first with a TASER ECD, then rapidly gaining physical control of the arms and legs will reduce the muscle activity of the large muscle groups, thus reducing the amount of lactic acid that is being produced, as well as the amount of oxygen being consumed. Throughout, the patient's airway should be carefully protected during any forceful maneuver, and respiratory status carefully monitored both during and after restraint. The purpose of this chapter is not to define police practices, but rather to bring attention to the fact that patients with ExDS are violent and dangerous, and will need physical control before medical assessment and therapy can safely begin." [page 170, highlighting emphasis added]

5. (06/2020 [UK] Stevenson) Stevenson, R., & Drummond-Smith, I. (2020). Medical implications of Conducted Energy Devices in law enforcement. *Journal of Forensic and Legal Medicine*, 101948.

**Abstract**

This study examines the medical implications of Conducted Energy Devices (CEDs) in law enforcement, of which TASER® is the brand most recognised. In order to develop understanding of TASER® use, this study undertook both a literature review and original research using data provided by a number of UK police forces.

The comprehensive review of literature identified a range of injures, including both primary and secondary complications.

Research was conducted into TASER(R) use in the United Kingdom using a number of data sets, including a retrospective study of some 60,000 uses of force. This data shows TASER® was only discharged on 18% of occasions it was drawn from the holster. **The injuries sustained by both subjects and Police Officers associated with TASER(R) use were compared and it was found that fewer injuries, as a proportion of use, were associated with TASER® than Police Dogs, baton or irritant spray or physical confrontation.** The data examined 948 discharges of TASER® and recorded 159 attendances at the Emergency Department as a result. Only three hospital admissions were identified.

The paper concludes that the use of CEDs as a police use-of-force may be associated with injury; the overwhelming majority of such are classified as

[3] 40. Wilson MP, Zeller SL. Reconsidering psychiatry in the emergency department. *J Emerg Med*. 2012;43(5):771–2.
41. Ho JD, Dawes DM, Nelson RS, et al. Acidosis and catecholamine evaluation following simulated law enforcement "Use of force" Encounters. *Acad Emerg Med*. 2010;12:E60–E6.
42. Ho JD, Dawes DM, Cole JB, et al. Lactate and pH evaluation in exhausted humans with prolonged TASER® X26 exposure or continued exertion. *Forensic Sci Int*. 2009;190:80–6.
43. Ho JD, Dawes DM, Bultman LL, et al. Prolonged TASER® use on exhausted humans does not worsen markers of acidosis. *Am J Emerg Med*. 2009;27:413–8.

© LAAW International, LLC. 2009–2022 ARR

minor. ==Death or the more severe injuries described in the medical literature are rare and any deaths occurring within temporal proximity to the use of a CED should be investigated thoroughly and the presentation of the individual carefully recorded==.

The collection of post-incident data provides evidence to the relative operational safety of the TASER® by the UK Police; it is accepted by the police that no use-of-force option is risk free, however **==data provided showed a greater incidence of injury to both the officers and subjects, as a proportion of use, when baton, irritant spray or physical confrontation was used==**. [highlighting emphasis added]

6. [Book Chapter] (01/2020 Childers) Childers, R., Chan, T., Vilke, G. Chapter 8: TASER Conducted Electrical Weapons. Pages 279-312. January 2020, Clinical Forensic Medicine, A Physician's Guide. Editors: Stark, Margaret M. (Ed.).

   a. **Conclusion**. Conducted electrical weapons are an important tool for LEOs when confronting violent subjects. Serious injuries from their use are rare and are usually minor and straightforward for the examining clinician. Determining if a CEW exposure has caused a death by inducing a lethal dysrhythmia is less clear. While this event is theoretically possible, it is highly unlikely. We recommend a systematic, evidence-based approach to making this clinical determination. Table 8.2, designed to help pathologists address the specific question regarding the causation of VF, can help in this area.

   b. **Key Points**.

      i. Significant injuries from CEW exposure are uncommon but include wounds from the direct trauma of probe penetration, traumatic injuries from falls caused by muscle incapacitation, and very rarely burns from ignition of flammable substances.

      ii. Ventricular fibrillation and sudden cardiac arrest are highly unlikely to be caused by a CEW exposure. Use the included checklist to assess for possible causation.

7. (11/2019 [AAEM Position Paper] Vilke) Vilke, G., Chan, T., Bozeman, W. P., & Childers, R. (2019). Emergency department evaluation after conducted energy weapon use: review of the literature for the clinician. *The Journal of emergency medicine*, 57(5), 740-746.

   a. **Results.** Two hundred and sixty-three articles on CEWs were screened and 37 appropriate articles were rigorously reviewed. Evaluation and treatment recommendations are presented. ==These studies did not report any evidence of dangerous laboratory abnormalities, physiologic changes, or immediate or==

==delayed cardiac ischemia or dysrhythmias after exposure to CEW electrical discharges of up to 15 s.== [highlighting emphasis added]

8. (10/2019 Aw-Yong) Aw-Yong, D. M. (2020). Ormrod Lecture October 2019: Police restraint–causes of death. *Medicine, Science and the Law*, 0025802420915329.

   a. **Use of conducted electrical weapon (TASER) in ABD** [acute behavioural disturbance]. In addition, if the over-riding medical requirement is to reduce physical activity and the subsequent development of acidosis and a person is too violent/agitated for ambulance personnel to approach, ==then a consideration is to use a TASER to stop the restraint requirement and to allow earlier medical access/intervention.== [highlighting emphasis added]

9. (07/2018 Baldwin) Baldwin, S., Hall, C., Blaskovits, B., Bennell, C., Lawrence, C., Semple, T. Excited delirium syndrome (ExDS): Situational factors and risks to officer safety in non-fatal use of force encounters. *International Journal of Law and Psychiatry* 60 (2018) 26–34.

   a. "…==In these incidents, officers should consider intervention options that provide greater time and distance from the subject (e.g., probe deployment of conducted energy weapon [CEW]), and also have lower injury rates when compared to the use of physical control== (Baldwin et al., 2017; Bozeman et al., 2018). Given the nature of ExDS symptomology (e.g., pain tolerance, constant/near constant activity, superhuman strength), typical UoF interventions (e.g., physical control, pepper spray) that rely on pain compliance or manual force may be rendered ineffective, which should also be taken into account by responding officers (Blaskovits et al., 2017). In the past, ExDS deaths have been suggested to be a consequence of OC spray, the CEW, or the use of neck restraints on subjects (DiMaio & DiMaio, 2006). However, ==no study to date has established a causal relationship between these less lethal intervention [including CEW] options and fatal subject outcomes== (e.g., Goudge et al., 2013; Michalewicz et al., 2007; Mitchell, Roach, Tyberg, Belenkie, & Sheldon, 2012; Petty, 2004)." [page 32, highlighting emphasis added]

10. (06/2018 Ross) Ross DL, Hazlett MH. Assessing the symptoms associated with excited delirium syndrome and the use of conducted energy weapons. *Forensic Res Criminol Int J.* 2018;6(3):187–196. DOI: 10.15406/frcij.2018.06.00206.

   **Abstract.** Incidents where the police and corrections officers confront a person exhibiting the symptoms of the excited delirium syndrome (ExDS) has become an important concern, although rare in occurrence. To date there has been two prospective, epidemiologic studies which have examined the frequency of the

symptoms of ExDS during a police use of force confrontation. Using a prospective research design, we analyzed a cohort of 635 arrestees who exhibited symptoms of ExDS as reported by 17 police agencies from six states in the U.S. over twelve months in 2013 during a use of force incident. We sought to determine if police officers could recognize the associated symptoms of ExDS, determine their prevalence during a use of force confrontation, and to assess if the symptoms were observable across multiple agencies. We also assessed the types of resistance displayed by the arrestees and the outcomes of the use of a conducted energy weapon (CEW) in response to the resistance. Officers reported observing thirteen symptoms associated with ExDS. Using descriptive statistics and regression analysis (p=0.05) showed that 58 percent of the arrestees presented 3 to 4 symptoms, 30 percent presented 5 to 6 symptoms, and 12 percent presented 7 or more symptoms. A CEW was applied in 38 percent (n=240) of the incidents and all arrestees were controlled and restrained in the prone position. None of the arrestees died and in 79 percent of the incidents, an arrestee did not sustain an injury. Officers from multiple agencies were able to recognize the varying symptoms associated with ExDS and their prevalence. The outcome of the incidents showed that applying a CEW with an arrestee exhibiting signs of ExDS is a safe and viable use of force device reducing the likelihood of an arrestee death and minimizing arrestee injuries. Based on the results policy, training, and the focus of future research is discussed. [highlighting emphasis added]

11. (12/2017 Bozeman) Bozeman, William P., Jason P. Stopyra, David A. Klinger, Brian P. Martin, Derrel D. Graham, James C. Johnson III, Katherine Mahoney-Tesoriero, and Sydney J. Vail. "Injuries associated with police use of force." *Journal of trauma and acute care surgery* 84, no. 3 (2018): 466-472. A few statements regarding CEWs: [highlighting emphasis added]

   a. A conclusion: CEW use was the force modality least likely to result in significant injury.

   b. No significant injuries occurred among 504 CEW uses (0%; 95% CI 0.0– 0.9%).

   c. There were no significant injuries after 504 CEW uses (0%; CI 0.0–0.9%) and 88 chemical weapon uses (0%; CI 0.0 – 5.0%).

   d. Unarmed physical force resulted in over one third (6/16) of the significant injuries seen in this series. These were evenly distributed among "soft" and "hard" unarmed physical force and included major head injuries and bony fractures.

e. Unarmed physical force and CEW use were the two most common force modalities used, representing 50.8% and 36.0% respectively and 86.8% combined. Traditional intermediate force options such as pepper spray and impact weapons were not commonly used, representing 6.3% and 0.6% of force utilizations. Firearms were used in 0.4% of force utilizations (n=6 cases).

f. The large majority of UOF cases in this series use lower levels of force such as unarmed physical force and CEWs. This reflects modern police practice in the United States as many agencies now equip some or all of their officers with CEW's. These tools have been associated with lower rates of use of other force options such as OC spray, impact weapons, and firearms, and in lower injury rates among both suspects and officers. [6,17,18] [4]

g. While serious injuries and fatalities have occurred after CEW use, this is rare.[17] With over 500 uses resulting in no significant injuries, these data suggest that CEW use is the force option least likely to result in significant suspect injury. This finding is consistent with prior epidemiology studies of CEW use.[8, 20] [5]

12. (09/2017 Blaskovits) Blaskovits. B., Baldwin, S., Hall, C., Bennell, C., & Lawrence, C. (2017, September 15, 2017). Excited Delirium Syndrome (ExDS): Outcomes and Best Practices in Non-Fatal Use of Force (UoF) Encounters. Annual meeting of the society for police and criminal psychology conference, San Diego, California, United States.

13. (09/2017 Baldwin) Baldwin, S., Walker, T., Blaskovits, B., & Bennell, C. (2017, September 14, 2017). The effects of intervention options and situational factors on outcomes in police use-of-force encounters. Annual meeting of the society for police and criminal psychology conference, San Diego, California, United States.

14. (09/2017 *Roell* 6th Circuit Published Case Decision) *Roell* v. Hamilton County, 870 F.3d 471 (CA6 (Ohio) Sept. 5 ,2017).

a. "In addition, although the deputies did not follow every OPTC [Ohio Peace Officer Training Commission] protocol, we note that the training materials acknowledge that the use of a taser might be effective in controlling an individual suffering from excited delirium, that a physical struggle might

---

[4] 6 - MacDonald JM, Kaminski RJ, Smith MR. The effect of less-lethal weapons on injuries in police use-of-force events. *Am J Public Health.* 2009 Dec;99(12):2268-74.

17 - Office of Justice Programs. NIJ Special Report: Study of Deaths Following Electro Muscular Disruption, National Institute of Justice, May 2011.

18 - Sousa, W., Ready, J., and Ault, M.: The impact of TASERs on police use-of-force decisions: Findings from a randomized field-training experiment, *J Exp Criminol.*, 2010, 6: 35-55.

[5] 8 - Strote J, Verzemnieks E, Walsh M, Hutson HR. Use of force by law enforcement: an evaluation of safety and injury. J Trauma. 2010 Nov;69(5):1288-93.

20 - Strote J, Walsh M, Angelidis M, Basta A, Hutson HR. Conducted electrical weapon use by law enforcement: an evaluation of safety and injury. *J Trauma.* 2010 May;68(5):1239-46.

==ensue, and that force might be appropriate or necessary in order to restrain the individual.==" [highlighting emphasis added]

15. (07/2017 Byard) R. W. Byard, "Ongoing issues with the diagnosis of excited delirium," (in eng), *Forensic Sci Med Pathol*, Aug 03 2017.

   a. "Although the use of Tasers has been implicated in episodes of fatal excited delirium ==no definite causal relationship has been proven== [11, 16]. [EN 11: Takeuchi A, Ahern TL, Henderson SO. Excited delirium. *West J Emerg Med*. 2011;12:77–83; and EN 16: Jauchem JR. Deaths in custody: are some due to electronic control devices (including Taser® devices) or excited delirium? *J Forensic Legal Med*. 2010;17:1–7.] [highlighting emphasis added]

16. [Book Chapter] (03/2017 Nakajima) Nakajima, Y., Vilke, G.M., Chapter 12: Use of Force in the Prehospital Environment, Zeller, S.L., Nordstrom, K.D. and Wilson, M.P. (eds.) (2017) *The Diagnosis and Management of Agitation*. Available at: https://www.cambridge.org/core/books/the-diagnosis-and-management-of-agitation / F579A66F96776E2DC8B807613B8E6A23.

   a. **Key Point:** ==TASERs are used commonly in the prehospital setting to ensure safety of personnel and the altered, aggressive, and agitated patient.==

   b. **Key Point:** ==TASERs are increasingly used to control violent and aggressive individuals while maintaining a margin of safety, as well as to reduce the need for impact weapons and injuries associated with their use. They are reported to have prevented many law enforcement personnel injuries as well as subject injuries.==

   c. "Quickly controlling an ExDS subject in the prehospital setting to minimize the subject's exertional activity is a priority, while maintaining both the safety of providers and the subject. ExDS subjects typically have altered mental status, are often paranoid, and are essentially impossible to effectively communicate with, making verbal de-escalation of little value. ==The use of an ECD such as TASER to rapidly gain physical control and restrain a subject is preferable to the approach of going hands-on, as heavy physical exertion may exacerbate acidosis in the subject and contribute to a greater risk of sudden death. Data have shown that exertion and struggle increase acidosis more than use of a TASER (Ho et al. 2010).== The goal is rapid control allowing as little struggle as possible by the subject. Once the subject is restrained and scene safety is secured, the medical evaluation and treatment can begin for the patient." [page 179, highlighting emphasis added]

17. [Book Chapter] (2016 Roberts) Roberts, E.E., Vilke, G.M. Restraint techniques, injuries and death: conducted energy devices. *Encyclopedia of Forensic and Legal Medicine* (Second Edition), 2016, pp 118-126.

   a. **Case Reports and Reviews.** "The use of TASERs weapons has been associated with cases of sudden in-custody deaths. There has been a great deal of publicity in the press recently regarding these devices, usually as a result of the death of a subject on whom the device was used (Figure 4). Amnesty International claims that more than 500 people have died after being 'tased' by law enforcement (Amnesty International, 2013). However, <mark>an actual causal connection between the use of the TASERs and these fatalities remains controversial</mark>." [page 120, highlighting emphasis added]

   b. "**Laboratory effects.** The current human literature has not demonstrated evidence of clinically significant laboratory abnormalities or physiologic changes after CED exposures. Human studies have not shown any clinically significant changes in electrolyte levels or renal function in subjects with up to 15 s CED activations. There have been mild, but clinically insignificant elevations in lactate levels with CED activations. However, <mark>these have been demonstrated to be of a smaller magnitude relative to other forms of physical exertion with a similar duration</mark>. Acid base status has been evaluated and has not shown any clinically significant pH shifts froma 5-s CED activation, with similar findings of mild transient pH shifts noted in longer application of up to 15s (Dawes et al., 2009; Ho et al., 2009a,b, 2011). [pages 123-124 highlighting emphasis added]

18. [Book Chapter] (08/2016 Vilke) Vilke, G. M. and Payne-James, J. J. (2016) Chapter 6: Excited Delirium Syndrome: aetiology, identification and treatment, in Current Practice in Forensic Medicine (eds J. A.M. Gall and J. J. Payne-James), John Wiley & Sons, Ltd, Chichester, UK. doi: 10.1002/9781118456026.ch6.

   a. Tactics used by law enforcement to gain control of a subject exhibiting signs and symptoms of ExDS should focus on rapid control and minimization of the patient's exertional activity, while maintaining the safety of officers and the subject. <mark>The use of a TASER® (electronic control device, ECD) to gain control and restrain someone exhibiting signs of ExDS is felt by many experts to be preferable to the more traditional physical wrestling for control as fighting or heavy physical exertion has been shown to have a more deleterious effect on a patient's acid-base status</mark> (Ho, Dawes and Bultman, 2009; Ho, Dawes, Cole et al., 2009; Ho, Dawes, Nelson et al., 2010). Use of the large muscle groups of the arms and legs in repeated contractions and extensions will cause a significant rise in oxygen consumption and lactic acidosis. Thus, once controlled, restraint becomes protective for the subject

(Michalewicz, Chan, Vilke et al., 2007). <mark>Patients with ExDS, already severely acidotic from their underlying condition and significant prolonged exertion, could aggravate this and contribute to a greater risk for cardiac arrest compared to a short burst of electrical control from an ECD and subsequent rapid restraint</mark>. Additionally, the patient's airway should be protected during any forceful manoeuvre and the breathing status monitored during and after the manoeuvre. [page 106, highlighting emphasis added]

19. (08/2016 House (UK)) House, C, Gillings, M, Grundlingh, J, Aw-Yong, M. (2016) QUALITY IN EMERGENCY CARE COMMITTEE Guidelines for the Management of Excited Delirium / Acute Behavioural Disturbance (ABD). Independent Advisory Panel on Deaths in Custody.[6]

    a. "There is insufficient research on the effects of <mark>TASER</mark> on ABD however <mark>its use as a rapid takedown method to minimise restraint time and activity and allowing expeditious medical intervention may be a necessary alternative once nonphysical methods have failed</mark>." [highlighting emphasis added]

20. [Book Chapter] Wyant, R.T., Burns, T. (2014) Chapter 8: Arrest-Related Death, In-Custody Death, and Excited Delirium Syndrome. Pages 201-220. Wyant, R. Burns, T. (2014) Risk Management of Less Lethal Options: Evaluation, Deployment, Aftermath, and Forensics. Edited by John Allgire. CRC Press, Taylor & Francis Group.

21. [Book Chapter] Wyant, R.T., Burns T. (2014) Chapter 9: Forensics: Conducted Electrical Weapons (Taser). Pages 221-260. Wyant, R. Burns, T. (2014) Risk Management of Less Lethal Options: Evaluation, Deployment, Aftermath, and Forensics. Edited by John Allgire. CRC Press, Taylor & Francis Group.

22. [Book Chapter] (04/2013 Wilson) Wilson, M.P., Vilke, G.M. 2013. Chapter 17: The patient with excited delirium in the emergency department. Behavioral Emergencies for the Emergency Physician. Edited by Leslie Zun. 2013.

    a. "… In the pre-hospital setting, the basic principles used by law enforcement to control a patient in ExDS revolve around rapid physical restraint, minimalization of the patient's exertional activity, and safety for all. <mark>The use of a taser electronic control device (ECD) is felt by many experts to be preferable to the more traditional physical wrestling for control, because fighting or heavy physical exertion has a more deleterious effect on a patient's acid-base status</mark> [34–36]. …" [page 127, highlighting emphasis added]

---

[6] http://iapdeathsincustody.independent.gov.uk/wp-content/uploads/2016/08/Acute-Behavioural-Disturbance-RCEM-guidelines-for-management-of-ABD-250416.pdf

23. (02/2012 Vilke) Vilke, G.M., Bozeman, W.P., Dawes, D.M., DeMers, G., Wilson, M.P. 2012. Excited delirium syndrome (ExDS): Treatment options and considerations, *Journal of Forensic and Legal Medicine* (2012), doi:10.1016/j.jflm.2011.12.009.

   a. "Tactics used in the prehospital setting to control a patient in ExDS should revolve around patient and provider safety with rapid control and minimisation of the patient's exertional activity. The use of an electronic control device, such as a TASER® ECD, to gain control of a patient appears preferable to the more traditional and drawn out approach of going 'hands on', as fighting or heavy physical exertion has more of a deleterious effect on a patient's already tenuous acid-base status.[22–24] Thus, heavy exertion may make the patient more acidotic and contribute to a greater risk for sudden death compared with a short burst of electrical control and rapid restraint. Judicious restraint of the patient will prevent ongoing use of the large thigh and arm muscles, which consume oxygen and contribute to acid-base disturbances. Containment and de-escalation where possible will minimise both stress and exertion." [highlighting emphasis added.]

24. (12/2011 Hughes) Hughes, E.L., Special Report, Special Panel Review of Excited Delirium, Less-Lethal Devices Technology Working Group, NIJ Weapons and Protective Systems Technologies Center, Penn State.

   a. "A conducted energy device is a fast way to restrain an individual with ExDS, pointed out Lenexa and Seattle police officers.[143] "While the TASER [CEW] is cycling, have somebody restrain him and deliver him to medics, if medics are present," stated Officer Myers.[144]" [page 30, highlighting emphasis added]

25. (08/2011 Vilke) Vilke G. Pathophysiologic changes due to TASER devices versus excited delirium: Potential relevance to deaths-in-custody [LETTER]. *J Forensic Leg Med.* Aug 2011;18(6):291.

26. (05/2011 [AAEM Position Statement] Vilke) Vilke, G. M., Bozeman, W. P., & Chan, T. C. (2011). Emergency department evaluation after conducted energy weapon use: review of the literature for the clinician. *The Journal of emergency medicine*, 40(5), 598-604.

   a. **Results.** There were 140 articles on CEWs screened, and 20 appropriate articles were rigorously reviewed and recommendations given. These studies did not report any evidence of dangerous laboratory abnormalities, physiologic changes, or immediate or delayed cardiac ischemia or dysrhythmias after exposure to CEW electrical discharges of up to 15 s. [highlighting emphasis added]

27. (05/2011 NIJ) Five (5) year NIJ study: Laub, J., <u>Study of Deaths Following Electro Muscular Disruption</u>, National Institute of Justice, May 2011.

   a. "CED exposure may contribute to "stress," and stress may be an issue related to cause-of-death determination. <mark>All aspects of an altercation (including verbal altercation, physical struggle or physical restraint) constitute stress that may heighten the risk of sudden death in individuals who are intoxicated or who have pre-existing cardiac or other significant disease. Medical research suggests that CED deployment during restraint or subdual is not a contributor to stress of a magnitude that separates it from the other stress-inducing components of restraint or subdual</mark>." [page 19, highlighting emphasis added]

28. (02/2011 Jauchem) Jauchem J. Pathophysiologic changes due to TASER devices versus excited delirium: Potential relevance to deaths-in-custody? *J Forensic Leg Med.* May 2011;18(4):145–153.

   a. "Notwithstanding results of animal experiments with direct effects on the heart in some specific conditions of TASER ECD applications (e.g., Valentino et al. [45]), the likelihood of ventricular VF directly due to such devices has been reported to be extremely low during typical fatality cases involving excited delirium.[144] In one study of deaths-in-custody between 1990 and 2004, only one out of 45 cases involved use of an ECD.[145] In a prospective multicenter cohort study of 1201 subjects exposed to ECDs, two deaths in-custody occurred; both were determined to be unrelated to ECD use.[146] In contrast, on the basis of some analyses, as many as 75% of excited delirium patients die at scene or during transport (C. Hall, quoted in Calgary Police Commission[147]). Bozeman and Winslow[148] concluded that drugs and/or restraint may be more important factors leading to death than several short exposures to ECDs. In 2006, it was estimated that as many as 800 people die from excited delirium each year.[149] Since different terminology and definitions of excited delirium may be used by different medical examiners, there are no reliable figures nationwide of suspects who died from the syndrome. One investigator estimated an in-custody death occurrence approximately every 2.5 days in the United States, with ECDs used on these subjects about 27% of the time.[150]"

29. (12/2009 Ontario, Canada) <u>Review of Conducted Energy Weapons Use in Ontario</u>, Report of the Policing Standards Advisory Committee, Minister of Community Safety and Correctional Services, Ontario, Canada, December 11, 2009.

   a. (page 7) "In addition, seven inquest juries from Ontario during the period from 2005 to early 2009 recommended all front-line/primary response officers be

authorized to use CEWs. The rationale for these recommendations stems from an acknowledgement that front-line officers may be in a position to facilitate a rapid resolution of violent situations without the use of lethal force and the situations in which a CEW is required are most often encountered by front-line/primary response officers. The presiding coroner of one of the inquests commented that:

'Particularly where ED (excited delirium) may be involved, early control and restraint of the agitated subject will prevent possible serious consequences, and allow for earlier medical intervention and treatment…Use of a Taser, particularly in full deployment (probe) mode, has proven highly effective in gaining rapid control of subjects, avoiding prolonged and potentially dangerous physical confrontations.'" [highlighting emphasis added]

30. (09/2009 ACEP) White Paper Report on Excited Delirium Syndrome. ACEP Excited DeliriumTask Force, http://ccpicd.com/Documents/Excited%20Delirium%20Task%20Force.pdf; September 10, 2009.

31. (04/2009 Bozeman) Bozeman, W.P., Hauda, W.E., Heck, J.J., Graham, D.D., Martin B.P., Winslow, J.E. 2009. Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects. *Annals of Emergency Medicine.* Volume 53, Issue 4, Pages 480–489, April 2009.

   a. "A rapidly evolving body of literature has examined a range of physiologic and cardiovascular effects of conducted electrical weapon exposure in human volunteers (Table 6). These studies, which include articles and published preliminary reports in abstract form, demonstrate no evidence of dangerous respiratory or metabolic effects using standard (5-second), prolonged (15-second), and **extended (up to 45-second)** conducted electrical weapon discharges." [page 486, bolding and highlighting emphasis added]

   b. "Other studies of conducted electrical weapon exposure in combination with exercise designed to simulate the physiologic effects of fleeing from or struggling with police demonstrate changes in pH, lactate, and other markers comparable to that induced by exercise of the same duration." [pages 486-497highlighting emphasis added]

32. (06/2008 Hagy) Hagy D., Study of Deaths Following Electro Muscular Disruption: Interim Report. U.S. Department of Justice. Office of Justice Programs. June 2008.

   a. "CED technology may be a contributor to "stress" when stress is an issue related to cause of death determination. All aspects of an altercation (including verbal altercation, physical struggle or physical restraint) constitute

stress that may represent a heightened risk in individuals who have pre-existing cardiac or other significant disease. Current medical research suggests that CED deployment is not a stress of a magnitude that separates it from the other components of subdual." [page 3, highlighting emphasis added]

© LAAW International, LLC.  2009–2022 ARR

**GREG MEYER**

_____

*CURRICULUM VITAE*

**NAME:**          **Greg Meyer**

**LOCATION:**      Los Angeles, CA

**EDUCATION:**     **M.S. - Public Administration, Cal State Los Angeles** (1991)
              Master's Thesis: "Nonlethal Weapons vs. Conventional Police Tactics:
                The Los Angeles Police Department Experience"

              **B.A. - Journalism, Cal State Long Beach** (1979)

              **A.A. - Journalism, Los Angeles Pierce College** (1974)

**CERTIFICATES
& LICENSES:**      **Certified Force Science Analyst**
              Force Science Institute (2009 - present)

              **Certified Litigation Specialist**
              Americans for Effective Law Enforcement (2003 – present)

              **Certified instructor, TASER X-26** (2005, 2009)

              **Certified instructor, TASER M-26 Instructor** (2001, 2003, 2005, 2009)

              **Certified instructor, Tasertron** (various TASER devices, 1992 – 1999)

              **Teaching Credential (Police Science)**
              State of California (1981 - Lifetime)

              **California Peace Officer Standards and Training (P.O.S.T.)**
              (Basic, Intermediate, Advanced, Supervisory, Management Certificates)

**EMPLOYMENT:**    **Police Tactics and Procedures Consultant**
              (Author, Lecturer, Consultant, Expert Witness) - self-employed
              (1989 - present)

              **Los Angeles Police Department (1976 – 2006)**
              Officer, Detective, Sergeant, Lieutenant, Captain, including assignments
              in patrol, detectives, vice, traffic, planning and research, tactical
              planning, administration, and training.  Retired from active service
              5-31-06.  Field Reserve Officer (1976-77); Reserve Officer (2006-2012);
              Specialist Volunteer, LAPD Training Group (2013 – 2020).

              **Long Beach Police Department**, Patrol Officer (1977-78)

              **Security Agent, Sears**
              Anti-shoplift detail in Los Angeles and Costa Mesa (1976-1977)

              **McDonald's Corporation**, Restaurant Manager, Training Coordinator
               (1972-76)

# GREG MEYER

---

**ASSOCIATIONS:**    **California Force Instructors Association (CALFIA)**
Member (2022 – present)

**Force Science Research Center (FSRC)**
National Advisory Board member (2006 - 2014)
Certified Force Science Analyst (2009 - present)

**Police Executive Research Forum (PERF)**
Life Member (2020-present);  Associate Member (2000 – 2020);
advisor, PERF's Center for Force and Accountability (2005 – 2007);
panel member for development of Conducted Energy Device guidelines
(2005 and 2010); attended annual meetings (2004, 2005, 2006, 2012,
2015, 2016); attended special meeting re Body Worn Cameras (2013);
attended Less-Lethal Force Options Symposium (2019)

**Peace Officers Association of Los Angeles County (POALAC)**
Training Seminars Committee chair (2003 - 2011); Board of Directors
(2004 – present); member (1981 - present); use of force and video
issues seminar producer/ presenter, numerous occasions since 2003

**International Law Enforcement Educators and Trainers Association
(ILEETA)**
Member (2016 – present); conference presenter (2017)

**Americans for Effective Law Enforcement (AELE)**
Certified Litigation Specialist (2003 – present); Academic Committee
member for AELE's Certified Litigation Specialist program (2002 –
present); Chairman, Association of Certified Litigation Specialists (2011-
2013); Monthly Law Journal I review panelist (2009 - present); seminar
instructor for "Critical Incident Response: Management and Legal
Liability" seminar (2002-2005); seminar instructor for "Lethal and Less-
Lethal Force" seminar (2006-2013); seminar instructor for "Management,
Oversight and Monitoring of Use of Force" (2013)

**American Society for Law Enforcement Training (ASLET)**
Vice Chair (2003-2004); Treasurer (2001-2003); Executive Board (2001-
2004); seminar instructor (1994 - 2004); master of ceremonies for annual
seminar opening ceremonies in Anchorage (AK), Ontario (CA), and St.
Louis (MO) (2002-2004)

**International Association of Chiefs of Police (IACP)**
Life Member; expert reviewer for selected manuscripts for "The Police
Chief magazine"; co-author of Electronic Control Weapons model policy
revision (2010); Project Advisor, "Electro-Muscular Disruption
Technology: A Nine Step Strategy for Effective Deployment" (published
April 2005); IACP member (1993 - present); attended multiple IACP
Annual Conferences (2004-present)

**PoliceOne.com**
Featured columnist (2006 - 2015)

## GREG MEYER

_____

**Los Angeles Police Command Officers Association**
Member (1998 - 2006)

**POLICE Magazine**
Advisory Board Member and article contributor (1997 – 2020)

**California Association of Force Instructors (CAFI)**
Presenter and Associate Member (1994 – 2000)

**Public Administration Advisory Committee**
California State University, Los Angeles (1993 - 1998)

**Pi Sigma Alpha** public administration honor society (1990)

**California Homicide Investigators Association**
Past Member

**California Peace Officers Association (CPOA)**
Member (1980 - life member)

**MILITARY:**    **United States Army Security Agency** (1968-72)
Top Secret/Cryptographic security clearance; Radio Traffic Analyst, Airborne Radio Direction Finding Specialist and German Linguist; duty stations at Pleiku and Nha Trang, Vietnam (1969-1970) and Bad Aibling, West Germany (1970 – 1972)

**COMMUNITY SERVICE:**    **Los Angeles Metropolitan YMCA**
Chairman, Board of Governors (2019 – present); Vice Chairman, Board of Directors (2019-present); CEO Search Committee (2021-2022); Teen Task Force (2020-present) ,Vice Chairman, Board of Governors Executive Steering Committee (2017 – 2018); Camp Committee member (2018-present); President's Club member (1976 – present); Golden Book of Distinguished Service honoree (2017)

**Mid-Valley YMCA** (San Fernando Valley, CA)
Chairman, Board of Managers (2014 – 2018); Board member (2014 – present); Golden Triangle for Outstanding Service (2014); Philip "Flip" Smith Pillar of the Community Award (2015)

**Tri-Valley YMCA** (San Fernando Valley, CA)
Chairman, Board of Managers (2012 – 2014); (a temporary combination of three YMCA branches under one management/leadership team)

**Los Angeles Police Museum**
Chairman of the Board of Directors (1992-1995; 2007-2010); Vice Chairman (2014); Medallion recipient, National Philanthropy Day (1992); (Director (1989-2014); on-camera interview for "The History Channel" program on the 1997 North Hollywood Bank Robbery Shootout (2008); Volunteer of the Year (2000): Co-Chair, Capital Development Campaign (2000-2001); Producer, Annual Jack Webb Awards Night (1996, 1999,

**GREG MEYER**

_____

2012); Co-producer, Jack Webb Awards Night (1997, 1998, 2001, 2004); Chief's Circle member (2001-present)

**Valley Traffic Advisory Council** (San Fernando Valley, CA)
Founder (2001); Advisor (2001-2004); Director (2007- 2009); Honorary Member (2009 - present)

**West Valley Family YMCA** (Reseda, CA)
Member, Board of Managers (2011 - 2012); Leadership reunion organizer (2010); Keynote speaker, annual campaign kickoff dinner (2008 & 2009); Chairman's Round Table (2007-present); President's Club (1974-present); Century Club (1974 – 2006); Board of Managers (1973-76); Camp Committee Chairman (1974); Youth in Government advisor (1974)

**HONORS & AWARDS:**

**Peace Officers Association of Los Angeles County (POALAC) Lifetime Achievement Award** (2012)

**POALAC Member of the Year** (2006)

**LAPD Management Achievement Award Nominee**, for leadership accomplishments as a division commanding officer (2001)

**LAPD Management Achievement Award Nominee**, for leadership of Wilshire Area's "Predators to Prison" program targeting parolees-at-large (1996)

**Defensive Tactics Newsletter's Leadership Award** to recognize commitment and contributions to research in training and tactics (1994)

**Detective of the Year** (1983)**,** LAPD Hollywood Division

**Soldier of the Quarter**, U.S. Army Field Station Bad Aibling, Germany (1971)

**Army Commendation Medal**, Vietnam (1969-1970)

**LAPD PROFESSIONAL ACTIVITIES:**

\*   **Advisor to LAPD Assistant Chief re development of LAPD's Integrated Communications and De-Escalation Course** focused on officer-subject de-escalation tactics in non-firearms encounters (2018)

\*   **Leader, LAPD Use-of-Force "Best Practices" Work Group** (2005 – 2006). Appointed by the Chief of Police.  Directed and coordinated internal subcommittees and outside consultants examining policy, training, equipment, tactics, post-incident review processes; directed

**GREG MEYER**

_____

LAPD's TASER Model X-26 field test; LAPD media resource on these issues; turned over the leadership role upon retiring from LAPD in May 2006, and continued as work group member); recognized by the Los Angeles Board of Police Commissioners during its adoption of a revised LAPD use-of-force policy resulting from the four-year project (2009)

\* **Member, Professional Advisory Committee,** a work group focusing on police improvement training issues, coordinated by the LAPD Director of Police Training and Education, LAPD Academy (2009 - 2010)

\* **Demonstrated TASER-Cam device for the Chief of Police** (2007)

\* **Presenter, LAPD Chief of Police and United States Military Delegation from Baghdad, Iraq,** on crime and traffic issues, Los Angeles (August 2006)

\* **Participant, National Institute of Justice Conference**, featuring nonlethal weapons session and force-options simulator technology session, Washington, DC (July 2006)

\* **Participant, Police Executive Research Forum (PERF)** focus group on officer safety issues, Washington, DC (May 2006)

\* **Participant, Police Executive Research Forum (PERF)** Annual Meeting, focused on law enforcement "best practices," San Francisco (April 2006)

\* **Presenter, TREXPO-West** on TASERs and Excited Delirium (March 2006)

\* **Presenter, LAPD In-Service Training Section Training Day** on TASERs and Excited Delirium (March 2006)

\* **Presenter, LAPD Chief of Police press conference**, to announce LAPD's field test of TASER Model X-26 (February 2006)

\* **Presenter, Institute for Law Enforcement Administration (ILEA**) national summit on use of force, Plano, TX (January 2006)

\* **Presenter, TASER Executive Course** for law enforcement leaders, risk managers, and legal staff, Scottsdale (December 2005)

\* **Participant, Police Executive Research Forum (PERF)** conference on handling the mentally ill and use of force, San Diego (December 2005)

\* **Member, California Peace Officer Standards and Training Commission (POST) committee** to create a statewide standardized lesson plan for TASER instructor certification, Sacramento (2005)

## GREG MEYER

_____

* **Coordinator, Use of Force Training** for LAPD Commissioners (2005)

* **Presenter, Performance Institute's 2005 Use of Force Summit**, Arlington VA (November 2005)

* **Participant, Police Executive Research Forum (PERF)** conference on TASER policy development, Houston (October, 2005)

* **Participant, International Association of Chiefs of Police (IACP)** annual conference, numerous use of force seminars, Miami (September 2005)

* **Participant, Canadian Officer Safety Conference**, Victoria BC (September 2005)

* **Participant, Force Science Research Center (FSRC)** seminar on biomechanics of officer-involved shooting incidents, "Winning Extreme Encounters from Street to Court," Seattle (June 2005)

* **Advisor, Police Executive Research Forum (PERF) Center for Force and Accountability** (June 2005 – present)

* **Participant, Police Executive Research Forum (PERF) Annual Meeting**, focused on international police use of force issues and "best practices," New York City (April 2005)

* **Creator and member of multi-agency custody-death research work group** to inspire the US Surgeon General to involve the medical research community in this persistent law enforcement problem (April 2005)

* **Project Advisor, International Association of Chiefs of Police (IACP) publication, "Electro-Muscular Disruption Technology: A Nine Step Strategy for Effective Deployment**" (published April 2005)

* **Participant, US Department of Justice Symposium on Less-Lethal Weapons Technology**, including workshop interaction with international law enforcement and military chiefs and trainers, Arlington, VA (April 2005)

* **Coordinator**, **Chief of Police-directed review of LAPD use-of-force policies and procedures** by eight nationally renowned use-of-force experts (March 2005)

* **Participant, International Association of Chiefs of Police (IACP) annual conference**, attended numerous use of force seminars, Los Angeles (November 2004)

* **Participant, LAPD Chief of Police "72-hour Briefings"** following officer-involved shootings and other major incidents (2004-2006)

## GREG MEYER

_____

\*   **Advisor**, **William H. Parker Foundation** (police training support) (2004-2006)

\*   **Guest lecturer on police traffic safety and management issues, Pepperdine University's School of Public Policy**, graduate seminar (2004)

\*   **Chairman, _ad hoc_ committee to improve traffic collision reporting efficiency** (2003-2004)

\*   **Member**, **Los Angeles City Councilman Jack Weiss' Advisory Commission** (2002 – 2004)

\*   **First-level adjudicator as the commanding officer for hundreds of disciplinary cases** involving public and internal personnel complaints; directed these investigations (1998 – 2006)

\*   **Presenter of facts, findings and recommendations to the Use of Force Review Board** for officer-involved shootings and other significant use of force incidents (1999 – 2006)

\*   **Board member, Police Sergeant selection process** (2001)

\*   **Participant, Law Enforcement Ethics Symposium presented by the FBI** (2001)

\*   **Reviewer, Police Lieutenant civil service examination** (2001)

\*   **Assistant Chair, Area Integrity Plan Development Committee** (2000)

\*   **Member, Board of Inquiry** to examine the suitability of particular officers to be promoted to the rank of detective and sergeant (1999 - 2006)

\*   **Guest speaker, International Traffic Safety Conference,** Madrid, Spain (2000)

\*   **Participant, California Office of Traffic Safety's annual conference**, San Diego (2000)

\*   **Chairman of the LAPD Board of Rights**, a _de novo_ disciplinary hearing for a Los Angeles Police Department captain accused of "neglect of duty" in the Department's "Rampart corruption scandal" (2000)

\*   **Master of Ceremonies, Valley Traffic Safety Summits** (2000-2004)

\*   **Member, LAPD Informant Policy and Procedures Review Committee** (2000)

**GREG MEYER**

_____

* **Panelist**, **West San Fernando Valley Traffic Summit**, a seminar for community activists, elected officials, and various government agencies pertaining to improving traffic safety (2000)

* **Guest speaker**, **California Assembly Speaker Robert Hertzberg's Public Safety Advisory Committee**, for the Families and Community Advisory Committee, on the subjects of traffic safety and the Rampart corruption probe (1999-2000)

* **Civil service interview and personnel-package-review panelist** for the sergeant's exam process (1999)

* **Member, Board of Inquiry committee** to examine command accountability for reviews of nondeadly force, vehicle pursuits, and fleet safety issues pertaining to policy, training and practices of the Los Angeles Police Department (1999)

* **Commissioner, San Fernando Valley Public Safety Advisory Commission** convened by California State Assembly Speaker Bob Hertzberg (1999 – 2003)

* **Member, Traffic Strategic Committee of the Los Angeles Police Department**, to develop and recommend improvements to the Department's efforts to reduce traffic collisions through education, engineering and enforcement (1999 –2001)

* **Member, Detective Strategy Committee of the Los Angeles Police Department**, to develop and recommend improvements to the Department's efforts to produce high-quality criminal investigations (1998-1999)

* **Member, Short-Term Strategy Committee on Juvenile Issues of the Los Angeles Police Department**, to develop and recommend improvements to the Department's efforts to produce high quality processes involving juveniles (1998-1999)

* **Chairman or Member, numerous Boards of Rights tribunals** to adjudicate disciplinary matters within the Los Angeles Police Department (1998 – 2006)

* **Chairman or Member, numerous Advanced Paygrade Selection Interview Panels** for Lieutenant II and Detective III (1998 – 2005)

* **LAPD—West Point Leadership Course instructional cadre member** (1997 - 2005)

* **Leadership Course instructor** for watch commanders, sergeants, and field training officers, Los Angeles Police Academy (1995 - 1997)

## GREG MEYER

_____

* **Use-of-Force Review Coordinator**, LAPD Wilshire Area (1993 - 1994)

* **Advisor, Use-of-Force Management Information System Task Force** (1994)

* **Chairman or Member, numerous Advanced Paygrade Selection Interview Panels** for Sergeant II, Detective III, Detective II, and Police Officer III (Field Training Officers and Detective Trainees (1993 –1998)

* **Member, LAPD Tactics Training Review Committee** (1990 – 1993); chaired the committee 2004 – 2006

* **Rodney King case**: Provided expert consultation on use-of-force issues to the criminal and internal investigators (1991), state case prosecutors (1991-92), City Attorney and administrative defense representatives (1991-1994), U.S. Attorney and Federal Bureau of Investigation (1992); memo to federal judge re use of force policy/training history (1993); testified for the City in the civil trial's punitive damages phase (1994).

* **Reviewed and analyzed use-of-force and officer-involved shooting reports** for the Commanding Officer, Operations-Headquarters Bureau (1991-93)

* **Conducted a special investigation of a senior police captain at the direction of the Chief of Police** (1987)

* **Authored "The Watch Commander's Guide for Control of Disasters and Other Emergencies"** (1982)

* **Developed nonlethal weapons policy and training material** (1980-81)

* **Trained 67 instructor/divisional coordinators and three tactics supervisors** on the TASER device, LAPD Academy (1981)

* **Researched and/or tested thirteen nonlethal weapons (including TASERs and chemical sprays** at Planning and Research Division (1979-1980)

* **Staffed the LAPD Ad Hoc Committee on Nonlethal Weapons** and created the Nonlethal Control Device Incident Report, later adapted as LAPD's Use of Force Report (1980)

* **Conducted demonstrations of nonlethal weapons** for the Mayor of Los Angeles, the Los Angeles Board of Police Commissioners, and the media (1980)

* **Member/staffer, LAPD's Human Resources Development Committee** (1980-1981)

**GREG MEYER**

_____

**SPECIALIZED TRAINING RECEIVED:**
    \*    **Command and Control, De-escalation** (December 2019, Los Angeles), presented by Los Angeles Police Academy staff

    \*    **Force Science Annual Conference** (October 2019, Chicago)
- ✓ Injuries Associated with Police Use of Force
- ✓ Kinematic Analysis of Police Officer Shooting Altercations: A Biomechanical Examination of Stationary Shooting, Shooting and Fleeing, and Fleeing and Shooting
- ✓ Striving for a Blockbuster Academy
- ✓ Stress-Activity Mapping: Physiological Responses during General Duty Police Encounters
- ✓ How Characteristics of Visual Perception Intersect with Mistake of Fact Shootings
- ✓ Legal and Practical Aspects of :Police Use of Force: Preparing for High Level Use of Force Events
- ✓ Reasonable but Avoidable? Spotlight on Minnesota Shootings
- ✓ Understanding and Explaining Use of Force Incidents
- ✓ Connecting the Interdisciplinary Dots: Applying Force Science in Law, Policy, and Practice

    \*    **Integrated Communications and De-Escalation Course**, Los Angeles Police Academy, focused on officer-subject de-escalation tactics in non-firearms encounters (3 hours) (2018)

    \*    **ICAT Training and Implementation (Integrating Communications, Assessment and Tactics),** presented by the Police Executive Research Forum in collaboration with the Los Angeles Police Department, seminar focused on officer-subject de-escalation tactics in non-firearms encounters (8 hours, Los Angeles) (2017)

    \*    **Use of Force and Labor Relations Legal Update**, Rains Lucia Stern (8 hours, Newport Beach) (2017)

    \*    **Force Science Institute,** update seminar re officer safety tactics, contact-cover, reaction time issues, edged weapon distance, officer and subject movement speeds (4 hours, Long Beach) (2016)

    \*    **Field Encounters with the Mentally Ill, Peace Officers Association of Los Angeles County (POALAC)** (8 hours) (2014)

    \*    **Managing, Oversight and Monitoring of Use of Force, Americans for Effective Law Enforcement's (AELE)** (3 days, Las Vegas) (2013)

# GREG MEYER

_____

\*     **Institute for Prevention of In-Custody Death (IPICD)** annual seminar (3 days, Las Vegas) (annually 2006-2013; and 2017, 2019)

\*     **Officer-Involved Shooting Investigation Course, Los Angeles Police Department, Force Investigation Division** (3 days, Los Angeles, 2009)

\*     **Force Science Analyst Certification Course, Force Science Institute** (5 days, San Jose, 2009)

\*     **Lethal and Less-Lethal Use of Force Seminar, Americans for Effective Law Enforcement (AELE)** (3 days, annually or twice per year from 2002-2013)

\*     **Public Safety Discipline and Internal Affairs Course, Americans for Effective Law Enforcement (AELE)** (3 days, 2005, 2009, 2014)

\*     **Training on California Highway Patrol (CHP) Mobile Video Audio Recording System (MVARS)** presented by CHP staff at the California Department of Justice (Los Angeles office) (February 2013)

\*     **Training on TASER X-2 and X26,** presented by Advanced Officer Safety Training staff of the California Highway Patrol (CHP) at the California Department of Justice (Los Angeles office) (August 2012)

\*     **Jail and Prison Legal Issues, Americans for Effective Law Enforcement's (AELE)** (3 days, Las Vegas) (2005, 2011)

\*     **Live-fire weapons, dynamic building entry, and drug-lab investigations, by the Drug Enforcement Administration (DEA), 4 hours (shooting M4, M4A1, HK53, AR15), Los Angeles (1 day, 2007)**

\*     **SWAT Debrief: The Death of LAPD SWAT Officer Randy Simmons** (3 hours, Pleasanton, CA, by instructor Mike Odle, 2011)

\*     **"Suicide By Cop – Revisited,"** sponsored by the Peace Officers Association of Los Angeles County (1 day, 2000)

\*     **Earthquake Management Course, California Specialized Training Institute** (5 days, San Luis Obispo, 1981)

\*     **Civil Disorders Management Course, California Specialized Training Institute** (5 days, San Luis Obispo, 1982)

\*     **Basic Detective School, LAPD** (15 days, 1982)

\*     **Supervisory Development Course, LAPD** (20 days, 1983)

\*     **Juvenile Procedures School, LAPD** (3 days, 1983)

**GREG MEYER**

_____

* **Vice School, LAPD** (5 days, 1986)

* **Supervisory Press Relations Training, LAPD** (1 day, 1988)

* **Homicide School, LAPD** (5 days, 1991)

* **Watch Commander School, LAPD** (5 days, 1993)

* **Effective Leadership Course, LAPD Wilshire Area** (1994)

* **P.O.S.T. Management Course** (10 days, 1993)

* **LAPD--West Point Leadership and Command Program** (24 days, 1996)

* **LAPD Command Development Course** (24 days, 1998-1999)

* **Street Survival Seminar**, Calibre Press (3 days, Honolulu (1999)

* **"Leadership in the 21st Century,"** presented by the University of California at Los Angeles, the University of Southern California, Pepperdine University, and Claremont University (12 days, 1999 – 2003)

**NON-LAPD EXPERT ACTIVITIES:**   Presented multi-media lectures on use-of-force policy, training, equipment, tactics, ethics, and risk-management processes to:

* "**Boxing Up CIT and UoF Concepts: Integrating Essential Concepts,"** presenter/co-facilitator, a seminar directed at use of force instructors produced by attorney Missy O'Linn (70 participants) (2019)

* **Peace Officers Association of Los Angeles County (POALAC)**, producer and presenter, use of force seminar, focusing on Force Science issues, video and body-cam issues, and TASERs, POST-certified (66  participants) (2017)

* **3rd Annual Law Enforcement Association Leadership Symposium (LEALS),** presenter on the PERF 30 Guiding Principles for Use of Force to police executives, attorneys and police representation unit officials (San Diego 2017)

* **ILEETA (International Law Enforcement Educators and Trainers Association),** presenter on the PERF 30 Guiding Principles for Use of Force at ILEETA's annual conference (St. Louis, 2017)

## GREG MEYER

_____

\* **RLS Seminar, "Protecting Cops in the 21st Century,"** presenter on the PERF 30 Guiding Principles for Use of Force to attorneys and police representation unit officials (San Jose, 2016)

\* **Use of Force Summit, "Policy, Implementation, and Training in a Changing World,"** presenter on nonlethal weapons policy and training issues; and critique of the PERF 30 Guiding Principles; also acted as master-of-ceremonies for the two-day event (Coral Gables, FL, September 2016)

\* **Special Assistant to the Attorney General, California Department of Justice; and deputy to Los Angeles County Supervisor Hilda Solis**, focus on policy, training, equipment, tactics (July 2016)

\* **Department of Homeland Security HQ, Office of Civil Rights and Civil Liberties**, focus on policy, training, equipment, tactics, case studies of DHS component agency complaints (Washington DC, May 2016)

\* **Peace Officers Association of Los Angeles County (POALAC)**, producer and presenter, LEOKA (Law Enforcement Officers Killed and Assaulted) and use of force seminar, video and body-cam issues, and TASERs  (110 participants) (March 2016)

\* **Harvard-Westlake school, criminal justice seminar**, discussed police use of force issues with students of attorney Laurie Levenson (8 participants) (March 2016)

\* **Office of the District Attorney, Los Angeles County**, use of force presentation for deputy district attorneys and local law enforcement, focused on video evidence (including body cameras), use of force basics, and nonlethal weapons (500 participants) (November 2015)

\* **Office of the Public Defender, Los Angeles County**, use of force presentation focused on video evidence (including body cameras), use of force basics, and nonlethal weapons (60 participants) (September 2015)

\* **Peace Officers Association of Los Angeles County (POALAC)**, producer and presenter, use of force seminar, focusing on Force Science issues, video and body-cam issues, and TASERs, POST-certified (55 participants) (April 2015)

\* **Peace Officers Association of Los Angeles County (POALAC)**, producer and presenter, "Video Evidence Issues" seminar (October 2014)

\* **Peace Officers Association of Los Angeles County (POALAC)**, producer and presenter use of force seminar, focusing on Force Science issues, video and body-cam issues, and TASERs, POST-certified (50 participants) (April 2014)

**GREG MEYER**

_____

\*     **Americans for Effective Law Enforcement's (AELE) Annual Lethal and Less-Lethal Weapons seminar,** Las Vegas, focused on Force Science issues (95 participants) (October 2013)

\*     **Lorman seminar for plaintiff and defense attorneys and law enforcement management, "Police Liability in California,"** focused on TASER issues and Force Science issues, Santa Ana (CA) (10 participants) (June 2013)

\*     **Lorman seminar for plaintiff and defense attorneys and law enforcement management, "Police Liability in California,"** focused on TASER issues and Force Science issues, Pasadena (CA) (25 participants) (June 2013)

\*     **Americans for Effective Law Enforcement's (AELE) Managing, Oversight and Monitoring of Use of Force,** Las Vegas, focused on TASER issues (135 participants) (April 2013)

\*     **Peace Officers Association of Los Angeles County (POALAC)**, producer and presenter, use of force seminar, focusing on Force Science issues and TASERs, POST-certified (65 participants) (January 2013)

\*     **Americans for Effective Law Enforcement's (AELE) Annual Lethal and Less-Lethal Weapons seminar** Las Vegas, focused on Force Science issues (110 participants) (October 2012)

\*     **Peace Officers Association of Los Angeles County (POALAC)**, producer and presenter, "Critical Incidents: Lessons Learned" seminar, focusing on the BART shooting/weapons confusion case (55 participants) (July 2012)

\*     **Lorman seminar for plaintiff and defense attorneys and law enforcement management, "Police Liability in California,"** TASER issues and Force Science issues, Santa Ana (48 participants)     (June 2012)

\*     **Peace Officers Association of Los Angeles County (POALAC)**, producer and presenter, "Video Evidence Issues" seminar (80 participants) (May 2012)

\*     **Travis County Grand Jury (Austin, TX)** to educate Grand Jury members on officer-involved shooting policy, training, tactics, and force-science issues (February 2012)

\*     **Peace Officers Association of Los Angeles County (POALAC)**, producer and presenter, use of force seminar, focusing on Force Science issues and TASERs, POST-certified (55 participants) (February 2012)

## GREG MEYER

_____

\*      **Labor Relations Information System (LRIS) annual Internal Affairs
and Critical Incidents seminar,** focus on arrest-related deaths, use-of-
force policy, police trainers, involuntary firearms discharges, Las Vegas
(110 participants) (November 2011)

\*      **Scottsdale (AZ) Police Department supervisors,** focus on TASER
issues for supervisors, trainers, and SWAT personnel (25 participants)
(June 2011)

\*      **Public Safety Training Institute (PSTI),** for various "East Bay" (Northern
California) law enforcement agencies, 240 participants (two, 4-hour
seminars) (July 2011)

\*      **Peace Officers Association of Los Angeles County (POALAC)**,
producer and presenter, use of force seminar, focusing on TASER issues,
Glendale, CA, 50 participants, POST-certified (June 2011)

\*      **Independent Cities Risk Management Association (ICRMA)**,
representing 22 cities in the greater Los Angeles Area, 50 participants
(May 2011)

\*      **Peace Officers Association of Los Angeles County (POALAC)**,
producer and presenter, use of force seminar, focusing on TASER issues,
Long Beach, CA, 45 participants, POST-certified (November 2010)

\*      **Institute for Law Enforcement Administration (ILEA) Use of Force
and Sudden In-Custody Death Seminar**, Plano (TX), 75 participants
(September 2010)

\*      **Arroyo Grande (CA) Police Department** (with guests from various
Central California Agencies), 40 participants (September 2010)

\*      **Americans for Effective Law Enforcement's (AELE) Annual Lethal
and Less-Lethal Weapons seminar (formerly: Critical Incident
Response Management Seminar)**, Las Vegas (60-275 participants),
usually twice per year (2002 – 2010)

\*      **Peace Officers Association of Los Angeles County (POALAC)**, use of
force seminar, focusing on TASER and nonlethal weapons issues, 70
participants, POST-certified, Torrance, CA (October 2009)

\*      **Lorman seminar for plaintiff and defense attorneys and law
enforcement management, "Police Liability in California,"** Santa Ana
(February 2009)

\*      **Penn State University's Center for Community and Public Safety's
annual seminar for Pennsylvania constables**, presenting on the
subject of sudden in-custody death, 150 participants including police
training personnel, attorneys, and judges (November 2008)

## GREG MEYER

_____

* **Institute for Law Enforcement Administration (ILEA) Use of Force and Sudden In-Custody Death Seminar**, 150 participants, Plano (TX) (2008)

* **Annual TASER Instructor Conference**, 280 participants, Chicago (2007)
* **Beverly Hills Rotary Club**, lunch speaker, police use of force,          120 participants (2007)

* **Presenter, Pepperdine University public-policy graduate seminar**, 20 graduate students, requested by former Los Angeles Police Commissioner Racquelle de la Rocha (2006)

* **Presenter and panelist on Tasers and excited delirium**, 30 law enforcement executives and ACLU members, presented by the New York Civil Liberties Union (Albany) (2006)

* **Performance Institute's 2005 Use of Force Seminar**, 30 participants, Arlington VA (2006)

* **TASER International's Executive Course**, 150 participants, Scottsdale (2005)

* **TASER International's Annual Instructor Seminar**, Las Vegas (150 participants) (2002)

* **Defensive Tactics Newsletter's Annual Training Seminar**, Tallahassee, Florida (25 participants) (2002)

* **American Society for Law Enforcement Training (ASLET)**, International Training Seminar, Anchorage, AK (100 participants) (2002)

* **Los Angeles County Sheriff's Department** training day for 1,200 deputies, West Covina, California (2002)

* **The Urban Alliance on Race Relations** conference, "Alternatives to the Use of Lethal Force by Police," Ontario, Canada (2000)

* **California Association of Police Training Officers (CAPTO)**, Norwalk, California; team-teach use-of-force issues with police defense attorney Michael P. Stone; and panelist with Assistant U.S. Attorney Michael Gennaco and plaintiff's attorney Stephen Yagman (160 participants) (2000) (8-hour POST certified)

* **American Society for Law Enforcement Training (ASLET)**, International Training Seminar, Richmond, VA (200 participants) (2000)

## GREG MEYER

_____

* **American Society for Law Enforcement Training (ASLET)**, Regional Use of Force Seminar, Ontario, California (50 participants) (1999)

* **American Society for Law Enforcement Training (ASLET)**, Regional Use of Force Seminar, Los Angeles, California (50 participants) (1997)

* **Sudden In-Custody Death Seminar** (presenter and panelist), Washington State Criminal Justice Training Commission (200 participants) (1997)

* **California Association of Police Training Officers (CAPTO)**, Regional Seminar, Fresno, CA (50 participants) (1996) (8-hour POST-certified)

* **American Society for Law Enforcement Training (ASLET)**, International Training Seminar, Grapevine, TX (100 participants) (1996)

* **California Association of Police Training Officers (CAPTO)**, Annual Seminar Bakersfield, California (80 participants) (1995)

* **American Society for Law Enforcement Training (ASLET)**, Regional Use of Force Seminar, Albuquerque, New Mexico (50 participants) (1995)

* **South East (Los Angeles County) Training Association**, at the University of Southern California (80 participants) (1995)

* **American Society for Law Enforcement Training (ASLET)**, International Training Seminar, Anchorage, Alaska (100 participants) (1995)

* **Los Angeles Sheriff's Academy, for the California Association of Force Instructors (CAFI)** (35 participants) (1994)

* **Central Florida Criminal Justice Institute at Orlando** (20 participants) (1994)

* **Orange County Traffic Officers' Association** (75 participants) (1994)

* **Wisconsin Chiefs' Training Seminar** (200 participants), Milwaukee (1993)

* **Wisconsin Department of Justice Round Table** (35 chiefs and sheriffs), Osh Kosh (1992)

* **Americans for Effective Law Enforcement (AELE) workshop on Critical Liability Issues (**100+ participants), Las Vegas (1991, 1996, 2000)

* **Trained and certified more than 375 TASER instructors** for dozens of law enforcement and corrections agencies, for Tasertron (1991 – 1999)

**GREG MEYER**
_____

    \*    **State-licensed chemical spray trainer**, trained hundreds of civilians (1981)

    \*    **Trained more than 20 TASER users**, Inglewood Police Department (1981)

**OTHER EXPERT ACTIVITIES:**

    \*    **Expert witness and consultant on police procedure and use-of-force issues** (1989 – present)

    \*    **Participant, "Investigations of Fatal Shootings of Unarmed Civilians by State Department of Justice (AB 1506) (CA Gov. Code 12525.3),"** webinar by RLS (February 2022)

    \*    **Subject-matter expert, California POST** member of a work group to develop a micro-course entitled, "Legal Update: Positional Asphyxia" (January 2022)

    \*    **Presenter, "Use of Force Video Issues,"** a 4-hour virtual lecture for California Department of Corrections and Rehabilitation (CDCR) on the value and limitations of video evidence and its implications for internal investigations, to an audience of CDCR attorneys, internal affairs investigators, subject matter experts, and attorneys from the Office of Inspector General (twice in August 2021, again April 2022)

    \*    **Participant, "Emerging Trends in Video Evidence,"** webinar by INPUT-ACE (July 2021)

    \*    **Participant, "What the Research Says about Use-of-Force Data" and "Analyzing Use of Force Data"**, webinars by the Police Executive Research Forum (March 2021)

    \*    **Participant, "Use of Force Investigations under 835a PC,"** webinar by RLS attorneys (December 2020)

    \*    **Participant, "Duty to Intercede – Conceptual, Cultural, Legal Aspects,"** webinar by Lexipol (November 2020)

    \*    **Participant, Police Executive Research Forum town hall meeting,** focused on lessons learned and civil disturbance/riot control strategies, featuring a variety of police chiefs across the country (October 2020)

    \*    **Participant, "Defunding"/Reforming Police,"** webinar by the Beverly Hills Bar Association (July 2020)

    \*    **Participant, "Use of Force Continuum – Seriously?**, webinar by attorney Eric Daigle (June 2020)

# GREG MEYER

---

\*    **Participant, "Prone Restraint**," webinar by Dr. Darrell Ross (June 2020)

\*    **Participant, "Excited Delirium: 8 Key Law Enforcement Takeaways,"** webinar presented by Lexipol (2019)

\*    **Participant, Americans for Effective Law Enforcement (AELE) webinar** on prone restraint issues (June 2020)

\*    **Participant, Police Executive Research Forum (PERF) virtual town hall** meeting regarding use of force issues (June 2020)

\*    **Consultant to Dr. Lorie Fridell, University of South Florida,** re revision of State of Florida use of force policy (June 2020)

\*    **Participant, "Critical Issues Review" seminar**, 4 hours, hosted by San Bernardino Sheriff's Department (March 2020)

\*    **Producer/presenter, "Blue Lives in Jeopardy: Surviving Your Attacker,"** a seminar  for the Peace Officers Association of Los Angeles County (POALAC) (40 participants) (January 2020)

\*    **Manuscript reviewer, "Police Deadly Force Encounters: What the Science Tells Us,"** for "The Police Chief," monthly publication of the International Association of Chiefs of Police (IACP) (December 2019)

\*    **Participant, Annual Sudden and In-Custody Death Conference**, presented by the Institute for Prevention of In-Custody Death, Las Vegas (October 2019)

\*    **Producer/presenter, "Police Video Issues,"** a seminar  for the Peace Officers Association of Los Angeles   County (POALAC) (80 participants) (2019)

\*    **Guest speaker, "Blue Lives in Jeopardy: When the Badge Becomes the Target"** book signing event by author Hon. Steve Cooley, retired Los Angeles County District Attorney (2019)

\*    **Producer, "Active Shooter and Mass Casualty Events: Prevention, Response & Lessons Learned,"** a seminar for the Peace Officers Association of Los Angeles County (POALAC)  (280 participants) (April 2019)

\*    **Participant, PERF/LAPD Less-Lethal Force Options Symposium** (Los Angeles) (March 2019)

\*    **RLS Seminar, "Protecting Cops in the 21st Century,"** panelist for use of force and the mentally ill (Costa Mesa, CA) (June 2018)

## GREG MEYER

---

\*        **Participant, Axon Accelerate Conference** (Scottsdale) (June 2018)

\*        **Producer, "Search and Seizure, Search Warrants, and Interviews & Interrogation,"** two seminar sessions for the Peace Officers Association of Los Angeles County (POALAC) (August & October 2018)

\*        **Producer, "Officer-Involved Shootings and Internal Affairs Investigations: Getting It Right,"** for the Peace Officers Association of Los Angeles County (POALAC) (June 2018)

\*        **Participant, The Fidler Institute, Loyola Law School,** presentations on sexual assaults prosecutions and "Me Too," the Mueller investigation, new marijuana laws, new parole procedures (April 2018)

\*        **Producer, "Surviving Your Attacker: Law Enforcement Officers Killed and Assaulted,"** for the Peace Officers Association of Los Angeles County (POALAC) (May 2018)

\*        **Producer, "Media Relations and Social Media Strategies for Law Enforcement,"** seminar for the Peace Officers Association of Los Angeles County (POALAC) (March 2018)

\*        **Conference Chair and Moderator of the Keynote Panel, 2nd Annual Body-Worn Camera Winter Forum: Strategies for Implementation, Operations, and Policy** (two days, San Diego, February 2018)

\*        **Participant, Annual Sudden and In-Custody Death Conference**, presented by the Institute for Prevention of In-Custody Death, Las Vegas (November 2017)

\*        **Assisted with the development of TASER policy for the U.S. Immigration and Customs Enforcement**, consulted by Rains, Lucia, Stern law firm in support of the American Federation of Government Employees (October 2017)

\*        **Appointed as the Law Enforcement and Policing Practices Subject Matter Expert in support of the US Department of Homeland Security Headquarters – Office for Civil Rights and Civil Liberties**, to conduct independent reviews of selected public complaint and use of force incidents by the Border Patrol, ICE, TSA, Secret Service, and other DHS components; rewrite use of force policy; 2016 presentation to DHS headquarters management on use-of-force issues. (2015-2017)

\*        **Conference Chair and Moderator of the Keynote Panel, Body-Worn Camera Summit**, focused on lessons learned from the early adopters of the technology (two days, San Diego, February 2017)

\*        **Participant, Town Hall Meeting, Police Executive Research Forum (PERF),** focused on rollout of PERF's ICAT training program (Integrating

# GREG MEYER

_____

Communications, Assessment, and Tactics) related to the PERF 30 Guiding Principles for use-of-force policy and training (San Diego, October 2016)

\* **Editor and contributor re tactical lessons learned, <u>Blue Lives Matter: In the Line of Duty</u>, <u>Blue Lives in Jeopardy: When the Badge Becomes the Target</u>, and <u>Blue Lives Under Fire: Shootouts</u>,** three books documenting murders of police officers in Los Angeles County, by former Los Angeles County District Attorney Steve Cooley and retired Supervising Deputy District Attorney Robert Schirn (Book 1 published in 2017; Book 2 in 2019; Book 3 pending publication)

\* **Panelist, "Journalist Law School," Loyola Law School,** seminar on how to fairly and accurately investigate allegations of excessive force or other misconduct, for prominent television and print media from around the country (35 participants) (June 2016)

\* **Participant, The Fidler Institute, Loyola Law School,** presentations on access to justice, terrorism and cyberterrorism, technology innovations in probation and parole, and workplace and consumer protection crimes (April 2016)

\* **Producer, "Active Shooter Incidents in Southern California,"** a seminar for the Peace Officers Association of Los Angeles County (POALAC)  (150 participants) (April 2016)

\* **Guest speaker, University of Southern California (USC) Journalism School**, re police use of force issues (March 2016)

\* **Producer, "Active Shooter Incidents in Southern California,"** a seminar for the Peace Officers Association of Los Angeles County (POALAC)  (375 participants) (November 2015)

\* **Participant, Town Hall Meeting, Police Executive Research Forum (PERF),** focused on officer-involved shooting investigations, use-of-force policy and training (Phoenix, June 2015)

\* **Independent review of the death of Nicholas Covelli** (occurred 2003 in Frazier Park, CA), involving bizarre behavior and an officer-involved shooting.  (2015)

\* **Interviewed by KCRW radio** re TASER history and issues (2015)

\* **Participant, The Fidler Institute, Loyola Law School,** presentations on police body-cams, line-up identifications, and grand jury processes (2015)

\* **Interviewed as a Subject Matter Expert** on a Los Angeles Police Department, Training Division project to integrate four California POST

### GREG MEYER
_____

perishable-skills training subjects into a training course that mirrors actual field situations (2015)

\*      **Provided input** for the Police Executive Research Forum (PERF) conference (Washington DC, May 2015) **"Re-Engineering Use-of-Force Policies, Training and Supervision"**

\*      **Consultant**, final draft of **The Law of Self-Defense and The Use of Force in California**, publication produced by Michel and Associates, PC

\*      **Participant, Internal Affairs and Discipline Seminar**, presented by Americans for Effective Law Enforcement (AELE), Las Vegas (2014)

\*      **Guest on PBS "The News Hour" and NPR Radio** in the wake of controversial use of force incidents in New York and Missouri (August 2014)

\*      **JPX Pepper Gun**, handled and test-fired at the Los Angeles Police Department Academy (August 2014)

\*      **Panelist, "Journalist Law School," Loyola Law School,** seminar on how to fairly and accurately investigate allegations of excessive force or other misconduct, for prominent television and print media from around the country (40 participants) (May 2014)

\*      **Independent Expert Reviewer, Office of the Inspector General, Oakland (CA) Police Department,** to review and report on selected OPD use of force cases during internal adjudication and testify at administrative hearings (2014)

\*      **Contributing editor, Electronic Control Weapons samples policies,** LAAW International, LLC (2014)

\*      **Participant, The Fidler Institute, Loyola Law School,** presentations on homicide investigations, sexual assault investigations, police misconduct investigations (2014)

\*      **Outside Independent Expert Advisor, Long Beach (CA) Police Chief's Community Use of Force Advisory Committee** (2013 – 2014)

\*      **Edited article on OC (Pepper Spray) issues** for Americans for Effective Law Enforcement's monthly law journal (April 2014)

\*      **Participant, Annual Sudden and In-Custody Death Conference**, presented by the Institute for Prevention of In-Custody Death, Las Vegas (each November 2005-2013)

## GREG MEYER

---

\*      **Participant, National Conference on Body Cameras,** Police Executive Research Forum (PERF) conference, Washington DC (September 2013)

\*      **Donor, "The Greg Meyer Taser Collection," Smithsonian National Museum of American History**, a collection of artifacts and files from TASER inventor Jack Cover and my personal equipment and files (2013)

\*      **Reviewer, United States Environmental Protection Agency (EPA)/Criminal Investigation Division (CID) shooting incident** (2013) Conducted independent external review for the EPA Inspector General re a shooting involving EPA/CID personnel in Florida (2013)

\*      **Consultant, California Peace Officer Standards and Training (POST)**, re development of their lesson plan for the officer-involved shooting investigations course (July 2012)

\*      **Reviewer, two draft National Institute of Justice reports,** "Evaluation of Less Lethal Beanbag Munitions and Launchers" and "Evaluation of Taser X2," (June 2012)

\*      **Contributing editor, "Weapons Confusion and Civil Liability" article,** for Monthly Law Journal of American's for Effective Law Enforcement (AELE) (May 2012)

\*      **Participant, Critical Issues in Policing Series: An Integrated Approach to De-Escalation and Minimizing Use of Force,** Police Executive Research Forum (PERF) conference (Washington DC, February 2012)

\*      **Interviewed by TV Channel11 (Los Angeles)** re the value of videotape evidence; and whether to show it to involved officers before or after interview; live television, "Studio 11 LA" (January 2012)

\*      **Participant, Use of Force, Electronic Control Devices, and In-Custody Death—Formulating a Plan,** South Bay Training Committee (Redondo Beach, CA, January 2012)

\*      **Participant, Use of Force Investigation and Risk Management lecture** by attorney Randy Means, Labor Relations Information System (LRIS) seminar (2011)

\*      **Interviewed by Tammi Downey, producer for Discovery Channel Canada,** re forthcoming documentary on electronic control weapons (2011)

\*      **Reviewer, Oakland (CA) use-of-force incident** Conducted independent external review for the chief of police re a use-of-force incident involving TASER, pepper spray, and baton (2010)

**GREG MEYER**

_____

* **Participant, Police Executive Research Forum (PERF) meeting to revise Conducted Energy Device Guidelines** and contributor to the final editing process (Philadelphia) (August  2010)

* **Edited Force Science News article re the Oakland BART Murder trial** (2010)

* **Conducted internal affairs investigation** for a local police agency to determine propriety of a TASER use in a street confrontation between an officer and a subject (2010)

* **Producer, "The Deadly Mix: 20 Years of Officer Survival Research,"** 8-hour class by former FBI staff who authored "In the Line of Duty," "In the Line of Fire," and "Violent Encounters" (2010)

* **Interviewed by Karyn MacEwan, producer for Discovery Channel,** re documentary on TASER inventor Jack Cover (2010)

* **Participant, Internal Affairs and Discipline Seminar**, presented by Americans for Effective Law Enforcement (AELE), Las Vegas (2009)

* **Participant, New Product Advisory Meeting,** TASER International Headquarters, Scottsdale (2009)

* **Interviewed by Hannah Simon, PoliceOne.com,** for an article relating to TASER International's new guidelines for probe target areas (2009)

* **Interviewed by Nick Berardini, for a feature-length documentary film on TASERs** (2009)

* **Interviewed by Bill Kidd, "Law Enforcement Management Bulletin,"** re TASER policy and training issues for law enforcement executives and supervisors (2009)

* **Interviewed by Chuck Remsberg, "Force Sciences News,"** re TASER recommendations from the Braidwood report in British Columbia (2009)

* **Advisor, "Research roundup: Latest on Tasers, arrest-related deaths, excited delirium,"** Force Science News Bulletin #127 (2009)

* **Co-author, "Electronic Control Weapons Model Policy,"** International Association of Chiefs of Police (IACP), 2010 revision

* **Participant, TASER Annual Instructor Conference,** including rollout of the TASER X3 model, Ft. McDowell (AZ) (2009)

* **External reviewer, TASER International's revision of "Product Warnings: Law Enforcement"** (July, 2009)

# GREG MEYER

_____

\*     **Participant, TASER International's new product line demonstration** including X-REP shotgun (fired it), Shockwave, and AXON, Los Angeles Sheriff's Academy (2009)

\*     **Certified instructor, TASER X-26** (2005, 2009)

\*     **Certified instructor, TASER M-26** (2001, 2003, 2005, 2009)

\*     **Participant, TASER Executive Conference**, Los Angeles Sheriff's Academy (March 2009)

\*     **Co-producer and presenter, Institute for Law Enforcement Administration (ILEA) use of force and sudden in-custody death seminar,** Texas (2008)

\*     **External reviewer, TASER International's revision of "Product Warnings: Law Enforcement" document** (January & April 2008)

\*     **Participant, Jail and Prison Legal Issues Seminar**, presented by Americans for Effective Law Enforcement, Las Vegas (2008)

\*     **Guest, TASER Scientific and Medical Advisory Board Meeting** (Las Vegas); participated in discussions of current issues (2007)

\*     **Monitored TASER user training for 60 LAPD officers at the Los Angeles Police Academy,** including viewing all officers receive TASER exposures for training purposes (September 18, 2007)

\*     **Edited three articles on Electronic Control Weapons issues** for Americans for Effective Law Enforcement monthly law journals (2007)

\*     **Peer Reviewer, US Department of Homeland Security's FY 2005 Commercial Equipment Direct Assistance Program** (2006)

\*     **Interviewed by Court-TV for a half-hour program on TASERs** (2006)

\*     **Participant, International Association of Chiefs of Police (IACP)** annual conference, attended use of force seminars, Boston (2006)

\*     **Reviewer, Police Executive Research Forum national survey on Officer Safety/Body Armor**, sponsored by United States Department of Justice, Bureau of Justice Assistance (2006)

\*     **Radio talk show guest, debating Amnesty International on stun-gun issues,** Station WWRL (New York) (2006)

\*     **Participant, TASER Annual Instructor Conference,** Las Vegas (2006)

## GREG MEYER

_____

\*    **Participant, Internal Affairs and Discipline Seminar**, presented by Americans for Effective Law Enforcement (AELE), Las Vegas (2005)

\*    **Consultant, TASER issues for Vista Research** (2005 - 2008)

\*    **Presenter and panelist on the state and future of law enforcement training,** Academy of Criminal Justice Sciences (ACJS), Las Vegas (2004)

\*    **Academic Committee member, Americans for Effective Law Enforcement's "Certified Litigation Specialist" program** (2002 – present)

\*    **Presenter, "Rafael Perez and the LAPD Rampart Corruption Game,"** American Society for Law Enforcement Training, Orlando (2001).

\*    **Editor, POST instructor-course proposal** "**Weaponless Defense Against Contact Weapons**" for Steve Tarani, Edge Defense (2000)

\*    **Panelist, "Mass Violence in America: The Law Enforcement Response," pertaining to Rapid-Response/Active Shooter** tactics for situations like the Columbine school shooting and other in-progress major incidents, for the American Society for Law Enforcement Training (ASLET), Richmond, Virginia (2000).

\*    **Reviewer and editor** for police attorney Michael P. Stone's article, "Lethal Force and Law Enforcement Activity-Related Deaths—A Suggested Protocol for Investigation" (1999)

\*    **Peer review panel member**, National Institute of Justice, for federal grant proposals relating to the Impact of Technology on Policing, Washington, D.C. (1998)

\*    **Presenter, custody-death issues** re *Price v. San Diego* to the California Association of Force Instructors (CAFI), Los Angeles (1998)

\*    **Co-presenter, "The Value of Videotaped Evidence,"** American Society for Law Enforcement Training (ASLET), Los Angeles (1997)

\*    **Presenter, causes and prevention of sudden in-custody death**, to the California Association of Force Instructors (CAFI), Beverly Hills, California (1997)

\*    **Met with the Director, Science and Technology Division, National Institute of Justice**, on concepts and issues surrounding development of improved nonlethal weapons policy and technology (1994)

\*    **Participant in the RAND Corporation's meeting on transfer of less-than-lethal military technology to civilian law enforcement arena;**

**GREG MEYER**

_____

and attended the House Armed Services Committee, Research and Technology Subcommittee hearing on that subject (1994)

\*       **Consultant to California Peace Officer Association, Standards and Ethics Committee** on nonlethal weapons policy, tactics and training issues (1993)

\*       **Consultant to California Peace Officer Standards and Training Commission's round table on pepper spray policy and training standards** (1993)

\*       **Quoted extensively** in <u>Deadly Force: What We Know</u>, book by William A. Geller and Michael S. Scott, Police Executive Research Forum (1992)

\*       **Conducted nonlethal weapons demonstrations and presentations** to the following during 1980-81:

          \*       California Peace Officers Association, Administrative Institutes
          \*       California Highway Patrol Academy, including numerous law enforcement agency and media representatives from the Sacramento area
          \*       California Department of Corrections, Sacramento
          \*       California Specialized Training Institute, San Luis Obispo
          \*       Rio Hondo Police Academy, Whittier
          \*       Redondo Beach Police Department
          \*       Chief of Police, Oakland
          \*       Chief of Police, San Francisco
          \*       Chief of Police, Los Angeles

**LAPD ASSIGNMENT HISTORY:**

2013 - 2020   **Specialist Volunteer, LAPD Training Group**
Consultant to the Commanding Officer, Police Science and Training Bureau, regarding police training issues

2006 - 2012   **Reserve Officer, Los Angeles Police Department**
Consultant to the Chief of Police re use of force issues; consultant to the Director, Police Training and Education re training issues; expert resource for LAPD Media Relations and Professional Standards Bureau re use-of-force issues.

2004 – 2006   **Captain, Training Division** (Captain II)
Line command in partnership with one other captain, more than 300 employees assigned to the three major facilities of the Los Angeles Police Academy, including nonlethal weapons, tactics, firearms, pursuit driving, curriculum development, recruit coordination (est. 600+ recruits annually), in-service course coordination (more than 80 courses annually), e-learning

## GREG MEYER
_____

development and implementation.  Chairman, Tactics Training Review Committee.  Manage the training of Department employees and perform a variety of administrative and coordination functions.  Review/adjudicate police pursuits, employee-involved traffic collisions, use of force and internal affairs cases.  Serve as chairman or associate member of numerous Boards of Rights (internal discipline tribunals to conduct *de novo* hearings of internal affairs cases). Speaker at supervisor, detective, leadership and other schools at the Police Academy. Work closely with the Police Commission, the Chief of Police and other high-ranking officials on use-of-force policy, training, equipment, tactics and post-incident procedures, including policy and training changes for use of the flashlight as an impact device, and shoot/don't shoot at moving vehicles, PIT maneuvers and spike strips. Manage the 2005 re-write of the LAPD Use of Force Sourcebook. Manage the Revolving Training Fund ($1.5 million annually).  Manage the Police Academy's relationship with the College of Canyons.  Manage the Police Academy's relationship with the California Peace Officers Standards and Training Commission (POST) and attend numerous POST Commission meetings.  Manage the LAPD/West Point Leadership Program. Manage the LAPD Personal Protection Equipment and Weapons of Mass Destruction (PPE/WMD) training program, including liaison with the Los Angeles County Sheriff's Department and the California Specialized Training Institute (CSTI).
(Retired from active service May 31, 2006)

1999 – 2004     **Commanding Officer, Valley Traffic Division** (Captain II)
Line command of more than 200 employees assigned to enforce the traffic laws, investigate traffic collisions, conduct follow-up investigations of major injury and fatal collisions, hit/run collisions, and arrests, and educate the public about traffic collision prevention issues.  Review/adjudicate police pursuits, employee-involved traffic collisions, use of force and internal affairs cases. Expert resource for LAPD on pursuit reviews.  Serve as chairman or associate member of numerous Boards of Rights (internal discipline tribunals to conduct *de novo* hearings of internal affairs cases). Review and approve probationary officer rating reports. Liaise with community groups, politicians, the insurance industry, transportation engineers, surrounding police agencies, and others to reduce deaths and injuries on our highways.  Deploy field forces to perform the traffic safety, enforcement and collision investigation mission in a manner that simultaneously assists patrol divisions with their crime control activities.  Coordinated operations of  LAPD/CHP sobriety checkpoints.  Task Force coordinator for crime-suppression operations throughout the San Fernando Valley (2002-2004).

## GREG MEYER
_____

| | |
|---|---|
| 1998 – 1999 | **Commanding Officer, North Hollywood Operations Support Division** (Captain I)<br>Line command of 95 employees assigned to detectives (including homicide, crimes against persons, sexual assaults, suspected child abuse reports, robbery, burglary, auto theft), vice, CRASH [the gang detail], bike/hype detail, career criminal apprehension, in-service training coordination, probationary officer training coordination including approval of probationary rating reports and counseling unsatisfactory probationary officers, personnel investigations, and crime analysis.  Review/adjudicate pursuits, employee-involved traffic collisions, use of force, and internal affairs cases.  Serve as chairman or associate member of numerous Boards of Rights (internal discipline tribunals to conduct *de novo* hearings of internal affairs cases).  Area liaison to the North Hollywood business and security communities. Act for the Area Commanding Officer in his absence. Creator of the *"Spike Busters!"* crime-control program in support of the FASTRAC command-accountability process.   Act for the Area commanding officer in his absence. |
| 1996 - 1998 | **Watch Commander, West Traffic Division** (Lieutenant)<br>Line supervision of 90 employees, including 10 sergeants assigned to collision investigation, traffic enforcement, community traffic services.  Act for the commanding officer in his absence. Oversee implementation and effectiveness of goals and expectations for employee productivity and work quality.  Review/adjudicate employee-involved traffic collisions, use of force, and internal affairs cases.  Monitor and rate the work of supervisory employees.  Instrumental in development and implementation of the division's Vision and Mission Statements, and the Strategic Plan.  Act for the commanding officer in his absence. |
| 1994 - 1996 | **Assistant Commanding Officer, Wilshire Detective Division** (Lieutenant)<br>Line supervision of 90 employees, and coordination responsibilities for follow-up investigations including murder, manslaughter, rape/sexual assaults, child abuse, robbery, aggravated assault, burglary, auto theft, juvenile matters, and other crimes.  Act for the commanding officer in his absence. Monitor and evaluate the work of supervisory employees.  Leader of the Operations-West Bureau Detective Mobile Field Force during emergency operations. Review/adjudicate pursuits, employee-involved traffic collisions, use of force, and internal affairs cases.  Co-creator, "Predators to Prison" program targeting parolees-at-large. Act for the commanding officer in his absence. |

## GREG MEYER
_____

1993 - 1994      **Patrol Watch Commander, Wilshire Area** (Lieutenant)
Line supervision for patrol sergeants and officers responding to
emergencies and handling basic calls for service.  Take field
command of major tactical incidents.  Supervise the division's
probationary officer training coordinator, approve probationary
rating reports and conduct feedback and counseling to satisfactory
and unsatisfactory probationary officers. Monitor and rate the work
of supervisory employees.  Review/adjudicate pursuits, employee-
involved traffic collisions, use of force, and internal affairs cases.
Act for the commanding officer in his/her absence.

1991 - 1993      **Adjutant/Aide to the Commanding Officer and the Assistant
Commanding Officer, Operations-Headquarters Bureau**
(Senior Sergeant)
Perform administrative functions (including review of internal
affairs, use of force, and pursuit investigations) for the command
that includes specialized detective functions, narcotics, SWAT,
Metropolitan Division, Air Support Division, Tactical Planning
Section, and Traffic Coordination Section.

1989 – 1991      **Adjutant to the Commanding Officer, Detective Support
Division** (Senior Detective)
Perform administrative functions (including review of internal
affairs and use of force investigations) for the command that
includes Special Investigation Section, Criminal Conspiracy
Section, Gang Information Section, Fugitive/Warrant Section, and
Asian Crime Investigation Section.

1988 - 1989      **Field Detective, Hollywood Area** (Detective)
Conduct follow-up investigations on reports of crime; write and
serve search and arrests warrants; make arrests; testify in court.

1986 - 1988      **Assistant Officer-in-Charge, Traffic Coordination Section**
(Senior Sergeant)
Line supervision for the Traffic Legislation and Special Projects
Unit.  Act for the officer-in-charge in his absence.  Monitor and
rate the work of supervisory employees; supervised work on
LAPD pursuit policy revisions supervised the Specialized Collision
Investigation Detail (SCID) re major accidents involving the Police
and Fire Departments, including pursuits; City-wide coordination
of review of police pursuits and employee-involved traffic
collisions; wrote policy change to accommodate California
Supreme Court ruling that established standards for operating
sobriety checkpoints; coordinated planning and operations of
LAPD/CHP sobriety checkpoints; authored the Office of
Operations Management Paper, "1987—The Year of Traffic
Enforcement" and several articles for the Chief of Police.

## GREG MEYER

_____

| | |
|---|---|
| 1985 - 1986 | **Officer-in-Charge, Prostitution Enforcement Detail, Hollywood Vice** (Sergeant) Line supervision and performance evaluation for personnel assigned to suppress street prostitution in Hollywood Area. |
| 1984 - 1985 | **Officer-in-Charge, Hollenbeck Footbeats; and Patrol Supervisor** (Sergeant) Line supervision and performance evaluation for uniformed personnel assigned to footbeat patrols in several housing projects and business districts; and perform general patrol supervision. Officer-in-charge of field transportation detail in the Coliseum/USC/Exposition Park venue during the 1984 Olympic Games. |
| 1982 - 1984 | **Detective, Hollywood Area** (Police Officer III) Conduct follow-up investigations on reports of crime (robberies, sexual assaults, auto-related crimes, burglaries and thefts, juvenile). Write and search and arrest warrants, make arrests, testify in court. Honored as the 1983 Hollywood Detective of the Year. |
| 1981 - 1982 | **Researcher, Tactical Planning Section** (Police Officer III) Author of LAPD's Watch Commander's Guide for Control of Disasters and Other Emergencies, as well as numerous other staff research projects. Field command post equipment driver. |
| 1980 - 1981 | **Field Training Officer, Venice Area** (Police Officer III) Train, evaluate and document the performance of probationary police officers, respond to calls for service and conduct general patrol functions, make arrests, testify in court. |
| 1979 - 1980 | **Staff Researcher/Adjutant, Planning and Research Division** (Police Officer II and III) **Primary researcher and field-test coordinator, LAPD's nonlethal weapons program including TASER, teargas sprays, other devices.** Demonstrate these devices to police managers, political officials, and the media. Write LAPD policy and training material on nonlethal weapons. Train police academy staff and front-line supervisors as users of these devices. Author of numerous other staff projects. Perform administrative functions for the commanding officer including review of proposed LAPD policy changes. |
| 1978 - 1979 | **Patrol Officer, Southwest Area** (Police Officer I and II) Respond to calls for service and conduct general patrol functions, make arrests, testify in court. |

## GREG MEYER

_____

| | |
|---|---|
| 1978 | **Recruit Officer** (Police Officer I)<br>In training at the Academy. |
| 1977 - 1978 | **Patrol Officer, Long Beach Police Department** (Police Officer);<br>Respond to calls for service and conduct general patrol functions,<br>make arrests, testify in court. |
| 1976 - 1977 | **Reserve Police Officer, Wilshire Area** (Line Reserve Officer)<br>Respond to calls for service and conduct general patrol functions,<br>make arrests, testify in court. |

\*      **Interviewed by local and national media** (1980 - present):

| | |
|---|---|
| o  Time | * US News & World Report |
| o  Police Chief (IACP) | * Longview News-Journal (TX) |
| o  Los Angeles Times | * Fox News 11, "Studio 11 LA" |
| o  Los Angeles Herald Examiner | * Associated Press (AP) |
| o  Los Angeles Daily News | * Money Magazine |
| o  Good Housekeeping | * Grand Junction (CO) Sentinel |
| o  Aspen Daily News | * Miami Daily Business Review |
| o  The Mountain Enterprise | * Court-TV |
| o  FOX News  (Tampa, FL) | * POLICE Magazine (multiple occasions) |
| o  San Francisco Chronicle | * National Public Radio (NPR) |
| o  Austin American-Statesman | * Charlotte (NC) Observer |
| o  Police & Security News | * Force Science News (multiple occasions) |
| o  Law Enforcement Management Bulletin | * Long Beach (CA) Register |
| o  Nick Berardini (documentary on TASERs) | * RT.com |
| o  PoliceOne.com | * Discovery Channel |
| o  KNBC-TV, KABC-TV, KCBS-TV, | * Kansas City Star |
| o  KTLA-TV, KTTV-TV | * Las Vegas Sun Times |
| o  The Capital (Anne Arundel, MD) | * Oakland Tribune |
| o  WNYC Radio (New York) | * San Francisco Examiner |
| o  Slate | * Las Vegas Review Journal |
| o  Discovery Channel Canada | * St. Petersburg Times |
| o  KLAS-TV Channel 8 (Las Vegas) | * Acadiana Advocate |
| o  The Daily (New York) | * KPCC Public Radio |
| o  Tampa Bay Times | * KCRW Radio |
| o  Columbus (GA) Ledger-Enquirer | * Washington Post |
| o  Salt Lake Tribune | * Scripps Television |
| o  Baltimore Sun | * BBC |
| o  The Daily Breeze (CA) | * CNN Digital |
| o  Tallahassee Democrat | * KCBS Radio (San Francisco) |
| o  The Today Show (NBC) | * Daily Mirror (London, UK) |
| o  The News Hour (PBS) | * Boston Herald |
| o  Hawaiian News Now | * Forbes |
| o  USA Today | * KUOW Radio-Seattle |
| o  Harvard-Westlake Chronicle | * TheInfluence.org |
| o  Reuters | * New York Times |
| o  The Independent (Colorado Springs) | * Bucks County Courier Times |
| o  Viewpoints Radio | * Los Angeles Magazine |
| o  Spectrum News | * The Oregonian |

## GREG MEYER

_____

**PARTIAL
BIBLIOGRAPHY:**     [redacted per Rule 26]

**"Rodney King: 30 Years Later,"** op-ed article for the Los Angeles Daily Journal (2021)

**"How Do We Save More Blue Lives from Being Murdered?"**, article for PoliceOne.com (2020)

**"Tactics and Training: A Half-Century of Change—where we've been, where we're at, where we're going,"** three-part article series for POLICE magazine (2019)

**"Will the New Year Be Safer for You?,"** guest editorial, POLICE Magazine (January 2018)

**"LAPD's Use of Force Policy Revision,"** article, POLICE magazine online (April 2017)

"**A Revolution in Use-of-Force Policy and Training?"** article, POLICE magazine (March 2016)

**"Nonlethal weapons revisited: A tactical update,"** article, PoliceOne.com (September 2015)

"**Improving ECW Tactics and Policies,"** article, POLICE magazine (August 2015)

**"Body Cameras –Keep It Real,"** guest editorial, POLICE magazine (June 2015)

**"Drafting Your Agency's Body-Worn Camera Policy,"** lead article, POLICE magazine body-camera supplement (June 2015)

"**Digital Video: Working Under the Microscope,"** article, POLICE magazine online edition (June 2015)

**"Unarmed Suspects and 'Un-brained Media,"** guest editorial, POLICE magazine (October 2014)

**"Tactics and science of TASER deployment,"** article, PoliceOne.com (January 2014)

**"Lessons from the Onion Field,"** article, POLICE Magazine online (March 2013)

**"Latest Medical Research on TASERs,"** article, PoliceOne.com (October 2012)

## GREG MEYER
_____

**"Video Evidence Issues: Conflict and Controversy,"** article, PoliceOne.com (June 2012)

**"The L.A. Riot – 20 Years Later,"** article, POLICE website (April 2012)

**"Training Crisis,"** editorial, ghost-written for the publisher, POLICE magazine (April 2012)

**LITIGATION and CASE REVIEW ACTIVITIES:**           [redacted per Rule 26]

**1989-PRESENT:   CASES: 401        DEPOSED: 74        TESTIFIED: 63**

Cases are organized by:
- **Police defense cases (civil)**
- **Plaintiff cases against police (civil)**
- **Police defense cases (criminal)**
- **Police prosecution cases (criminal)**
- **Arbitrations, administrative appeals for officers**
- **Arbitrations, administrative appeals against officers**
- **Other matters**
- **Independent case reviews for prosecutors**
- **Independent case reviews for law enforcement agencies**

### Police defense cases (civil)

**KJP v. County of San Diego (re-trial)** (CA) (2022) (Federal)
Expert witness for the defense, civil suit alleging excessive force, arrest-related death TASER issues (Testified)

**Almahmodi v. City of La Mesa** (CA) (2021) (Federal)
Expert witness for the defense, civil suit alleging battery, unnecessary handcuffing, failure to intervene, ADA violations, Monell (Deposed)

**Sullivan v. City of Palm Springs** (CA) (2021) (Federal)
Expert witness for the defense, civil suit alleging failure to provide timely medical treatment (Deposed)

**Skommesa v. City of Murrieta** (CA) (2021) (Federal)
Expert witness for the defense, civil suit alleging excessive force (Deposed)

**Mendez v. City of Chicago** (IL) (2021) (Federal)
Expert witness for the defense, civil suit alleging negligence during search warrant service (Deposed)

**Gonzalez v. State of California** (CA) (2021) (Federal)
Expert witness for the defense, civil suit alleging excessive force, arrest-related death, TASER and OC pepper spray involved (Deposed)

## GREG MEYER

_____

**Anumudu v. Salvador** (CA) (2020) (Federal)
Expert witness for the defense, civil suit alleging false arrest (Deposed)

**Cornelius v. City of Mt. Washington KY**  (KY) (2019) (Federal)
Expert witness for the defense, civil suit alleging excessive force, arrest-related death, TASER issues (Deposed)

**Muhaymin v. City of Phoenix** (AZ) (2019) (Federal)
Expert witness for the defense, civil suit alleging excessive force, failure to intervene, ADA issues, arrest-related death (Deposed)

**Guttman v. New Mexico State Police** (NM) (2019)
Expert witness for the defense, civil suit alleging false detention, excessive force, Monell issues, ADA issues (Deposed)

**Lacy v. County of San Diego** (CA) (2019)
Expert witness for the defense, civil suit alleging excessive force, deputy-involved shooting (Deposed; testified)

**Barron v. State of California (CHP)** (CA) (2018) (Federal)
Expert witness for the defense, civil suit alleging excessive force, fatal officer-involved shooting, TASER issues (Deposed; testified)

**Kennedy v. Mohave County** (AZ) (2017) (Federal)
Expert witness for the defense, civil suit alleging excessive force, officer-involved shooting (Testified)

**Garcia v. City of Garden Grove** (CA) (2017) (Federal)
Expert witness for the defense, civil suit alleging excessive force, non-fatal officer-involved shooting (Deposed)

**White v. State of California** (CA) (2017) (Federal)
Expert witness for the defense, civil suit alleging excessive force (Testified)

**KJP v. County of San Diego** (CA) (2017) (Federal)
Expert witness for the defense, civil suit alleging excessive force, arrest-related death TASER issues (Deposed; testified) (see re-trial 2022, above)


**Plaintiff cases against police (civil)**

**Cardenas v. Saladen** (AZ) (2019) (Federal)
Expert witness for the plaintiff, civil suit alleging unlawful entry, false arrest, excessive force, TASER related (Deposed)

**Sykes v. Liparoto** (MO) (2017) (Federal)
Expert witness for the plaintiff, civil suit alleging false arrest, excessive force (Deposed)

**Burnikel v. Fong** (IA) (2016) (Federal)
Expert witness for the plaintiff, civil suit alleging excessive force, pepper spray issues (Deposed; testified)

**GREG MEYER**
_____

### Police defense cases (criminal)

**People v. Captain Taylor and Officer Dingman** (OK) (2021)
Expert witness for the criminal defense, officers accused of murder, TASER involved (Testified)

### Police prosecution cases (criminal)

**State of California v. Deputy Luke Liu** (2019) (California)
Expert witness for the prosecution, deputy accused of excessive force, deputy involved shooting (Testified)

### Arbitrations, administrative appeals for officers

### Arbitrations, administrative appeals against officers

### Other matters

**Gomez v. Canoga Park Bowl** (CA) (2017)
Expert witness for the defense, civil suit alleging negligence regarding security and failure to call police when a fight occurred (Deposed; settled)

### Independent case reviews for prosecutors

**re Santa Paula Police** (CA) 2020
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of a use-of-force incident by an on-duty police officer, with potential criminal charges (Work completed)

**re Santa Paula Police** (CA) 2020
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of a use-of-force incident by an on-duty police officer, with potential criminal charges (Work completed)

**re Santa Paula Police** (CA) 2020
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of a use-of-force incident by an on-duty police officer, with potential criminal charges (Work completed)

**re Santa Paula Police** (CA) 2020
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of a use-of-force incident by an on-duty police officer, with potential criminal charges (Work completed)

## GREG MEYER

_____

**re Ventura County Sheriff** (CA) 2020
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of a use-of-force incident by an on-duty deputy in a jail setting, with potential criminal charges (Work completed)

**re Los Angeles Sheriff** (CA) 2018
Expert consultant for a District Attorney's office; retained to conduct an independent review of an officer-involved shooting incident by an on-duty law enforcement officer, with potential criminal charges (Work completed)

**re Long Beach Police** (CA) 2018
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of an officer-involved shooting incident by an on-duty law enforcement officer, with potential criminal charges (Work completed)

**re Tehachapi Police** (CA) 2018
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of an officer-involved shooting incident by an on-duty law enforcement officer with potential criminal charges (Work completed)

**re Sacramento County Sheriff** (CA) (2017)
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of an officer-involved shooting incident by an on-duty law enforcement officer, with potential criminal charges (Work completed)

**re Los Angeles Police** (CA) (2017)
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of an officer-involved shooting incident by an on-duty law enforcement officer, with potential criminal charges (Work completed)

**re Long Beach Police** (CA) (2016)
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of an officer-involved shooting incident by on-duty law enforcement officers ,with potential criminal charges (Work completed)

**re Montebello Police** (CA) (2015)
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of a use of force incident by on-duty law enforcement officers with potential criminal charges (Work completed)

**re California Highway Patrol** (CA) (2015)
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of a use of force incident by an on-duty law enforcement officer with potential criminal charges (Work completed)

**re Gardena Police** (CA) (2014)
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of a fatal shooting by on-duty law enforcement officers with potential criminal charges (Work completed)

**re Deputy US Marshal** (CA) (2009)
Non-testifying expert consultant for a District Attorney's office; retained to conduct an independent review of a fatal shooting by an off-duty law enforcement officer, with potential criminal charges (Work completed)

## GREG MEYER

_____

**United States v. Thompson** (WA) (2009) (Federal)
Non-testifying expert consultant for an Assistant United States Attorney, retained to conduct an independent review of use of force issues for a federal civil rights prosecution of a local police officer, including TASER issues. (Work completed)

## Independent case reviews for law enforcement agencies

**[caption confidential] Patrol UOF Incident** (MT) (2022) (Hardin)
Non-testifying expert consultant for a police chief, to conduct an independent review of a fatal officer-involved shooting by an on-duty patrol officer, TASER-related, for internal affairs purposes. (Work completed)

**[caption confidential]  Patrol OIS Incident** (CA) (2021)(Indio)
Non-testifying expert consultant for a police chief, to conduct an independent review of a fatal officer-involved shooting by an on-duty patrol officer, for internal affairs purposes. (Work completed)

**[caption confidential] Patrol UOF Incident** (CA) **(**2019) [KC file ending in 2469]
Non-testifying expert consultant for a law enforcement agency; retained to conduct an independent review of a use of force incident by an on-duty patrol sergeant for internal affairs purposes. (Work completed)

**[caption confidential] Jail UOF Incident** (CA) **(**2018) [KC file ending in 9860]
Non-testifying expert consultant for a law enforcement agency; retained to conduct an independent review of a use of force incident by an on-duty custody deputy for internal affairs purposes. (Work completed)

**[caption confidential]  Patrol OIS Incident** (CA) (2018) [SB file ending in 7369]
Non-testifying expert consultant for a law enforcement agency; retained to conduct an independent review of a fatal officer-involved shooting by an on-duty patrol deputy for internal affairs purposes. (Work completed)