## On-Scene Consulting

March 2, 2022

Mr. Spencer Bryan, Esq.
Mr. Steven J. Terrill, Esq.
Bryan & Terrill Law
3015 E. Skelly Drive, Suite 400
Tulsa, Oklahoma 74105

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**CYNTHIA LAKEY AND DOUGLAS LAKEY, as co-Special Administrators for the Estate of Jared Lakey, Plaintiff,**
**vs.**

**CITY OF WILSON; JOSHUA TAYLOR, in his official and individual capacities; BRANDON DINGMAN, in his individual capacity; CHRIS BRYANT, in his official and individual capacity as Sheriff of Carter County; DAVID DUGGAN, in his individual capacity; LONE GROVE; TERRY MILLER, in his individual capacity; and KEVIN COOLEY, in his official and individual capacity, Defendants. (Case No. 20-cv-152-RAW).**

Dear Mr. Bryan and Mr. Terrill,

Thank you for retaining me to analyze and render opinions regarding the July 4, 2019, incident that resulted in the In-Custody Death of Mr. Jared Lakey. I have studied reports, photographs, videos, Oklahoma State Bureau of Investigation (OSBI) documents, Transcriptions of Digitally Recorded Depositions, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case.

Please be advised that if any additional documents related to this matter, are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions. It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

**Materials Reviewed:**

1.  Attorney Lien Claimed Jury Trial Demanded, Third Amended Complaint, Case No. 20-cv-152-RAW.

2.  Combined Video, OSBI 12019-805, (50:27).

3.  Incident/Offense Report, Carter County Sheriff's Office, Case No. 2019-00651, (00073-80).

4.  Statement by Wilson Police Department, Captain Joshua Taylor, (00081-82).

5.  Photographs of Scene, 7/4/2019, (00083-109).

6.  Written Statement by Wilson Police Department, Police Officer Terry Miller, (00010).

7.  Carter County Sheriff's Office, Voluntary Statement, Case No. 2019-651, by Johnna Greenroyd, (000111).

8.  Sheriff Carter County, Oklahoma, Statement by Captain David Duggan, (000121).

9.  Wilson Police Department, Voluntary Statement by Jeremy Brundage, 7/5/2019, (000129).

10.  Clark County Sheriff's Office, Manual for Field Deputies, 4/1/2018, (Confidential), (001063-1405).

11.  Carter County Sheriff's Office Radio Log, Incident Report, 2019-00651, (003007-3008).

12.  City of Employee Handbook, Pages 44-46.

13.  Board of Medicolegal Investigations, Office of the Chief Medical Examiner, Jared Wayne Lakey, Report of Investigation by Medical Examiner, ME Case No. 1903283.

14.  Board of Medicolegal Investigations, Office of the Chief Medical Examiner, Report of Laboratory Analysis, ME Case No. 1903283.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

15.  Supplemental Report, Case No. 1903283, 7/6/2019.

16.  Wilson Police Department, Statement by Police Officer Brandon Dingman, Case No. 2019-00651, (WILSON 0188-189).

17.  Wilson Police Department, Policy and Procedures, Use of Force, 5/1/2014, (WILSON 0191-198).

18.  Wilson Police Department, Chief of Police, Body Camera Policy and Procedure, (WILSON 0199-202).

19.  Case Report_OSBI2019-805_1-29.

20.  Southern Oklahoma Ambulance Service, Pre-Hospital Care Report, Lakey, Jared, W.

21.  Photographs, (WILSON 0203-209).

22.  Healdton Police Department, Voluntary Statement by Wilson Police Department Police Officer Brandon Wayne Dunn.

23.  Taser Evidence, Sync, Ardmore Police Department, Taser X26P, Serial No. X120004EP.

24.  Taser Evidence, Sync, Ardmore Police Department, Taser X26P, Serial No. X120002FF.

25.  Taser Training Academy, Taser Electronic Device, Brandon C. Dingman, 6-11-2013.

26.  State of Oklahoma, Council on Law Enforcement Education and Training, Taylor, Joshua.

27.  Evidence Report, OSBI2019-805.

28.  Oklahoma Bureau of Investigation, File No. OSBI2019-805, Lakey, Jared, Officer Use of Force-Death.

29.  Oklahoma Highway Patrol, Defensive Tactics Instructor System.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

30.  In the District Court of the Twentieth Judicial District of the State of Oklahoma Sitting in and for Carter County, Case No. CF-2020-221, Affidavit by Tony Navarro, The State of Oklahoma vs. Joshua Taylor.

31.  In the District Court of the Twentieth Judicial District of the State of Oklahoma Sitting in and for Carter County, Case No. CF-2020-221, Affidavit by Tony Navarro, The State of Oklahoma vs. Brandon Dingman.

32.  In the District Court of the Twentieth Judicial District of the State of Oklahoma, Sitting in and for Carter County, Felony Warrant, Joshua Taylor, Case No. 2020-221.

33.  In the District Court of the Twentieth Judicial District of the State of Oklahoma, Sitting in and for Carter County, Felony Warrant, Brandon Dingman, Case No. 2020-222.

34.  Carter County Sheriff's Office Inmate Released Sheet, Taylor, Joshua Lee, Booking Number 2020-01253.

35.  Carter County Sheriff's Office Inmate Released Sheet, Dingman, Brandon, Cole, Booking Number 2020-01254.

36.  Oklahoma State Bureau of Investigation, Case Master Report No. OSBI2019-805.

37.  Audio-Recorded Interview of David B. Duggan, (41:59).

38.  Audio-Recorded Interview of Harry Miller II, (25:23).

39.  Audio-Recorded Interview of Joshua Lee Taylor, (58:41).

40.  Audio-Recorded Interview of Brandon Cole Dingman, (43:41).

41.  Audio-Recorded Interview of Cody Helms, (14:08).

42.  Audio-Recorded Interview of Brandon Wayne Dunn, (25:54).

43.  Audio-Recorded Interview of Brandon Wayne Dunn, (2:41).

44.  Audio-Recorded Interview of Mark T. Cole, (18:01).

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

45.  Wilson Police Department Incident/Offense Report, Administrative, (WILSON 0222-231).

46.  In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222.

47.  Dingman Combined Video, (37:29).

48.  Dingman Dash Camera Video, 1_2019-07-04_23-56-51_WPD 03, (4:10).

49.  Dingman Dash Camera Video, 1_2019-07-05_00-01, (4:59).

50.  Dingman Dash Camera Video, 1_2019-07-05-_00-06, (5:00).

51.  Dingman Dash Camera Video, 1_2019-07-05-_00-11, (4:59).

52.  Dingman Dash Camera Video, 1_2019-07-05-_00-16, (5:00).

53.  Dingman Dash Camera Video, 1_2019-07-05-_00-21, (5:00).

54.  Dingman Dash Camera Video, 1_2019-07-05-_00-26, (5:00).

55.  Dingman Dash Camera Video, 1_2019-07-05-_00-31, (4:59).

56.  Dingman Dash Camera Video, 1_2019-07-05-_00-36, (5:00).

57.  Dingman Dash Camera Video, 1_2019-07-05-_00-41, (4:59).

58.  Dingman Dash Camera Video, 1_2019-07-05-_00-46, (5:00).

59.  Dingman Dash Camera Video, 1_2019-07-05-_00-51, (5:00).

60.  Dingman Dash Camera Video, 1_2019-07-05-_00-56, (0:23).

61.  Police Officer Dunn, Axon Body 2, Video X81358468, 2019-07-05, (22:47).

62.  911 Call, 7-4-2019, (0:49).

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

63. Text Messages from David Duggan's Phone, (Duggan 001-17).

64. Audio-Recording of David Duggan, by District Attorney Craig Ladd, 20200629-102650, (17:42).

65. Deposition Transcript and Exhibits of Charles (Chuck) Wayne Greenroyd II, taken on 6/16/2021.

66. Deposition Transcript and Exhibits of Johnna Beth Greenroyd II taken on 6/16/2021.

67. Deposition Transcript and Exhibits of Charles (Chuck) Wayne Greenroyd II taken on 6/16/2021.

68. Deposition Transcript and Exhibits of Mark Taylor Cole taken on 6/22/2021.

69. Deposition Transcript and Exhibits of Terry Dale Miller taken on 7/27/2021.

70. Deposition Transcript and Exhibits of Brandon Wayne Dunn taken on 8/12/2021.

71. Deposition Transcript and Exhibits of Billy Mitchell taken on 1/18/2022.

72. Deposition Transcript and Exhibits of Sterling Tucker taken on 1/18/2022.

73. Deposition Transcript and Exhibits of Tommy (Gus) Handke taken on 1/19/2022.

74. Deposition Transcript and Exhibits of David Ryan Duggan taken on 9/9/2021.

75. Defendant Chris Bryant In His Official Capacity's Response to Plaintiff's First Set of Interrogatories, Case No. CIV-20-152-RAW.

**Summary:**

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the Materials Reviewed Section of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

## FACTS

1. Mr. Jared Lakey was 28 years old on July 4, 2019.

2. On July 4, 2019, Dispatch Logs/Records reflect at 11:49 p.m. "Johnna" called to report a male running down the street. "Johnna" did not report that the man was naked.

3. Dispatch Logs/Records reflect at 11:52 p.m., there was a call out to Wilson Police Department Police Officer Joshua Taylor in response to the report from "Johnna."

4. Wilson Police Department Police Officer Joshua Taylor was dispatched in response to a male screaming and yelling.

5. Officer Taylor's report does not include any facts suggesting he was dispatched in response to a naked man.

6. Dispatch Logs/Records reflect at 11:55 p.m. Officer Taylor was "out with the subject."

7. Police Officer Taylor was wearing a Wilson Police Department issued Body Worn Camera at the time.

8. Wilson Police Department Body Worn Camera Policy required Police Officer Taylor to activate his body camera before any police-citizen encounter.

9. Wilson Police Department policy mandated that officers are required to activate their body cameras to record all contacts with citizens.

10. Police Officer Taylor was required under the Wilson Police Department policy to record the entire contact and interaction with Mr. Jared Lakey.

11. According to Wilson Police Department policy, when a Police Officer fails to activate their Body Worn Camera, fails to record the entire contact, or interrupts the recording, the Police Officer must document why the recording was not made, was interrupted, or terminated.

12. There is no video memorializing how the encounter began between Mr. Jared Lakey and Police Officer Taylor.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

13.  Police Officer Taylor's report/statement omits all references to the fact that his brother in-law was in the patrol vehicle with him on a "ride-along."

14.  Police Office Taylor reported that Mr. Jared Lakey was naked and only wearing socks at time of the encounter.  In addition, Police Officer Taylor reported that Mr. Jared Lakey appeared agitated, and Police Officer Taylor claimed Mr. Jared Lakey was naked with socks on before the encounter.  In addition, Police Officer Taylor alleges that Mr. Jared Lakey approached the front of his patrol vehicle and began pushing down on the bumper and aggressively stated, "Okay, we are going to do this."

15.  Police Officer Taylor reported that he unholstered his Taser X26P and ordered Mr. Jared Lakey to the ground and to put his hands behind his back.

16.  Police Officer Taylor reported that Mr. Jared Lakey got on the ground and laid on his back and rolled over several times.

17.  Police Officer Taylor's report does not include any statement or suggestion that he, or anyone else, ever communicated to Mr. Jared Lakey that he was under arrest.

18.  Police Officer Taylor's report stated that he requested Wilson Police Department Police Officer Brandon Dingman to respond.

19.  Police Officer Dingman's vehicle's dash-camera and Body-Worn Camera were both operational and recording at the time of his arrival.

20.  Police Officer Dingman reported that the approached Mr. Jared Lakey to handcuff him but instead the video reflects that he actually placed his foot on Mr. Jared Lakey's back instead of handcuffing him.

21.  Police Officer Dingman requested Mr. Jared Lakey to place his hands behind his back.

22.  Police Officer Taylor stated, "Non-compliance is going to get you tased."

23.  Police Officer Dingman kept his right foot on Mr. Jared Lakey for approximately 18 seconds and did not attempt to handcuff him.

24.  The video footage depicts Mr. Jared Lakey attempting to get to his knees and elbows in what appeared to be an ultimate attempt to stand up.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

25.  At this time, Police Officer Taylor deployed/activated his Taser X26P in dart/probe and began to continuously administer Taser deployments to Mr. Jared Lakey.

26.  Police Officer Taylor continued to deploy/activate his Taser X26P in dart/probe mode as Mr. Jared Lakey falls to the ground.  Police Officers Taylor and Dingman yell simultaneously for Mr. Jared Lakey to put his hands behind his back as he is continuously being tased and appears to be responding to the pain associated with the continuous tasing and rolled onto his back.

27.  At this same time, Police Officer Dingman deployed/activated his Taser X26P in dart/probe mode and began multiple applications simultaneously with Police Officer Taylor.

28.  At this time. Police Officer Taylor expended the Taser X26P cartridge and reloaded a new cartridge and resumed tasing Mr. Jared Lakey. Taylor instructed Jared to roll over and put his hand behind his back while Dingman radioed that two Tasers were deployed/activated.

29.  Police Officer Taylor instructed Mr. Jared Lakey to put his hands behind his back or he will get tased again.

30.  It appears that Mr. Jared Lakey is attempting to comply with Police Officer Taylor's directive at which time Police Officer Dingman began additional deployments/activations of the Taser X26P.

31.  The video depicts Mr. Jared Lakey face-down on the ground.  Police Officer Dingman instructed Mr. Jared Lakey to put his hands behind his back several times while Mr. Jared Lakey was not moving.

32.  Police Officer Dingman continued to deploy his Taser X26 P.  There was no attempt to handcuff Mr. Jared Lakey while he's lying face down on the ground.

33.  At this point in the encounter, Mr. Jared Lakey desperately grabbed a chain-link fence.  Mr. Jared Lakey fell to the ground.

34.  Before the arrival of additional law enforcement officers, Police Officers Taylor and Dingman had approximately six minutes where Mr. Jared Lakey was in a prone position and there were many opportunities to simply handcuff Mr. Jared Lakey.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

35.  OSBI reviewed the TASER Evidence Sync data logs for Police Officers Dingman and Taylor that revealed that Police Officer Dingman activated/deployed his Taser X26 <u>23 times for a total of 114 seconds</u>.  Police Officer Taylor activated/deployed his Taser X26P <u>30 times for a total of 122 seconds</u>.

36.  The TASER Evidence Sync data logs reflected that Police Officers Dingman and Taylor activated/deployed their <u>Tasers 53 times</u> on Mr. Jared Lakey for approximately four minutes.

37.  On July 5, 2019, at 12:09 a.m., Carter County Sheriff's Office Captain David Duggan arrived on scene.

38.  At the time of Captain Duggan's arrival, Mr. Jared Lakey can be depicted on video seated on the ground in front of Officer Dingman's vehicle and near a chain-link fence after being tased 53 times.

39.  Captain Duggan is seen walking along the side of Officer Dingman's vehicle and slowly approaching Mr. Jared Lakey from behind. Captain Duggan appears to apply a Carotid Neck Restraint on Mr. Jared Lakey.

40.  As soon as Jared was moved to the seated position, Duggan placed his hand on the back of Mr. Jared Lakey's neck forcing his head down as Mr. Jared Lakey struggled to breathe.

41.  Lone Grove Police Department Police Officer Terry Miller briefly attempted to pull Mr. Jared Lakey's head up but let go after approximately four seconds.

42.  Police Officer Dingman then put his left hand on the back of Mr. Jared Lakey's head, pushing it down with his right hand, and applying pressure on Mr. Jared Lakey's upper back.

43.  Police Officer Dingman then pushed Mr. Jared Lakey's head down for over thirteen seconds before releasing his left hand and continuing to push on Mr. Jared Lakey's back with his right hand.

44.  While Mr. Jared Lakey is gasping and struggling to breathe, Captain Duggan repeatedly slaps Mr. Jared Lakey's back.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

45.  Video depicts Police Officers Miller and Dingman putting their hands on Mr. Jared Lakey's back and shoulders which may have impacted his ability to breathe.

46.  On three separate occasions, Mr. Jared Lakey appeared to attempt to straighten his body and move his head back in apparent attempt to breathe, but Police Officers Dingman and Miller continued to force him forward each time.

47.  This activity/action(s) continued for approximately two minutes and fifty-four seconds.

48.  Approximately three minutes and fifty seconds elapse from the time Police Officer Miller announced that Mr. Jared Lakey was breathing until someone begins any life-sustaining measures.

49.  On July 5, 2019, at 12:43 a.m., ambulance records document leaving the scene with Mr. Jared Lakey in route to Healdton Mercy Hospital.

50.  On July 5, 2019, at 12:53 a.m., ambulance records document arrival at Healdton Mercy Hospital.  Upon arrival, medical providers were informed that Mr. Jared Lakey "was tasered x4 total - law enforcement says 1st was about 11:30."

51.  Records from OUMC reflect Mr. Jared Lakey died at 6:32 a.m. on July 6, 2019. The post-mortem toxicology for Mr. Jared Lakey performed by the Office of the Chief Medical Examiner was negative for all illegal drugs.

**Opinions:**

Note:  None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues.  Rather, my opinions involve the consistency of the officers' actions with standard police practices.

### Opinion Number 1

It is my opinion that a reasonable Police Officer would have initially determined that Mr. Jared Lakey was mentally ill, experiencing a mental crisis, and or under the influence of a controlled substance or alcohol.   It is my opinion that the Defendants in this matter failed to initially determine that based on Mr. Jared Lakey's actions he was mentally ill, experiencing a mental crisis and or under the influence of a controlled substance or alcohol.   Throughout the United States and in Oklahoma, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Jared Lakey who are suffering from a mental illness, experiencing a mental crisis

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

and or under the influence of a controlled substance or alcohol.  The objective is to avoid unnecessary injury and or death.  The underlying principle is reverence for human life.  These correct and reasonable methods are recognizing cues and other indicators in order to make appropriate decisions regarding intervention strategies; time to assess the situation; calm the situation; request additional and equipment; provide reassurance that the officers are there to help; give the person time to calm down; move slowly; eliminate emergency lights and reduce environmental distractions.  These correct and reasonable methods are well known and proven effective for the safety and welfare of both Peace Officers and the public.  It is my opinion the Defendants in this matter to include Wilson Police Department Captain Joshua Taylor and Police Officer Brandon Dingman, Carter County Sheriff's Office Captain David Duggan, and Lone Grove Police Department Police Officer Terry Miller, failed to initially determine that Mr. Jared Lakey was mentally ill, experiencing a mental crisis, under the influence of a controlled substance or alcohol and act appropriately and reasonably.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.  Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place and the use of force can be avoided.

In addition, <u>law enforcement officers should be taught the below listed De-escalation Techniques</u>:

- Recognize the person may be overwhelmed by thoughts, beliefs, sounds (<u>voices</u>).
- Remember, a person's delusions or hallucinations are real to them.
- Understand that a rational discussion may not take place.
- Speak simply, move slowly.
- Announce actions before taking them.
- Attempt to gain voluntary compliance.
- Remove distractions and disruptive people.
- Be friendly, patient and encouraging but remain professional.
- Be aware that a uniform and a gun may frighten a person with mental illness.
- Reassure the person that no harm is intended.
- Get immediate emergency aid when needed.

Effective communication may enable a peace officer to gain cooperation and voluntary compliance in stressful situations.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety.  <u>Effective communication</u>:

- Provides skills that reduce the likelihood of physical confrontation.
- Can result in a reduction of injuries.
- Renders more effective public service and improves community relations.
- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessens personal and professional stress.

It is not the role of or within the capacity of peace officers to attempt to diagnose a person's disability, officers need to recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies.  In addition, based on Mr. Jared Lakey's behavior, it is my opinion the Defendants failed to determine if Mr. Jared Lakey was a <u>Danger to Self</u>:

**<u>Danger to Self:</u>**  Danger to self as a result of a mental illness typically means the presence of suicidal thoughts, statements, or behaviors.

<u>Indicators that might lead an officer to believe that a person may be in danger to self-include, but are not limited to the individual's</u>:

- Words or actions that imply an intent to commit suicide or inflict bodily harm on self.
- Exhibition of gross neglect for personal safety which could lead to that person receiving or being at risk or receiving serious injury.
- Statements or action implying a specific plan to commit suicide or inflict harm on self.
- Plans and means available or within that individual's ability to carry out.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level by recognizing that an individual may be mentally ill and or experiencing a mental crisis.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

<u>In addition, I base my opinion on the following video, facts, and testimony in this matter</u>:

- According to Denton County Sheriff's Office Investigator Eric Hamblin, somebody who was acting like Mr. Jared Lakey is possibly intoxicated, on some type of substance or having a mental health crisis, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 391</u>).
- According to Carter County Sheriff's Office Deputy Sheriff Billy Mitchell, if he had received a call of a naked man running down the street they may not be in their right state of mind, (<u>Deposition Transcript of Billy Mitchell, Page 121</u>).
- According to David Ryan Duggan, when he arrived, he suspected Mr. Jared Lakey was having a mental health issue or something like that, (<u>Deposition Transcript of David Ryan Duggan, Page 130</u>).

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

<u>**Opinion Number 2**</u>

It is my opinion the Wilson Police Department failed to properly train Wilson Police Department Captain Joshua Taylor and Police Officer Brandon Dingman in Crisis Intervention Techniques.  In addition, it is my opinion that the Wilson Police Department failed to establish a Crisis Intervention Team(<u>s</u>) comprised of mental health professionals and sworn Wilson Police Department Police Officers trained in Crisis Intervention Techniques, which could have responded to assist with the providing Mr. Jared Lakey the proper mental health treatment.  Crisis Intervention Team (<u>CIT</u>) Officers are specially trained to respond to incidents involving individuals who are mentally ill and pose a danger to themselves or others.

Many law enforcement agencies throughout the United States that have provided Crisis Intervention Training (<u>CIT</u>) to their police officers and or have formed a Crisis Intervention Team(<u>s</u>) that typically <u>follow the below listed recommended guidelines</u>:

- Whenever possible, a uniformed CIT Officer(<u>s</u>) should respond to any call involving a mentally ill individual that pose a danger to self or others.
- Upon receiving a call involving a mentally ill person, who poses a danger to themselves or others, Communications (<u>Dispatch</u>) will follow the standard dispatch protocol and request a CIT Officer(<u>s</u>) to respond.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

Crisis Intervention curriculum teaches officers skills such as de-escalation, (e.g., <u>talking slowly, having more patience, asking subject questions, recognizing the signs and symptoms of mental illness</u>), how to provide mental health referrals/resources, and about the voluntary treatment options.  By increasing understanding by officers of mental illness and improving the response to mental health calls will reduce the need for the use of force, decrease injuries and deaths to officers and people in a mental health crisis, reduce the stigma of mental illness and increase access and engagement in services for people with mental illness.

In addition, in the event that the establishment of a Crisis Intervention Team was cost prohibitive or could not be established due to deployment and or staffing reasons, Wilson Police Department still had the responsibility to ensure that their Police Officers were properly trained in Crisis Intervention Techniques.

In addition, I base my opinion on my law enforcement experience with the Los Angeles Police Department (<u>LAPD</u>) while assigned to: Patrol, Vice, Special Problems Unit, Detectives, and Special Weapons and Tactics (<u>SWAT</u>) to include being the Supervisor-in-Charge of LAPD SWAT's Crisis Negotiation Team.  In addition, the utilization of a mental health professional at the onset of an incident such as this incident can be an invaluable tool.  The Los Angeles Police Department Mental Evaluation Unit (<u>MEU</u>) responds to thousands of similar incidents on an annual basis and supports uniformed personnel by providing valuable insight and information.  Lastly, I base my opinion on my twenty-eight-year law enforcement career where I have utilized the services of LAPD's Mental Evaluation Unit on hundreds of incidents to effectively resolve situations involving mentally ill subjects.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### <u>Opinion Number 3</u>

It is my opinion based on my review of the facts, video and testimony in this matter, Wilson Police Department Captain Joshua Taylor violated <u>Wilson Police Department, Chief of Police, Body Camera Policy and Procedure,</u> (<u>WILSON 0199-202</u>).
when failed to immediately activate his Body Worn Camera (<u>BWC</u>) upon contacting Mr. Jared Lakey.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

## BODY CAMERA POLICY AND PROCEDURE

**II.  POLICY:**

It is the policy of this department that officers shall activate the BWC when such use is appropriate to the proper performance of his or her official duties, where the recordings are consistent with this policy and law.

**III.  PROCEDURES:**

A.  Administration:

This agency has adopted the use of the BWC to accomplish several objectives.  The primary objectives are as follows:

1.  BWC's allow for accurate documentation of police-public contacts, arrests, and critical incidents.  They also serve to enhance the accuracy of officer reports and testimony in court.

2.  Audio and video recordings also enhance this agency's ability to review probable cause for arrest, officer and suspect interaction, and evidence for investigative and prosecutorial purposes and to provide additional information for officer evaluation and training.

3. The BWC may also be useful in documenting crime and accident scenes or other events that include the confiscation and documentation of evidence or contraband.

B.  When and How to Use the BWC:

1.  Officers shall activate the BWC to record all contacts with citizens in the performance of official duties.

3.  If an officer fails to activate the BWC, fails to record the entire contact, or interrupts the recording, the officer shall document why a recording was not made, was interrupted, or was terminated.

In addition, the Code of Ethics of any profession details the standard of conduct that identifies specific principles of desired behavior required of its practitioners.  The profession of policy requires its members to adhere to specific standards in order to

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

maintain the trust and respect of those who are served.  Adherence to a Code of Ethics is required to build and maintain morale, a sense of duty, effective standards of performance and community support.  Peace Officers are held to higher standards then others in the community.  Although policing shares ideals with other professions, only peace officers are given the authority and power to detain and arrest others and to deprive them of their liberty while awaiting adjudication of their offense.  It is essential that officers understand the importance of professional behavior.

To embody the spirit of professionalism, ethical conduct must be a way for those in policing.  To maintain the community's trust, peace officers must maintain consistently high- standards of ethical conduct.  Officers must model and live as examples of the behavior that they are charged to enforce.  The policing community is only strong as its weakest link.  Unethical conduct affects the image and morale of the entire profession, and it offends officers and society throughout the country.

In addition, I base my opinion on the following video, facts, and testimony:

- According to Wilson Police Department Chief Kevin Coley, he admits that Captain Joshua Taylor's BWC did not come on until late, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 595).
- According to Captain Joshua Taylor, he did not think of his BWC, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 670).
- In addition, based on my review of the facts in this matter, Captain Joshua Taylor was never disciplined and or retrained in Wilson Police Department, Chief of Police, Body Camera Policy and Procedure for his failure to initially activate his BWC.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 4

It is my opinion based on my review of the facts, video and testimony in this matter, Wilson Police Department Captain Joshua Taylor failed to properly de-escalate and defuse the situation by handcuffing Mr. Jared Lakey.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

The principal reason for handcuffing an arrestee is to maintain control of the individual and to minimize the possibility of a situation escalating to a point that would necessitate using higher level of force or restraint.  In addition, once a subject is handcuffed and properly monitored, the subject typically poses a "minimal threat" to themselves, the involved Police Officers, or the public.

Restraint Devices are used to minimize:

- Attack on a Police Officer or others.
- Escape of the subject.
- Destruction or concealment of evidence or contraband.
- Self-inflicted injury by the subject.

Handcuffs should be placed behind the subject's back whenever possible to enhance the peace officers control of the prisoner/subject.  Correct placement of handcuffs on the prisoner's wrists is essential for preventing injury or escape.

Additional guidelines for positioning handcuffs include the following:

- Handcuffs should be applied on the subject's bare wrist between the handcuff and the protruding ulnar bone.
- The shape of the handcuff should correspond with the shape of the subject's wrist.
- Handcuffs should be properly adjusted.  Too tight may cause reduced circulation or nerve damage.  Too loose could allow the subject to escape.
- Handcuffs should not be applied over the top of the clothing or jewelry.
- Handcuffs should be double locked when tactically safe.

In addition, I base my opinion on the following video, facts, and testimony:

- According to Captain David Duggan, he admits that at some points on the video, Mr. Jared Lakey looks like he was trying to put his hands behind his back, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 379)
- According to Witness Mark Cole, he believes that there was an opportunity when Mr. Jared Lakey was face down that he could have been put in handcuffs, (Deposition Transcript of Mark Cole, Page 119).
- According to Witness Mark Cole, he would have approached Mr. Jared Lakey from the back and put handcuffs on him, (Deposition Transcript of Mark Cole, Page 131).

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 5**

It is my opinion a reasonable Police Officer would have given Mr. Jared Lakey a verbal warning and a reasonable opportunity to comply prior to deploying his Taser X26P, Electronic Controlled Device (<u>ECD</u>).

It is my opinion based on my review of the facts, BWC videos and testimony in this matter, Wilson Police Department Captain Joshua Taylor failed to give/issue Mr. Jared Lakey a verbal warning and a reasonable opportunity to comply prior to deploying his Taser X26P, Electronic Controlled Device (<u>ECD</u>).

A verbal warning of the intended use of the TASER device should precede its application unless it would otherwise endanger the safety of Police Officers or when it is not practicable due to the circumstance.  <u>The purpose of the warning it to:</u>
(<u>a</u>).  Provide the individual with a reasonable opportunity to voluntarily comply.
(<u>b</u>).  Provide other Police Officers/Deputies and individuals with a warning that the TASER device may be deployed.

If, after a verbal warning, an individual is unwilling to voluntarily comply with a deputy's lawful orders and it appears both reasonable and feasible under the circumstances, the deputy may, but is not required to, display the electrical arc (<u>provided that a cartridge has not been loaded into the device</u>), or the laser in a further attempt to gain compliance prior to the application of the TASER device.

The fact that a verbal or other warning was given or the reasons it was not given shall be documented by the deputy deploying the TASER device in the related.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 6**

It is my opinion based on my review of the facts, video and testimony in this matter, Wilson Police Department Police Officer Brandon Dingman failed to properly de-escalate and defuse the situation by handcuffing Mr. Jared Lakey.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

The principal reason for handcuffing an arrestee is to maintain control of the individual and to minimize the possibility of a situation escalating to a point that would necessitate using higher level of force or restraint.  In addition, once a subject is handcuffed and properly monitored, the subject typically poses a "minimal threat" to themselves, the involved Police Officers, or the public.

Restraint Devices are used to minimize:

- Attack on a Police Officer or others.
- Escape of the subject.
- Destruction or concealment of evidence or contraband.
- Self-inflicted injury by the subject.

Handcuffs should be placed behind the subject's back whenever possible to enhance the peace officers control of the prisoner/subject.  Correct placement of handcuffs on the prisoner's wrists is essential for preventing injury or escape.

Additional guidelines for positioning handcuffs include the following:

- Handcuffs should be applied on the subject's bare wrist between the handcuff and the protruding ulnar bone.
- The shape of the handcuff should correspond with the shape of the subject's wrist.
- Handcuffs should be properly adjusted.  Too tight may cause reduced circulation or nerve damage.  Too loose could allow the subject to escape.
- Handcuffs should not be applied over the top of the clothing or jewelry.
- Handcuffs should be double locked when tactically safe.

In addition, I base my opinion on the following video, facts, and testimony:

- According to Captain David Duggan, he admits that at some points on the video, Mr. Jared Lakey looks like he was trying to put his hands behind his back, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 379).
- According to Witness Mark Cole, he believes that there was an opportunity when Mr. Jared Lakey was face down that he could have been put in handcuffs, (Deposition Transcript of Mark Cole, Page 119).
- According to Witness Mark Cole, he would have approached Mr. Jared Lakey from the back and out handcuffs on him, (Deposition Transcript of Mark Cole, Page 131).

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 7

It is my opinion based on my review of the facts, video and testimony in this matter, Wilson Police Department Captain Joshua Taylor and Wilson Police Department Police Officer Brandon Dingman failed to formulate a tactical plan as soon as Police Officer Brandon Dingman arrived at scene.

Law Enforcement Officers are trained to work together and function as a team.  In order to ensure officer safety and to ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another.  Appropriate communication involves advising the primary officer of any critical occurrences or safety issues as well as the following:

**Plan of Action:**
- Officers should discuss safety factors as well as possible plans for taking actions.
- Plans may include coordination of who will transmit radio traffic.
- Appropriate use of escalation of force.

**Poor or No Planning:**
- Rushing into the situation without any plan of action.
- Failure to establish plan of action prior to engaging the suspect.
- Not considering alternative actions.

**Inappropriate Attitude:**
- Careless or complacent.
- Overconfident.
- Too aggressive.

Officers must approach every contact with officer safety and public safety in mind. Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack.

The tactical plan that should have outlined verbal skills (defusing and de-escalation techniques) and Less Lethal Force options such as: empty hands, physical strength, and compliance techniques, soft or hard hand techniques, the X-26P Electronic Control Device (ECD) Taser with an effective range of 7-15 feet and a maximum range 21-25

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

feet, ASP/ baton, Oleoresin Capsicum "OC" spray with an effective range of 3-12 feet or the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round. The Drag Stabilized 12-Gauge Round is a translucent 12 Gauge shell loaded with a 40-Gram tear shaped bag made from a cotton and ballistic material blend and filled with #9 shot. The design utilizes four stabilizing tails and smokeless powder as the propellant. The round has a velocity of 270 feet per second (FPS) with a maximum effective range of 75 feet.

The Taser is an Electronic Controlled Device (ECD) as defined by the manufacturer, Axon. It is a handheld, battery operated tool which uses controlled electrical current designed to disrupt a person's sensory and motor nervous system by means of deploying electrical energy sufficient to cause temporary uncontrolled muscle contractions, or Neuro Muscular Incapacitation, ("NMI"). As a result, the electrical energy can override the person's voluntary motor responses for a brief duration. The use of Taser ECD deployment resulting in NMI may provide a brief opportunity during which physical restraint procedures can be initiated whenever practical.

De-Escalation Techniques:

- Tactics used to slow pace of the encounter.
- Use of distance and barriers.
- Verbal de-escalation and subject response.
- Use of tools and other equipment.

In addition, it is my opinion Wilson Police Department Captain Joshua Taylor and Wilson Police Department Police Officer Brandon Dingman failed to designate Contact and Cover Officers. The designation of Contact and Cover Officers is critically important especially when the subject of a call is mentally ill and or experiencing a mental crisis to ensure that multiple Police Officers are issuing commands to the subject simultaneously or that may be conflicting which may ultimately confuse the subject and escalate the situation.

**The Contact Officer is responsible for**:

- Initiating action.
- Establishing dialogue.
- Issuing verbal commands and or warnings.

**Conducting the essential business required, such as, but not limited to:**

- Alerting cover officer that a weapon or contraband is located on the suspect.
- Conducting thorough systematic searches.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

- Maintaining control of the suspect.
- Recovering evidence.
- Recording necessary suspect or incident information.
- Handling radio communication.
- Communicating with the cover officer, as appropriate, regarding force options selection (i.e., Less Lethal).

**The Cover Officer is responsible for**:
- Protecting the contact officer.
- Alerting the contact officer that a weapon or contraband is located on the suspect.
- Maintaining constant observation of the overall situation; being aware of possible dangers and potential interferences.
- Providing a command presence to discourage hostile acts, assaults, or escapes by the suspect.
- Securing any weapons or contraband; this allows the contact officer to continue searches.
- Preventing the destruction of evidence.
- Intervening with appropriate force to protect the contact officer if the suspect reacts violently.
- Communicating with the contact officer, as appropriate, regarding force option selection (i.e., Less Lethal).

In addition, I base my opinion on the following facts and testimony in this matter:

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 8

It is my opinion a reasonable Police Officer would not have deployed his Taser X26P, Electronic Control Device (ECD) at any time in this matter as Mr. Jared Lakey's behavior never rose to the level of resisting, assaultive, or life-threatening at any time during this incident.

It is my opinion Wilson Police Department Captain Joshua Taylor used inappropriate and unreasonable deadly force when he deployed his Taser X26 P Electric Controlled Device (ECD), **30 times for 122 seconds** causing/contributing to the death of Mr. Jared Lakey.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

The Taser is an Electronic Controlled Device (ECD) as defined by the manufacturer, Axon.  It is a handheld, battery operated tool which uses controlled electrical current designed to disrupt a person's sensory and motor nervous system by means of deploying electrical energy sufficient to cause temporary uncontrolled muscle contractions, or Neuro Muscular Incapacitation, ("NMI").  As a result, the electrical energy can override the person's voluntary motor responses for a brief duration.  The use of Taser (ECD) deployment resulting in NMI may provide a brief opportunity during which physical restraint procedures (Handcuff Under Power) can be initiated whenever practical.

Law enforcement officers receive training at the beginning and throughout their careers on significant case law such as Graham v. Connor, United States Supreme Court (490 U.S. 386, 1989), not for the purpose of providing legal opinion(s) but for understanding what constitutional standards govern a citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other seizure of his person.

The Fourth Amendment "reasonableness" inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

The test of reasonableness is not capable of precise definition or mechanical application. Its proper application requires careful attention to the facts and circumstances of each particular case, including:

1. The severity of the crime at issue.
2. Whether the suspect poses an immediate threat to the safety of the officers or others.
3. Whether he is actively resisting arrest or attempting to evade arrest by flight.

The question is whether the "totality of the circumstances" justifies a particular use of force applied in the situation.  The most important factor is No. 2, whether the suspect poses an immediate threat to the safety of the officers or others.

The officer's actual intent is irrelevant as to whether the force was excessive.  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

Law Enforcement Officers are instructed during initial Taser Certification as well as during annual Taser Re-Certification not to exceed three deployments/activations (maximum of 15 seconds) on a subject.  If the Taser is not effective after the third deployment/activation, Law Enforcement Officers are taught to transition to another Less Lethal Force option.

In addition, Law Enforcement Officers are instructed during initial Taser Certification as well as during annual Taser Re-Certification to never deploy a Taser simultaneously with another Law Enforcement Officer.

The TASER device may be used in any of the following circumstances, when the circumstances perceived by the deputy that indicate that such application is reasonably necessary to control a person:
(a).  The subject is violent or is physically resisting.
(b).  The subject has demonstrated, by words or action, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm deputies, himself/herself to others.

Mere flight from a pursuing a Law Enforcement Officer, without other known circumstances or factors, is not good cause for the use of the TASER device to apprehend the individual.

In addition, the use of a Taser involves the application of force and each use of force on a person must be objectively reasonable.  Each Taser application involves an additional use of force.  Multiple Taser applications cannot be justified solely on the grounds that a suspect fails to comply with a command.  Any decision to apply multiple Taser applications must take into consideration whether a suspect is capable of complying with officers' commands.  It is my opinion; Mr. Jared Lakey was not provided a reasonable opportunity to comply with commands and or was unable to comply with commands.

In addition, Law Enforcement Officers must justify/document every Taser trigger pull (5 second) and articulate the subject's threat and behavior at the time of the initial Taser activation and any additional Taser activations.  Law Enforcement Officers are taught or should be taught to avoid multiple, repeated, prolonged, or continuous Taser exposures unless necessary to counter a reasonably perceived threat, which does not apply to the facts in this matter.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

In addition, it is my opinion Wilson Police Department Captain Joshua Taylor violated <u>Wilson Police Department, Policy and Procedures</u>, <u>Use of Force</u>, <u>5/1/2014</u>, (<u>WILSON 0191-198</u>):

### III.  **Policy** (**OPS.01.01**):

**E.**  An officer may use deadly force only when the officer reasonably believes that the action is in defense of human life, including the officers own life, or in the defense of any person in immediate danger of serious physical injury.  (<u>Does not apply to the facts in this matter</u>).

In addition, it is my opinion a reasonable officer acting <u>would not</u> have used lethal force in this situation for the following reasons:

- Highest level of force a Police Officer can use.
- This was not an immediate Defense of Life situation.
- Must be a last resort before using lethal force.
- Must be the direst of circumstances.
- Deadly force is likely to cause great bodily injury or death.
- Must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- Warnings when feasible that deadly force will be used.
- Subjective Fear is insufficient.
- Over reaction is excessive force.

In addition, I base my opinion on <u>Board of Medicolegal Investigations, Office of the Chief Medical Examiner</u>, Jared Wayne Lakey, <u>Report of Investigation by Medical Examiner</u>, <u>ME Case No. 1903283</u>:

<u>Possible Cause of Death</u>: Complications of Myocardial Infarction (<u>Clinical</u>) in the setting of Cardiomegaly and Critical Coronary Atherosclerosis ***and Law Enforcement Use of Electrical Weapon and Restraint.***

### <u>Considerations Regarding the Use of Deadly Force</u>

The use of force that can prove lethal is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by ***the reverence for human life***

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

and, used only when other means of control are unreasonable or have been exhausted. Reverence for life is the foundation on which the decision to use force rests. Deadly force, including the use of techniques that can kill, is always the last resort used in the direst of circumstances. The authority to use such force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously. In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained that the use of force must meet an "*Objectively Reasonable"* standard. *"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner."

A great deal of emphasis is placed on tried and proved tactics with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

<u>In addition, I base my opinion on the following facts and testimony in this matter</u>:

- OSBI Investigator Tony Navarro documented in his Affidavit that Mr. Jared Lakey was tased for approximately (<u>4</u>) minutes by Captain Joshua Taylor and Police Officer Brandon Dingman over a 9-minute time period.
- According to Denton County Sheriff's Office Investigator Eric Hamblin, he never heard Mr. Jared Lakey threaten violence to Police Officer Brandon Dingman or Captain Joshua Taylor, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 394</u>)
- According to Denton County Sheriff's Office Investigator Eric Hamblin, when he watched the video, when Mr. Jared Lakey was tased he was not resisting arrest and that would be a violation of Wilson Police Department's Use of Force Policy, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Pages 394-395</u>).
- According to Denton County Sheriff's Office Investigator Eric Hamblin, based on the Taser training that he received, you don't deploy a Taser unless somebody is actively assaulting or threatening to assault somebody, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma,</u>

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

<u>Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 398</u>)

- According to Denton County Sheriff's Office Investigator Eric Hamblin, he believed the use of force was greatly exceeded and excessive and that after (<u>3</u>) cycles of the Taser, if it isn't working, go onto something else, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 398</u>)

- According to Oklahoma City Police Department Master Sergeant and Taser/Axon Master Instructor Kent Cochran, going past (<u>15</u>) seconds is a significant safety point and Taser recommends that you do not Tase the same person with two different Tasers at the same time, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Pages 472 & 477</u>).

- According to Wilson Police Department Chief Kevin Coley, he agrees that Taser training says avoid simultaneous Tasing, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 602</u>).

- According to Wilson Police Department Chief Kevin Coley, they are taught that you should try to minimize the number of times you Tase somebody.  In the disclaimer they recommend avoiding not more than 3 times, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 601</u>).

- According to Captain Joshua Taylor, he does not recall Mr. Jared Lakey taking a swing at him or Police Officer Brandon Dingman, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 664</u>).

- According to Captain Joshua Taylor, he agrees that the training that he received regarding the proper use of the Taser, you should avoid simultaneously avoid Tasing someone, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 681</u>).

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

- According to Captain Joshua Taylor, he believes that every Taser deployment should be justified individually, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 684).
- According to Defense Expert Greg Meyer, Master Taser Instructors are trained to avoid maximum exposure exceeding (15) seconds, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 979).
- According to Axon Enterprise Senior Engineer Brian Chiles, when possible, limit the number of Taser activations to 15 seconds of continuous time, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 792).
- "They lit him up like a Christmas Tree about 50 times, (Audio Recording of David Duggan re: Resignation with DA Ladd, 4:22)
- According to Witness Mark Cole, he never saw Mr. Jared Lakey strike or kick any of the Officers, (Deposition Transcript of Mark Cole, Page 124).
- According to Police Officer Terry Miller, Taser suggests that after 3 times with the Taser and if it is not effective, move onto something else, (Deposition Transcript of Terry Miller, Page 55).
- According to Police Officer Terry Miller, as far as he knew, Mr. Jared Lakey was unarmed and he received no indicators from officers that he had a weapon, (Deposition Transcript of Terry Miller, Page 55).
- According to Brandon Wayne Dunn, he agrees that Tasing someone 53 times constitutes torture, (Deposition Transcript of Brandon Wayne Dunn, Page 112).

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 9

It is my opinion a reasonable Police Officer would have given Mr. Jared Lakey a verbal warning and a reasonable opportunity to comply prior to deploying his Taser X26P, Electronic Controlled Device (ECD).

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

It is my opinion based on my review of the facts, BWC videos and testimony in this matter, Wilson Police Department Police Officer Brandon Dingman failed to give/issue Mr. Jared Lakey a verbal warning and a reasonable opportunity to comply prior to deploying his Taser X26P, Electronic Controlled Device (ECD).

A verbal warning of the intended use of the TASER device should precede its application unless it would otherwise endanger the safety of Police Officers or when it is not practicable due to the circumstance.  The purpose of the warning it to:

(a).  Provide the individual with a reasonable opportunity to voluntarily comply.
(b).  Provide other Police Officers/Deputies and individuals with a warning that the TASER device may be deployed.
If, after a verbal warning, an individual is unwilling to voluntarily comply with a deputy's lawful orders and it appears both reasonable and feasible under the circumstances, the deputy may, but is not required to, display the electrical arc (provided that a cartridge has not been loaded into the device), or the laser in a further attempt to gain compliance prior to the application of the TASER device.

The fact that a verbal or other warning was given or the reasons it was not given shall be documented by the deputy deploying the TASER device in the related.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 10**

It is my opinion a reasonable Police Officer would not have deployed his Taser X26P, Electronic Control Device (ECD) at any time in this matter as Mr. Jared Lakey's behavior never rose to the level of resistive, assaultive, or life-threatening at any time during this incident.

It is my opinion Wilson Police Department Police Officer Brandon Dingman used inappropriate and unreasonable deadly force when he deployed his Taser X26 P Electronic Controlled Device (ECD), **23 times for 114 seconds** causing/contributing to the death of Mr. Jared Lakey.

The Taser is an Electronic Controlled Device (ECD) as defined by the manufacturer, Axon.  It is a handheld, battery operated tool which uses controlled electrical current designed to disrupt a person's sensory and motor nervous system by means of deploying

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

electrical energy sufficient to cause temporary uncontrolled muscle contractions, or Neuro Muscular Incapacitation, ("NMI").  As a result, the electrical energy can override the person's voluntary motor responses for a brief duration.  The use of Taser (ECD) deployment resulting in NMI may provide a brief opportunity during which physical restraint procedures (Handcuff Under Power) can be initiated whenever practical.

Law enforcement officers receive training at the beginning and throughout their careers on significant case law such as Graham v. Connor, United States Supreme Court (490 U.S. 386, 1989), not for the purpose of providing legal opinion(s) but for understanding what constitutional standards govern a citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other seizure of his person.
The Fourth Amendment "reasonableness" inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

The test of reasonableness is not capable of precise definition or mechanical application. Its proper application requires careful attention to the facts and circumstances of each particular case, including:

1.  The severity of the crime at issue.
2.  Whether the suspect poses an immediate threat to the safety of the officers or others.
3.  Whether he is actively resisting arrest or attempting to evade arrest by flight.

The question is whether the "totality of the circumstances" justifies a particular use of force applied in the situation.  The most important factor is No. 2, whether the suspect poses an immediate threat to the safety of the officers or others.

The officer's actual intent is irrelevant as to whether the force was excessive.  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."

Law Enforcement Officers are instructed during initial Taser Certification as well as during annual Taser Re-Certification not to exceed three deployments/activations (maximum of 15 seconds) on a subject.  If the Taser is not effective after the third deployment/activation, Law Enforcement Officers are taught to transition to another Less Lethal Force option.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

In addition, Law Enforcement Officers are instructed during initial Taser Certification as well as during annual Taser Re-Certification to never deploy a Taser simultaneously with another Law Enforcement Officer.

The TASER device may be used in any of the following circumstances, when the circumstances perceived by the deputy at the indicate that such application is reasonably necessary to control a person:
(a).  The subject is violent or is physically resisting.
(b).  The subject has demonstrated, by words or action, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm deputies, himself/herself to others.
Mere flight from a pursuing a Law Enforcement Officer, without other known circumstances or factors, is not good cause for the use of the TASER device to apprehend the individual.

In addition, the use of a Taser involves the application of force and each use of force on a person must be objectively reasonable.  Each Taser application involves an additional use of force.  Multiple Taser applications cannot be justified solely on the grounds that a suspect fails to comply with a command.  Any decision to apply multiple Taser applications must take into consideration whether a suspect is capable of complying with officers' commands.  It is my opinion; Mr. Jared Lakey was not provided a reasonable opportunity to comply with commands and or was unable to comply with commands.
In addition, Law Enforcement Officers must justify/document every Taser trigger pull (5 second) and articulate the subject's threat and behavior at the time of the initial Taser activation and any additional Taser activations.  Law Enforcement Officers are taught or should be taught to avoid multiple, repeated, prolonged, or continuous Taser exposures unless necessary to counter a reasonably perceived threat, which does not apply to the facts in this matter.

In addition, it is my opinion Wilson Police Department Police Officer Brandon Dingman Taylor violated Wilson Police Department, Policy and Procedures, Use of Force, 5/1/2014, (WILSON 0191-198):

## III.  Policy (OPS.01.01):

E.  An officer may use deadly force only when the officer reasonably believes that the action is in defense of human life, including the officers own life, or in the defense of any

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

person in immediate danger of serious physical injury.  (Does not apply to the facts in this matter).

In addition, it is my opinion a reasonable Police Officer would not have used lethal force in this situation for the following reasons:

- Highest level of force a Police Officer can use.
- This was not an immediate Defense of Life situation.
- Must be a last resort before using lethal force.
- Must be the direst of circumstances.
- Deadly force is likely to cause great bodily injury or death.
- Must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- Warnings when feasible that deadly force will be used.
- Subjective Fear is insufficient.
- Over reaction is excessive force.

In addition, I base my opinion on Board of Medicolegal Investigations, Office of the Chief Medical Examiner, Jared Wayne Lakey, Report of Investigation by Medical Examiner, ME Case No. 1903283:

Possible Cause of Death: Complications of Myocardial Infarction (Clinical) in the setting of Cardiomegaly and Critical Coronary Atherosclerosis **and Law Enforcement Use of Electrical Weapon and Restraint.**

**Considerations Regarding the Use of Deadly Force**

The use of force that can prove lethal is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by **the reverence for human life** and, used only when other means of control are unreasonable or have been exhausted. Reverence for life is the foundation on which the decision to use force rests.  Deadly force, including the use of techniques that can kill, is always the last resort used in the direst of circumstances.  The authority to use such force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

Officers are trained that the use of force must meet an "*Objectively Reasonable*" standard. *"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner."

A great deal of emphasis is placed on tried and proved tactics with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

In addition, I base my opinion on the following facts and testimony in this matter:

- Based on my review of the documents provided in this matter, Police Officer Brandon Dingman received his Taser certification on 6/11/13 and had not received Taser training for almost (6) years preceding this incident on 7/4/2019.  Axon recommends that Taser recertification training should occur on an annual basis.
- OSBI Investigator Tony Navarro documented in his Affidavit that Mr. Jared Lakey was tased for approximately (4) minutes by Captain Joshua Taylor and Police Officer Brandon Dingman over a 9-minute time period.
- According to Denton County Sheriff's Office Investigator Eric Hamblin, he never heard Mr. Jared Lakey threaten violence to Police Officer Brandon Dingman or Captain Joshua Taylor, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 394)
- According to Denton County Sheriff's Office Investigator Eric Hamblin, when he watched the video, when Mr. Jared Lakey was tased he was not resisting arrest and that would be a violation of Wilson Police Department's Use of Force Policy, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Pages 394-395)
- According to Denton County Sheriff's Office Investigator Eric Hamblin, based on the Taser training that he received, you don't deploy a Taser unless somebody is actively assaulting or threatening to assault somebody, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 398)
- According to Denton County Sheriff's Office Investigator Eric Hamblin, he believed the use of force was greatly exceeded and excessive and that after (3) cycles of the Taser, if it isn't working, go onto something else, (In the District

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 398)

- According to Oklahoma City Police Department Master Sergeant and Taser/Axon Master Instructor Kent Cochran, going past (15) seconds is a significant safety point and Taser recommends that you do not Tase the same person with two different Tasers at the same time, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Pages 472 & 477).
- According to Wilson Police Department Chief Kevin Coley, he agrees that Taser training says avoid simultaneous Tasing, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 602).
- According to Wilson Police Department Chief Kevin Coley, they are taught that you should try to minimize the number of times you Tase somebody.  In the disclaimer they recommend avoiding not more than 3 times, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 601).
- According to Captain Joshua Taylor, he does not recall Mr. Jared Lakey taking a swing at him or Police Officer Brandon Dingman, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 664).
- According to Captain Joshua Taylor, he agrees that the training that he received regarding the proper use of the Taser, you should avoid simultaneously avoid Tasing someone, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 681).
- According to Captain Joshua Taylor, he believes that every Taser deployment should be justified individually, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 684).

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

- According to Axon Enterprise Senior Engineer, when possible, limit the number of Taser activations to 15 seconds of continuous time, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 792).

- According to Defense Expert Greg Meyer, Master Taser Instructors are trained to avoid maximum exposure exceeding (15) seconds, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 979).

- According to Police Officer Terry Miller, Taser suggests that after 3 times with the Taser and if it is not effective, move onto something else, (Deposition Transcript of Terry Miller, Page 55).

- According to Police Officer Terry Miller, as far as he knew, Mr. Jared Lakey was unarmed and he received no indicators from officers that he had a weapon, (Deposition Transcript of Terry Miller, Page 55).

- According to Brandon Wayne Dunn, he agrees that Tasing someone 53 times constitutes torture, (Deposition Transcript of Brandon Wayne Dunn, Page 112).

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 11

It is my opinion based on my review of the facts, video and testimony in this matter, Carter County Sheriff's Office Captain David Duggan failed to properly de-escalate and defuse the situation by handcuffing Mr. Jared Lakey.

The principal reason for handcuffing an arrestee is to maintain control of the individual and to minimize the possibility of a situation escalating to a point that would necessitate using higher level of force or restraint.  In addition, once a subject is handcuffed and properly monitored, the subject typically poses a "minimal threat" to themselves, the involved Police Officers, or the public.

Restraint Devices are used to minimize:

- Attack on a Police Officer or others.
- Escape of the subject.
- Destruction or concealment of evidence or contraband.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

- Self-inflicted injury by the subject.

Handcuffs should be placed behind the subject's back whenever possible to enhance the peace officers control of the prisoner/subject.  Correct placement of handcuffs on the prisoner's wrists is essential for preventing injury or escape.

Additional guidelines for positioning handcuffs include the following:

- Handcuffs should be applied on the subject's bare wrist between the handcuff and the protruding ulnar bone.
- The shape of the handcuff should correspond with the shape of the subjects' wrist.
- Handcuffs should be properly adjusted.  Too tight may cause reduced circulation or nerve damage.  Too loose could allow the subject to escape.
- Handcuffs should not be applied over the top of the clothing or jewelry.
- Handcuffs should be double locked when tactically safe.

In addition, I base my opinion on Carter County Sheriff's Office, Use of Firearms and Force, Effective Date 04-01-2018, (001212-1214):

**III.  Use of Handcuffs:**

**a.**  When Deputies arrest and transport a person, the person will be restrained by using handcuffs.

In addition, I base my opinion on the following video, facts, and testimony:

- According to Captain David Duggan, he admits that at some points on the video, Mr. Jared Lakey looks like he was trying to put his hands behind his back, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 379).
- According to Witness Mark Cole, he believes that there was an opportunity when Mr. Jared Lakey was face down that he could have been put in handcuffs, (Deposition Transcript of Mark Cole, Page 119).
- According to Witness Mark Cole, he would have approached Mr. Jared Lakey from the back and out handcuffs on him, (Deposition Transcript of Mark Cole, Page 131).

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

### Opinion Number 12

It is my opinion a reasonable Deputy Sheriff would not have utilized a Carotid Neck Restraint as Mr. Jared Lakey's behavior <u>never</u> rose to the level of resisting, assaultive, or life-threatening at any time during this incident.

It is my opinion based on my review of the videos, testimony and facts in this matter, Carter County Sheriff's Office Captain David Duggan used <u>inappropriate and unreasonable deadly force</u> when he applied a Carotid Neck Restraint to Mr. Jared Lakey for approximately (<u>46 seconds</u>).

In addition, Carter County Sheriff's Office Captain David Duggan used a use of force option that is not authorized by the Carter County Sheriff's Office.  In addition, based on my review of the facts in this matter, the last time that Captain Duggan received training in this perishable skill was (<u>6</u>) years prior in 2013.

In addition, Deputy Sheriffs are taught or should be taught not to apply the Carotid Neck Restraint for more than an estimated <u>30 seconds</u> (<u>count aloud, or in your head once bilateral pressure begins</u>).  Studies have shown that a properly applied vascular neck restraint takes an average of <u>7-10 seconds</u>.  If after <u>30 seconds</u> the hold has no effect, reassess your application (<u>subject's chin could be preventing proper application), you may not be delivering bilateral pressure (reduce blood flow on only one side of the neck most likely will not produce unconsciousness</u>), or perhaps the hold is just not effective on this individual (<u>not every technique works on every person</u>).  Transition to another appropriate force option.

<u>In addition, I base my opinion on Carter County Sheriff's Office, Use of Firearms and Force, Effective Date 04-01-2018, (001212-1214)</u>:

I.  <u>Use of Force</u>:
**b.**  Deputies shall not use more force than is reasonably necessary under the circumstances.  Deputies shall use only that force against persons who <u>resist lawful arrest</u> as is necessary to overcome resistance.  (<u>At the time that Captain David Duggan applied the Carotid Neck Restraint, Mr. Jared Lackey was not resisting arrest and his level of resistance was not assaultive and or life threatening</u>).

Law enforcement officers receive training at the beginning and throughout their careers on significant case law such as <u>Graham v. Connor</u>, United States Supreme Court (<u>490 U.S. 386, 1989</u>), not for the purpose of providing legal opinion(<u>s</u>) but for understanding what constitutional standards govern a citizen's claim that law enforcement officials used

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

excessive force in the course of making an arrest, investigatory stop, or other seizure of his person.

The Fourth Amendment "reasonableness" inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

The test of reasonableness is not capable of precise definition or mechanical application. Its proper application requires careful attention to the facts and circumstances of each particular case, including:
1. The severity of the crime at issue.
2. Whether the suspect poses an immediate threat to the safety of the officers or others.
3. Whether he is actively resisting arrest or attempting to evade arrest by flight.

The question is whether the "totality of the circumstances" justifies a particular use of force applied in the situation. The most important factor is No. 2, whether the suspect poses an immediate threat to the safety of the officers or others.

The officer's actual intent is irrelevant as to whether the force was excessive. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."

In addition, it is my opinion a reasonable Deputy Sheriff would not have used lethal force in this situation for the following reasons:

- Highest level of force a Police Officer can use.
- This was not an immediate Defense of Life situation.
- Must be a last resort before using lethal force.
- Must be the direst of circumstances.
- Deadly force is likely to cause great bodily injury or death.
- Must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- Warnings when feasible that deadly force will be used.
- Subjective Fear is insufficient.
- Over reaction is excessive force.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

In addition, I base my opinion on <u>Board of Medicolegal Investigations, Office of the Chief Medical Examiner</u>, Jared Wayne Lakey, <u>Report of Investigation by Medical Examiner</u>, <u>ME Case No. 1903283</u>:

<u>Possible Cause of Death</u>: Complications of Myocardial Infarction (Clinical) in the setting of Cardiomegaly and Critical Coronary Atherosclerosis ***and Law Enforcement Use of Electrical Weapon and Restraint.***

### **Considerations Regarding the Use of Deadly Force**

The use of force that can prove lethal is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by ***the reverence for human life*** and, used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation on which the decision to use force rests.  Deadly force, including the use of techniques that can kill, is always the last resort used in the direst of circumstances.  The authority to use such force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained that the use of force must meet an "*Objectively Reasonable"* standard.  *"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner."

A great deal of emphasis is placed on tried and proved tactics with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

<u>In addition, I base my opinion on the following facts and testimony in this matter</u>:

- According to Dr. Eric Pfeifer, he agreed that Mr. Jared Lakey did not have labored breathing until after the neck restraint, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 348</u>)
- According to Captain David Duggan, when he applied the neck restraint, Mr. Jared Lakey was not resisting, (<u>In the District Court of Carter County, State of</u>

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 370).

- According to Captain David Duggan District Attorney Craig Ladd advised him that he would not be charged criminally if he resigned, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 376).

- According to Wilson Police Department Chief Kevin Coley, when Captain David Duggan put his hand on the back of Mr. Jared Lakey's neck pushing his head down is not something taught at CLEET, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Pages 608-609).

- According to Wilson Police Department Chief Kevin Coley, when Captain David Duggan had Mr. Jared Lakey in a neck restraint, he did not hear Police Officer Brandon Dingman or Captain Joshua Taylor say, "Don't do that," (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 614).

- According to Police Officer Terry Miller, he does not recall if commands were given to Mr. Jared Lakey before the neck restraint was applied by Captain Duggan, (Deposition Transcript of Terry Miller, Page 84).

- According to Police Officer Terry Miller, as far as he knew, Mr. Jared Lakey was unarmed and he received no indicators from officers that he had a weapon, (Deposition Transcript of Terry Miller, Page 55).

- According to Police Officer Terry Miller, he agrees that at 14 minutes and 13 seconds of the Dingman Combined Video, he agrees that there were no commands given before Captain Duggan applied the neck restraint, (Deposition Transcript of Terry Miller, Page 114).

- According to Police Officer Terry Miller, after the neck restraint was applied at 15 minutes and 15 seconds of the Dingman Combined Video, he agrees that he sees someone pushing Mr. Jared Lakey's head down until 15 minutes and 24 seconds of the Dingman Combined Video, (Deposition Transcript of Terry Miller, Pages 120-121).

- According to Brandon Wayne Dunn, he agreed that when Captain Duggan put Mr. Jared Lakey in a neck restraint, Mr. Jared Lakey was not resisting and no

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

commands were given to Mr. Jared Lakey before he applied the neck restraint, (Deposition Transcript of Brandon Wayne Dunn, Page 89).

- According to Carter County Sheriff's Office Narcotics Investigator Sterling Tucker, it did not appear that Mr. Jared Lakey was resisting when he applied the neck restraint, (Deposition Transcript of Sterling Tucker, Pages 71-72).
- According to Carter County Sheriff's Office Undersheriff Tommy (Gus) Handke, the Carter County Sheriff's Office is not in the practice of using the Lateral Vascular Neck Restraint (LVNR), (Deposition Transcript of Tommy (Gus) Handke, Page 67).
- According to Carter County Sheriff's Office Undersheriff Tommy (Gus) Handke, he would not have used the LVNR during the incident with Mr. Jared Lakey, (Deposition Transcript of Tommy (Gus) Handke, Pages 79-80).
- According to David Ryan Duggan, he admits that Mr. Jared Lakey was not fighting him, and he did not see Mr. Jared Lakey fighting anyone else at the time that he used the neck restraint, (Deposition Transcript of David Ryan Duggan, Page 63).
- According to David Ryan Duggan, he agrees that when you give commands to a person, you must give them a chance to comply with those commands, (Deposition Transcript of David Ryan Duggan, Page 63).
- According to David Ryan Duggan, he agrees that DA Craig Ladd could have told him that the neck restraint could have contributed to the death of Mr. Jared Lakey, (Deposition Transcript of David Ryan Duggan, Page 65).
- According to David Ryan Duggan, he agrees that Mr. Jared Lakey did not resist him, (Deposition Transcript of David Ryan Duggan, Page 69).
- According to David Ryan Duggan, he admits that he has not used a neck restraint prior to the Mr. Jared Lakey incident for approximately seven years, (Deposition Transcript of David Ryan Duggan, Pages 180-181).

In addition, I base my opinion on the following: over thirty years of martial arts, self-defense, and defensive tactics training, receiving, and providing training on the Carotid Neck Restraint during my employment with the Los Angeles Police Department.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

## <u>Opinion Number 13</u>

It is my opinion the Defendants in this matter to include Wilson Police Department Captain Joshua Taylor and Police Officer Brandon Dingman, Carter County Sheriff's Office Captain David Duggan, and Lone Grove Police Department Police Officer Terry Miller, were indifferent to Mr. Jared Lakey's medical situation and that he was in medical distress and having a difficulty breathing. I base my decision on my review of the facts and testimony as well as my review of the video/audio recordings in this matter where it can be <u>clearly</u> heard that Mr. Jared Lakey was wheezing, grunting, and having difficulty breathing.

In addition, it is my opinion the Defendants failed to determine Mr. Jared Lakey's physical condition and apply medical care.

<u>This should be done by</u>:

- Checking the subject's pulse (<u>other than the carotid</u>).
- Monitor the subject's breathing.
- Obtaining a coherent response form the subject.
- Being prepared to establish an airway and administer CPR.
- Summon Emergency Medical Services.

It is my opinion based on my training and experience that Agonal Respirations or what is commonly referred to as Agonal Breathing looks or sounds like: snoring, heavy breathing; labored or exaggerated breathing; gurgling; guttural sounds; groaning; snorting; and or gasping. Agonal Respirations are often heard by those people who are near a person prior to death.

Whenever practicable, Law members should take appropriate steps to provide initial medical aid, (<u>e.g., First Aid, CPR, use of an Automated External Defibrillator</u> (<u>AED</u>)), in accordance with their training and current certification levels.

In addition, based on an initial assessment, Law Enforcement Officers may need to provide basic care for victim(<u>s</u>). Such care may include providing basic emergency medical care until relieved by other personnel with equal or higher levels of training.

If the victim is unable to speak or is not responsive, then appropriate steps should be taken to assess the victim's:

- Airway
- Breathing

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

- Circulation

I.  The responding peace officer should determine if the victim is breathing:

If the victim is not breathing with a pulse:

- Begin rescue breathing.

If the victim is not breathing with no pulse:

- Begin CPR.

If the victim is breathing:

- Complete primary assessment.

If the victim has a pulse, is breathing, but unconscious:

- Check for indications of life-threatening conditions, (e.g., major bleeding, shock, etc.).
- Place the victim in a **recovery position** (**on the side with the head supported by the lower forearm**), if appropriate to aid breathing and allow fluids or vomit to drain from the mouth.

In addition, I base my opinion on the following facts and testimony in this matter:

- Based on my review of the Combined Video, (50:27), from the time that Police Office Brandon Dingman said, "he's out again," (18:44), until the time that CPR was initiated (23:05), was 4 minutes and 21 seconds.
- According to Police Officer Terry Miller, after the neck restraint was applied at 15 minutes and 15 seconds of the Dingman Combined Video, he agrees that he sees someone pushing Mr. Jared Lakey's head down until 15 minutes and 24 seconds of the Dingman Combined Video, (Deposition Transcript of Terry Miller, Pages 120-121).
- According to Police Officer Terry Miller, he agrees that the grunting that can be heard on the Dingman Combined Video, is coming from Mr. Jared Lakey, (Deposition Transcript of Terry Miller, Page 124).
- According to Police Officer Terry Miller, he agrees that Mr. Jared Lakey was dependent on him and other officers for medical treatment until Emergency Medical Services arrived, (Deposition Transcript of Terry Miller, Page 178).

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

- According to Brandon Wayne Dunn, he noticed that Mr. Jared Lakey's breathing had become shallow, and he was slumped over forward, (<u>Deposition Transcript of Brandon Wayne Dunn, Pages 51-52</u>).
- According to Brandon Wayne Dunn, Mr. Jared Lakey was trying to recover his breath and he was pushed forward, (<u>Deposition Transcript of Brandon Wayne Dunn, Pages 91-92</u>).
- According to Brandon Wayne Dunn, the officers should have been performing CPR for several minutes when Mr. Jared Lakey's was not breathing, (<u>Deposition Transcript of Brandon Wayne Dunn, Pages 51-52</u>).
- According to Brandon Wayne Dunn, he agrees that almost 4 minutes had elapsed since it was announced that Mr. Jared Lakey's was not breathing and officers had not provided him Emergency Medical Services, (<u>Deposition Transcript of Brandon Wayne Dunn, Pages 103-104</u>).
- According to David Ryan Duggan, he was not focused on Mr. Jared Lakey's breathing after he placed him in a neck restraint and did not know if anyone else was, (<u>Deposition Transcript of David Ryan Duggan, Page 112</u>).
- According to David Ryan Duggan, he can hear wheezing on the video, and it does not sound like Mr. Jared Lakey is breathing normally, (<u>Deposition Transcript of David Ryan Duggan, Page 256</u>).
- According to David Ryan Duggan, he can see on the video of the officers forcing Mr. Jared Lakey's head down and admits the position of Mr. Jared Lakey's neck is not appropriate following the use of a neck restraint, (<u>Deposition Transcript of David Ryan Duggan, Page 258</u>).
- According to David Ryan Duggan, he does not know why CPR was not initiated, and it would be the proper thing to do when someone is not breathing, (<u>Deposition Transcript of David Ryan Duggan, Pages 264 & 277</u>).

In addition, <u>I base my opinion on the following</u>: over thirty years of martial arts, self-defense, and defensive tactics training, receiving, and providing training on the Carotid Neck Restraint during my employment with the Los Angeles Police Department.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### <u>Opinion Number 14</u>

It is my opinion that there was a gross lack of situational awareness, failure to de-escalate and defuse the incident and fundamental tactical errors in this incident.  It is also my

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

opinion that there was a departure from Use of Force training to include the Use of a Taser (<u>ECD</u>) and Use of Deadly Force training.

It is my expert opinion that a properly trained Wilson Police Department Police Officer would not have considered Mr. Jared Lakey to be a threat as he never resisted, attempted to assault, or assaulted any of the Law Enforcement Officers at scene during this incident.

In addition, it is my opinion that these significant failures should be addressed by the Wilson Police Department to properly examine its policies and procedures and training to ensure incidents like this do not occur in the future.  In addition, based on my review of the facts and testimony in this matter, Wilson Police Department <u>did not</u> revise existing policies and or formulate new policies as a result of this incident involving Mr. Jared Lakey.

In addition, it is my opinion that prior to this incident involving Mr. Jared Lakey, Wilson Police Department failed to develop a Use of Force Policy that properly guides and directs sworn personnel on the proper use of force options based on the subject's level of resistance and the totality of the circumstances.  In addition, the Wilson Police Department failed to mandate that its sworn personnel only use a Less Lethal Force option or a Lethal Force option that they have received initial and ongoing training in and that is specifically outlined in their Use of Force Policy such as the use of a Taser (<u>ECD</u>). In addition, the Wilson Police Department failed to develop a Use of Force accountability system which documents all use of force training for its sworn personnel to ensure that they receive use of force training in an ongoing and timely manner such as Axon recommended annual Taser recertification training.

It is also my opinion that there was a failure by the Wilson Police Department to properly train the Defendant Officers on <u>following subject matters</u>: Proper Response and Interaction with the Mentally Ill or Individuals Experiencing a Mental Crisis, Working as a Team, Verbal Strategies, Active Listening Skills, Crisis Intervention, Defusing and De-Escalation Techniques, Handcuffing/Restraints, Use of Less Lethal Force (<u>Taser/ECD</u>), Tactical Planning, Designation of Contact and Cover Officers, and the Use of Lethal Force.

In addition, it is my opinion that ratification of the use of deadly force and the Defendants conduct prior to the use of deadly force can be seen as endorsing and perpetuating inadequate training and failure to enforce written polices and established standards.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

<u>In addition, I base my opinion on the following facts and testimony in this matter</u>:

- According to Wilson Police Department Chief Kevin Coley, they did not put Taser warnings on Wilson Police Department's Use of Force Policy, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 614</u>).

- According to Police Officer Brandon Dingman, he was not carrying "OC" spray on the night of the incident, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 721</u>).

- According to Police Officer Brandon Dingman, he was not carrying a baton on the night of the incident, (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 727</u>).

- According to Witness Mark Cole, he sat in his brother-in-law's Tahoe after the incident with Mr. Jared Lackey for 45 minutes and just ended up going home, (<u>Deposition Transcript of Mark Cole, Page 98</u>).

- According to Wilson Police Department Chief Kevin Coley, *after watching the video, he does not believe that Captain Joshua Taylor or Police Officer Brandon Dingman violated the Wilson Police Department Use of Force Policy,* (<u>In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 563</u>).

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 15**

It is my opinion that there was a gross lack of situational awareness, failure to de-escalate and defuse the incident and fundamental tactical errors in this incident.  It is also my opinion that there was a departure from Use of Force training to include the unauthorized use of a Carotid Restraint and Use of Deadly Force training.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

It is my expert opinion that a properly trained Carter County Sheriff's Office Deputy Sheriff would not have considered Mr. Jared Lakey to be a threat as he never resisted, attempted to assault, or assaulted any of the Law Enforcement Officers at scene during this incident.

In addition, it is my opinion that these significant failures should be addressed by the Carter County Sheriff's Office to properly examine its policies and procedures and training to ensure incidents like this do not occur in the future. In addition, based on my review of the facts and testimony in this matter, Carter County Sheriff's Office <u>did not</u> revise existing policies and or formulate new policies as a result of this incident involving Mr. Jared Lakey.

In addition, it is my opinion that prior to this incident involving Mr. Jared Lakey, Carter County Sheriff's Office failed to develop a Use of Force Policy that properly guides and directs sworn personnel on the proper use of force options based on the subject's level of resistance and the totality of the circumstances. In addition, the Carter County Sheriff's Office failed to mandate that its sworn personnel only use a Less Lethal Force option or a Lethal Force option that they have received initial and ongoing training in and that is specifically outlined in their Use of Force Policy such as the use of a Lateral Vascular Neck Restraint/Carotid Neck Restraint prior to the incident involving Mr. Jared Lakey. In addition, the Carter County Sheriff's Office failed to develop a Use of Force accountability system which documents all use of force training for its sworn personnel to ensure that they receive use of force training in an ongoing and timely manner.

It is also my opinion that there was a failure by the Carter County Sheriff's Office Department to properly train Captain David Duggan on <u>following subject matters</u>: Proper Response and Interaction with the Mentally Ill or Individuals Experiencing a Mental Crisis, Working as a Team, Verbal Strategies, Active Listening Skills, Crisis Intervention, Defusing and De-Escalation Techniques, Handcuffing/Restraints, Use of Less Lethal Force/Lethal Use of Force to include Lateral Vascular Neck Restraints/Carotid Neck Restraints, Tactical Planning, Designation of Contact and Cover Officers.

In addition, it is my opinion that ratification of the use of deadly force and the Defendants conduct prior to the use of deadly force can be seen as endorsing and perpetuating inadequate training and failure to enforce written polices and established standards.

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

In addition, I base my opinion on the following facts and testimony in this matter:

- According to Carter County Sheriff's Office Undersheriff Tommy (Gus) Handke, he never determined if Captain Duggan violated policy because he was no longer an employee, (Deposition Transcript of Tommy (Gus) Handke, Page 67).
- According to David Ryan Duggan, he was not disciplined as a result of the incident involving Mr. Jared Lakey, (Deposition Transcript of David Ryan Duggan, Page 43).
- According to David Ryan Duggan, he admits that he has not used a neck restraint prior to the Mr. Jared Lakey incident for approximately seven years, (Deposition Transcript of David Ryan Duggan, Pages 180-181).
- According to Carter County Sheriff's Office Sheriff Chris Bryant, ***he does not know whether he contends Duggan's use of force on Decedent was or was not justified***, (Defendant Chris Bryant In His Official Capacity's Response to Plaintiff's First Set of Interrogatories, Response to Interrogatory No. 2, Case No. CIV-20-152-RAW.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 16**

It is my opinion Defendants in this matter to include Wilson Police Department Captain Joshua Taylor and Police Officer Brandon Dingman, Carter County Sheriff's Office Captain David Duggan, and Lone Grove Police Department Police Officer Terry Miller, failed to take Command and Control of the scene and immediately intervene/intercede and ensure that Mr. Jared Lakey received immediate medical care until the arrival of Emergency Medical Services.

The community expects that its peace officers will use reasonable force, and peace officers will intervene if reasonable force is exceeded.  For the community and officer's protection, the officer must know the laws pertaining to intervention.

This intervention may take the form of one or more of the following actions:
- Strongly caution the other officer.
- Physically restrain the other officer.
- Immediately report the incident.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

**Intervention:** is the act of attempting to prevent or attempting to stop the inappropriate or unlawful behavior of another.

An officer may face both criminal or civil liability and disciplinary action if they fail to intervene and prevent other officers from violating anyone's constitutional rights if they had reason to know and an opportunity to act.

**Necessity for Intervention:**

Intervention is necessary because:

- It is required by law.
- It is morally and ethically correct.
- Personal integrity demands it.
- It enhances officer safety.
- It preserves professionalism and supports the law enforcement mission.
- It strengthens public confidence in the law enforcement profession and the individual agency involved.

It reduces personal and agency liability because it results in fewer:

- Physical injuries arising from unreasonable force.
- Disciplinary actions and personal complaints.
- Criminal complaints filed against officers.
- Civil liability suits, including fewer punitive financial judgments against individual officers.

The United States Constitution protects individuals from unlawful actions of peace officers.

**Factors Affecting Intervention:**

Although peace officers are legally and ethically required to intervene when they observe inappropriate behavior by a fellow officer, personal and psychological reasons may prevent them from intervening.

Peace Officers may fail to act when a fellow officer is behaving inappropriate because of several factors.

**Peace Officers may not intervene because of:**

I.  Transfer of Responsibility: "Somebody else will step in any minute now."

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

II.  Rationalization: "Nobody else is doing anything so maybe I am just misunderstanding the situation, and nothing is really wrong."

III.  Self-Doubt: "What if I'm wrong?  What will everyone think of me if I step in and do something."

**Personal and Psychological Factors:**

**Personal Factors:**

- Unfamiliar with fellow officer.
- Inexperience with proper action to remedy the situation.
- Feeling the intervention is someone else's responsibility.
- Peer pressure.
- Personal problems.
- Fearing consequences, such as being ostracized.
- Fear of reaction from senior officers, field training officers, or supervisors.

**Psychological Factors:**

- Erroneous notion of how peace officers should behave.
- Fear may play a significant part in the behavior of the observing officer.

In addition, I base my opinion on the following facts and testimony:

- According to Police Officer Brandon Dingman, it is possible that a guy the size of Mr. Jared Lakey with his head being pushed forward would have trouble breathing, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 748).
- According to Police Officer Brandon Dingman, he agrees the breathing he heard on the video indicated that Mr. Jared Lakey was in distress, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma, Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 749).
- According to Police Officer Brandon Dingman, he believes that Captain David Duggan should have known to call a doctor after he applied the neck restraint because Captain Duggan was trained in neck restraints, (In the District Court of Carter County, State of Oklahoma 20th Judicial District, In the State of Oklahoma,

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

> Plaintiff vs. Joshua Lee Taylor and Brandon Cole Dingman, Defendants, Case Numbers CF-2020-221 and CF-2020-222, Page 755).

- "He's having trouble breathing and Dingman is putting his hands on the back of his neck," (Audio Recording of David Duggan re: Resignation with DA Ladd, 4:54)

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**My Qualifications for Reviewing this Case:**

My opinions are based on my education, training, and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau. I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds.  I received the Purple Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basic Detective School. Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division. Prior to my assignment, I attended mandated Basic Supervisor School. In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training. The training focused on team building, leadership, and decision making. While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training. I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents. I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance. While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group. I directly supervised (14) Police Officers and Detectives assigned to the Unit. Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division. I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives. As a Unit, we prepared and served numerous search warrants. I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the service. I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section. I investigated personnel complaints that were too large in scope for a geographical Division. At the conclusion of my loan, I was selected to Management Services Division, Special Projects, and Office of the Chief of Police. I completed numerous in-depth staff projects for review by the Chief of Police. In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice. I directly supervised ten undercover officers and four uniformed officers. I provided all facets of training to the officers assigned to Vice at that time to include Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits on Specialized Units in Central and South Bureaus. I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School. While at K9, I investigated and completed K9 contacts, personnel complaints, Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers. I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, X-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing,

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

deployment, de-briefing).  I was the Supervisor-in-Charge of the Crisis Negotiation
Team.  I provided on-going crisis negotiation training, mental health training,
de-briefs, 40-hour POST Certified CNT School, and suicide prevention training.  I
worked in conjunctional with the mental health community to provide and facilitate
training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science
Services Section (BSS), and the Didi Hirsch Suicide Prevention Training.  In addition, I
was assisted the West Point Military Academy with the development of their crisis
negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to
Mumbai India with Counterterrorism following the terrorist attack in November 2008.  I
taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical
Police Officers.  Upon my return, I assisted with the development of multiple
venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service
to pursue an opportunity in the private sector. I held supervisory positions for the last 14
years of my career.  During my tenure with the LAPD, I received over 100
Commendations to include: The Medal of Valor, Purple Heart, and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at
Caruso Affiliated in Los Angeles, CA.  My responsibilities included: Identified and
conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments,
projected developments/investments, and residences.  Utilized strategic-level analysis
from the intelligence community, law enforcement and the private sector.  Ensured a
coordinated ability to identify and monitor potential or actual incidents among critical
infrastructure domains and all personal and professional interests of Caruso Affiliated.
Mitigated expected threats.  Utilized preplanned, coordinated actions in response to
infrastructure warnings or incidents.  Responded to hostilities.  Identified and eliminated
the cause, or source, of an infrastructure event by the utilization of emergency response
measures to include on-site security personnel, local law enforcement, medical and fire
rescue, and relevant investigative agencies.  Conducted all facets of security training for
the company and employees.  Formulated Business Continuity and CEO Succession Plans
for the company and all affiliated business interests.  Conducted ongoing audits and
internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's
Department where I conducted all facets of patrol service to include calls for service, self-

Exhibit 1

DEFENDANT'S EXHIBIT 1

On-Scene Consulting

initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation, and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.


From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.


From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies.  Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation

Exhibit 1

DEFENDANT'S EXHIBIT 1

## On-Scene Consulting

Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule.

_____
Scott A. DeFoe

Exhibit 1

DEFENDANT'S EXHIBIT 1